No. 25-2180

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

RODNEY PIERCE and MOSES MATHEWS,
Plaintiffs-Appellants,
v.
NORTH CAROLINA STATE BOARD OF ELECTIONS, et al.,
Defendants-Appellees.

On Appeal from the United States District Court
for the Eastern District of North Carolina
Hon. James C. Dever III, No. 23-cv-193-D

**PETITION FOR INITIAL, EXPEDITED HEARING EN BANC,
AND TO EXPEDITE CONSIDERATION OF THIS PETITION**

Caroline P. Mackie
N.C. Bar No. 41512
Edwin M. Speas, Jr.
N.C. Bar No. 4112
POYNER SPRUILL LLP
Post Office Box 1801
Raleigh, NC 27602-1801
(919) 783-1108
cmackie@poynerspruill.com
espeas@poynerpsruill.com

Elisabeth S. Theodore
R. Stanton Jones
Orion de Nevers
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
elisabeth.theodore@arnoldporter.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................ii

INTRODUCTION ............................................................................ 1

RELEVANT BACKGROUND ........................................................... 3

    A.    Plaintiffs' VRA Section 2 Claim ............................................ 3

    B.    The Preliminary Injunction Denial and Prior Appeal ........... 3

    C.    The Trial and Final Decision ................................................. 4

    D.    The Upcoming Election Schedule ......................................... 6

ARGUMENT ................................................................................... 6

I.    The District Court's Decision Piles Error On Error And
    Warrants Immediate Correction For The 2026 Elections ............. 6

    A.    The District Court Misconstrued *Gingles* One ..................... 6

    B.    The District Court Misconstrued *Gingles* Three ................. 13

    C.    The District Court Misconstrued the Senate Factors ......... 17

II.    The Court Should Grant Initial En Banc Review ........................ 19

III.    En Banc Proceedings Should Be Expedited To Allow Relief For
    2026 .................................................................................... 23

CONCLUSION .............................................................................. 24

CERTIFICATE OF SERVICE ......................................................... 25

CERTIFICATE OF COMPLIANCE .................................................. 26

ADDENDUM

    Opinion Below

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Milligan*,
  599 U.S. 1 (2023) ................................................... 1, 2, 6, 7, 8, 12, 13, 14

*Cooper v. Harris*,
  581 U.S. 285 (2017) ...................................................... 2, 15, 17

*Covington v. N.C.*,
  316 F.R.D. 117 (M.D.N.C. 2016) ........................................... 17

*N.C. A. Philip Randolph Inst. v. NCSBOE*,
  730 F. Supp. 3d 185 (M.D.N.C. 2024) ..................................... 17

*N.C. A. Philip Randolph Inst. v. NCSBOE*,
  2025 WL 2627027 (4th Cir. Sept. 12, 2025) .............................. 17, 18

*N.C. State Conf. of NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016) .............................................. 17

*North Carolina v. Covington*,
  585 U.S. 969 (2018) ...................................................... 17

*Pierce v. North Carolina State Board of Elections*,
  97 F.4th 194 (4th Cir. 2024) ....................................... 1, 3, 4, 15, 16, 21

*Thornburg v. Gingles*,
  478 U.S. 30 (1986) ................................................. 7, 8, 13, 15

## INTRODUCTION

This exceptionally important and time-sensitive appeal presents a paradigmatic occasion for expedited initial hearing en banc under Federal Rule of Appellate Procedure 40(g).

In 2023, North Carolina's legislature redistricted the state Senate map to "crack[] the state's Black Belt right down the middle." *Pierce v. North Carolina State Board of Elections*, 97 F.4th 194, 229 (4th Cir. 2024) (Gregory, J., dissenting). It cracked the Black population across Senate Districts 1 and 2, leaving each with roughly 30% Black voting-age population. Under a "faithful application" of the *Gingles* framework, that plainly violates § 2. *Allen v. Milligan*, 599 U.S. 1, 42 (2023). Compact, majority-Black districts can easily be drawn under *Gingles* One—indeed, one can be formed without splitting a single county. The court found *Gingles* Two satisfied. As to *Gingles* Three, voting is starkly racially polarized, and defendants' own expert admitted that "White voters vote sufficiently as a bloc to enable them usually to defeat the minority's preferred candidate" in both districts. D.E.119 at 81-82. In 2024, Black-preferred Senate candidates lost by *over 14 points* in both districts.

Yet the district court denied relief. Under its novel "district-effectiveness analysis" rule, racially polarized voting is not "legally significant" if a hypothesized sub-50%-BVAP district might elect a Black-preferred candidate. That radical rule—which means that *any* white crossover voting negates *Gingles* Three—would gut Section 2. It conflicts with *Milligan, Cooper v. Harris*, 581 U.S. 285 (2017), and decades of precedent recognizing that the *Gingles* inquiry turns on whether white bloc voting *usually* defeats Black-preferred candidates in the challenged districts—not whether some hypothetical crossover district might perform.

The decision below compounds that grievous error with many others, including treating the drawing of a majority-Black demonstration district as disqualifying under *Gingles One*. And it misreads nearly every Senate Factor. The court repeatedly invoked this Court's prior panel opinion affirming the denial of a preliminary injunction to justify its holdings, ensuring that panel review now would be mired in disputes over its supposed precedential force.

Time is short. Candidate filing for the 2026 primaries begins December 1, 2025. Only immediate en banc review can ensure uniformity

with Supreme Court precedent and prevent an obvious, highly consequential Section 2 violation from persisting through another election cycle.

## RELEVANT BACKGROUND

### A.    Plaintiffs' VRA Section 2 Claim

Plaintiffs—Black voters from Halifax and Martin Counties—filed suit in November 2023, less than a month after the plan's enactment, alleging that the plan dilutes Black voting strength in violation of VRA § 2. They seek replacement of SD1 and SD2 with two new districts, one giving Black voters a fair opportunity to elect their preferred candidates. The proposed remedy can be implemented entirely within the footprint of the existing districts.

### B.    The Preliminary Injunction Denial and Prior Appeal

Plaintiffs moved for a preliminary injunction and sought expedited proceedings, but the district court denied expedition and later denied the preliminary injunction, holding that Plaintiffs had not shown "legally significant" racially polarized voting under *Gingles* Three. D.E.23, D.E.61 at 45.

A divided panel of this Court affirmed. *Pierce*, 97 F.4th 194. The majority acknowledged that a central premise of the district court's

3

ruling—requiring a "district effectiveness analysis" to prove a § 2 violation—was "inaccurate," but nonetheless deemed such analysis "probative." *Id.* at 218.

Judge Gregory dissented, explaining that the majority's "district effectiveness" gloss imposed "an insurmountable roadblock" for § 2 plaintiffs and that the record already showed what *Gingles* Three requires: white bloc voting that usually defeats Black-preferred candidates in the challenged districts. *Id.* at 237. He also faulted the district court for disregarding North Carolina's continuing history of racial discrimination and warned that the majority's approach would effectively shield vote-dilution from review.

The Court denied rehearing en banc.

## C.    The Trial and Final Decision

The district court conducted a bench trial from February 3-7, 2025. Plaintiffs presented lay testimony and four experts. Blakeman Esselstyn offered illustrative majority-Black districts satisfying *Gingles* One, and Dr. Jonathan Mattingly applied North Carolina's county-clustering algorithm. Dr. Loren Collingwood showed severe racially polarized voting in SD1 and SD2, with white bloc voting almost always defeating Black-

4

preferred candidates. Dr. Traci Burch described North Carolina's long record of racial appeals in campaigns and persistent socioeconomic disparities that hinder Black political participation.

Legislative Defendants called Dr. Sean Trende, who admitted that his report contained material errors. Dr. John Alford conceded that "White voters vote sufficiently as a bloc to enable them usually to defeat the minority's preferred candidate in Senate District 1 and Senate District 2"—acknowledging that *Gingles* Three was satisfied. D.E.119 at 81-82. Dr. Donald Critchlow opined that North Carolina campaigns rarely featured racial appeals based on a cherrypicked newspaper survey. And Dr. Andrew Taylor testified that North Carolina's racial disparities in socioeconomic factors were not unusual nationally.

On September 30, 2025, the district court denied Plaintiffs' claim. The court held that Plaintiffs had failed to satisfy *Gingles* One's requirement for a reasonably configured majority-Black district, even though one demonstration district was majority-Black and composed entirely of whole counties. The court found *Gingles* Two satisfied. Op.50-51. On *Gingles* Three, the court concluded that racially polarized voting was not "legally significant." Op.69. And on the totality of circumstances,

the court discounted unrebutted evidence of ongoing racial discrimination, socioeconomic disparities, and racial appeals in political campaigns.

### D.    The Upcoming Election Schedule

North Carolina's 2026 primaries are on March 3, 2026; candidate filing runs from December 1-19, 2025.

## ARGUMENT

### I.    The District Court's Decision Piles Error On Error And Warrants Immediate Correction For The 2026 Elections

The district court's judgment rests on a cascade of fundamental legal errors. The court dismissed Plaintiffs' evidence of reasonably configured majority-Black districts under *Gingles* One, disregarded undisputed proof of legally significant racially polarized voting under *Gingles* Three, and discounted the Senate Factors through novel legal tests no court has endorsed. The court's decision also rests on numerous factual errors plaintiffs will detail in their merits brief, but the extreme legal errors warrant en banc review.

### A.    The District Court Misconstrued *Gingles* One

*Gingles* One requires proof that "the minority group [is] sufficiently large and geographically compact to constitute a majority in a reasonably

6

configured district." *Milligan*, 599 U.S. at 18; *see Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). Plaintiffs presented multiple illustrative districts that are majority-Black, contiguous, compact, and respect traditional redistricting principles. The district court nevertheless found *Gingles* One unsatisfied—an error explained only by the court's repeated misstatements of law and refusal to credit unrebutted record evidence.

As the district court acknowledged, two of Plaintiffs' illustrative districts, Demonstration Districts A and C, exceed 50% BVAP under the decennial census. Op.36 n.9. District A splits no counties or precincts and District C splits only one county and no precincts. D.E.126 at 29, 193; Op.44. Both districts better preserve the Black Belt community of interest and are more compact than enacted SD1 and SD2. D.E.126 at 18-19, 28-29.

Faced with this overwhelming showing, the court rewrote the legal standard. The court insisted that Plaintiffs prove the Black "population" of northeastern North Carolina is "sufficiently geographically compact" in the abstract—declaring that *Gingles* "focuses on the compactness of the minority population itself, not the shape of the proposed minority district." Op.40-41. But *Gingles* and *Milligan* judge minority voters'

7

compactness by asking *whether* they can "constitute a majority in a reasonably configured *district*." *Milligan*, 599 U.S. at 18 (emphasis added); *Gingles*, 478 U.S. at 50-51. That Plaintiffs drew multiple majority-Black districts that are more compact than enacted SD1 and SD2 proves the minority community is geographically compact in the only way *Gingles* cares about. Indeed, district compactness was the only thing *Milligan* considered. 599 U.S. at 20.

The district court then discounted Demonstration District D—a majority-Black CVAP district that split only one county and did not require altering any district boundary other than SD1 and SD2—based on an unprecedented legal conclusion that CVAP figures may not be used in VRA cases unless they *lower* a district's minority-population estimate. Op.38-39. The court held that CVAP would be appropriate if there was a "significant black noncitizen population" such that BVAP would overestimate black voting power, Op.39, but was categorically inappropriate where, as here, the presence of *non-Black* noncitizens means that Blacks are a *higher* percentage of the citizen voting-age-population, *see* Op.36; PX69 14 n.6. The court also perplexingly asserted that it had "no way of knowing" whether CVAP results were produced by

8

"sampling error" because plaintiffs did not "report the margins of error." Op.39. Plaintiffs presented detailed, unrebutted margin of error calculations, showing that any error was tiny and that District D's 50.14% Black CVAP estimate was conservative, D.E.126 at 14-15, 34. Defendants' expert conceded that District D's CVAP percentage established that it was "more likely than not" a majority-Black district. *Id.*

The court then asserted that Districts C and D (but not A) were unreasonable because they contained "appendage[s]," Op.42-43—but the so-called appendages were contained within a single county and tracked city or precinct boundaries.

Because District A did not split a single county, the court looked *outside* its boundaries to declare it unreasonable, holding that applying North Carolina's county-grouping algorithm while freezing District A would result in a 23-county grouping containing multiple districts. Op.44-45. But applying state-law district configuration requirements cannot possibly render a district unreasonably configured. And these districts are no more visually "outlandish"—to use the court's term—than the enacted map:

9

**Figure 9: Demonstration Map A districts that differ from enacted 2023 plan**



**Enacted Senate Map:**



The court also found that District A would "crack[]" an "adjacent performing crossover district," District 5. Op.46. This is demonstrably wrong. District A does not contain *either* of District 5's two counties and it is easy to draw a map that contains both districts. D.E.126 at 20. The district court held that plaintiffs should have applied a state-law

11

districting algorithm that changed District 5 and had no "legal justification to 'freeze'" District 5 when drawing a map around District A. Op.47. But if (as the district court held) federal law requires preserving District 5, that *is* the justification for freezing it. The court's theory seemed to be that District A is unreasonable because if you ignore federal law and blindly follow a state-districting algorithm that alters a federally-required neighboring district, the resulting map violates federal law. Op.46-47. That Catch-22 of a holding is plainly incorrect.

Finally, the district court asserted that all plans failed *Gingles* One because race "predominated" in their construction. Op.48-50. That conclusion flagrantly contradicts record evidence the court simply ignored, including proof that plaintiffs' expert rejected configurations with higher Black populations because they were less compact or did not preserve political subdivisions. D.E.126 at 29-30. It is also wrong as a matter of law. The court held that the *fact* that plaintiffs' expert "made decisions designed to draw majority-Black districts" established racial predominance. Op.48. *Milligan* rejected exactly this holding. 599 U.S. at 32-33. And the court's holding that a demonstrative district consisting entirely of whole counties fails *Gingles* 1 because race "predominated"

over other considerations highlights the very serious concerns this Court should have with the decision below.

### B.     The District Court Misconstrued *Gingles* Three

*Gingles* Three asks whether the white majority "votes sufficiently as a bloc to enable it … usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50-51; *Milligan*, 599 U.S. at 18. Defendants' own racially polarized voting expert conceded that "White voters vote sufficiently as a bloc to enable them usually to defeat the minority's preferred candidate in Senate District 1 and Senate District 2." D.E.119 at 81-82. That should have ended the matter. But the district court nevertheless invented an irrelevant "district-effectiveness" analysis to find that Plaintiffs failed to satisfy *Gingles* Three.

Plaintiffs plainly satisfied *Gingles* Three. It was undisputed that around 80% or more of white voters consistently voted against the Black-preferred candidates in SD1 and SD2, a rate markedly higher than the statewide opposition rate of about 71%. D.E.126 at 52-55; D.E.119 at 81. It was also undisputed that white-preferred candidates beat Black-preferred candidates in 88-91% of contests in SD1 and SD2 over the last five cycles—and in the last three cycles, 100% of contests in SD1 and 98%

in SD2. *Id.* at 58, 67. In 2024 alone, the white-preferred candidate won all 16 contests in SD1 (average margin 13 points) and 15 of 16 in SD2 (average margin 13.1 points). *Id.* at 64-65. In the two endogenous 2024 Senate races, white-preferred candidates prevailed by 14.4 points (SD1) and 14.3 points (SD2). *Id.*

This proof was unrebutted. Legislative Defendants' RPV expert, Professor Alford, agreed with Dr. Collingwood's EI estimates, methods, geographies, election set, and blocking analysis. D.E.119 at 72-77, 81-82. And using the 23 statewide elections the General Assembly internally analyzed from 2016 to 2022, the white-preferred candidate prevailed in SD1 and SD2 every single time. JX6 at 27-72; D.E.119 at 23.

The district court did not address *any of this evidence*. Instead, citing this Court's preliminary injunction opinion, the court held that racially polarized voting in SD1 and SD2 is not "legally significant" because a remedial district in the region could perform with less than 50% BVAP. Op.53; *see* Op.51-72. It is impossible to overstate what a striking conclusion that is and how dramatically such a rule would upend the VRA. If the district court were right, Black voters who are currently unable to elect their candidates of choice under an actual enacted plan

would nevertheless be unable to invoke § 2 because, in a hypothetical district that *does not exist*, those same voters could elect their preferred candidate with something less than a majority-Black district.

This is plain legal error that is contrary to 40 years of § 2 law. *Gingles* Three requires only that white bloc voting "usually" defeat Black-preferred candidates in the enacted districts. 478 U.S. at 51. Nothing in *Gingles* or its progeny imposes an additional burden to prove the precise BVAP level at which a hypothetical remedial district might perform, much less a requirement that the level exceed 50%. Indeed, that requirement means that if *any* white voters cross over to support Black-preferred candidates, § 2 does not apply.

The district court's holding is irreconcilable with the Supreme Court's square holdings that crossover districts with BVAPs *below* 50% may serve as lawful and effective § 2 remedies. *Cooper*, 581 U.S. at 306. Indeed, the Supreme Court found liability in both *Gingles* and *Milligan* without any "district-effectiveness" analysis. The district court's holding bears out the dissenting judge's concern that this Court's preliminary injunction opinion could be read to greenlight the use of a "district

effectiveness" requirement to impose "an insurmountable roadblock" inconsistent with § 2. *Pierce*, 97 F.4th at 237 (Gregory, J., dissenting).

That legal error consumed virtually all of the district court's *Gingles* Three analysis, and correcting it is enough to reverse the court's *Gingles* Three conclusion. The court's *Gingles* Three analysis was also replete with factual misstatements and inconsistent treatment of the witnesses, which plaintiffs will detail in their merits brief. But ultimately it is irrelevant whether the average BVAP needed for Black-preferred candidates to win in these counties is in the high 40s or the low 40s—the principal question the court analyzed. The challenged districts' BVAPs are 29.49% and 30.01%, D.E.126 at 5; D.E.119 at 18-19—numbers that remarkably never appear in the district court's opinion. Indeed, the district court's discussion of how Black-preferred candidates perform in cross-over districts studiously avoids any discussion of their decisive defeats in 2024 in the actual districts here, Op.69-72—even though at the preliminary injunction stage, the district court said such elections were the *most* important. D.E.61 at 38.

There is no factual dispute that "white voters vote sufficiently as a bloc to enable them usually to defeat the minority's preferred candidate

in Senate District 1 and Senate District 2." D.E.126 at 52. *Gingles* Three is satisfied.

## C. The District Court Misconstrued the Senate Factors

The district court's Senate Factor analysis was riddled with legal error. We highlight a few errors:

On **Factor One,** North Carolina's history of voting-related discrimination is unbroken and recent. During the prior redistricting cycle alone, maps were struck down *three times* as unconstitutional racial gerrymanders. *Cooper*, 581 U.S. 285; *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016); *North Carolina v. Covington*, 585 U.S. 969 (2018). North Carolina's 2013 election law targeted Black voters "with almost surgical precision." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 214, 223 (4th Cir. 2016). As of 2024, the State was still enforcing a felon-disenfranchisement law adopted for the purpose of racial exclusion. *N.C. A. Philip Randolph Inst. v. NCSBOE*, 730 F. Supp. 3d 185, 189 (M.D.N.C. 2024), aff'd, 2025 WL 2627027 (4th Cir. Sept. 12, 2025). The court wrote the redistricting cases off as "very old cases" even though they were from the *last* cycle, Op.75, and discounted *Randolph* because the law was "enacted more than 150 years ago," Op.76—even

though it "continue[d] to disproportionately" prevent Black voters from voting until last year. *Randolph*, 2025 WL 2627027, at *8.

On **Factor Five,** continuing effects of racial discrimination, the record showed massive racial disparities across education, employment, income, health, and criminal justice—disparities that both experts agreed stem in part from racial discrimination and that depress Black political participation. D.E.126 at 229-235; PX21 at 4-18.

The district court flatly ignored extensive causation evidence, including that identical resumes randomly assigned to have Black-associated names receive fewer callbacks, and that majority-Black rural census tracts were 10 times more likely to be food deserts than majority-White rural census tracts. PX21 at 4-18; PX117 at 7; D.E.120 at 19. The court then invented a novel causation test no other court has applied, faulting Plaintiffs for not conducting a randomized controlled trial to account for the district court's *post-trial, extra-record, citationless* hypothesized explanations for racial disparities, such as the trope that different "job interests" or "lifestyle choices" might explain racial disparities. Op.80.

On **Factor Six**, racial appeals in campaigns, Dr. Burch documented pervasive explicit and implicit racial appeals spanning decades, including the 2024 gubernatorial race and other recent statewide, congressional, legislative, and local contests. Some candidates openly invoked white supremacist rhetoric. D.E.126 at 128-38. The court brushed all that aside in favor of a defense expert who claimed to systematically measure racial appeals by searching North Carolina newspapers for the words "racism," "bigotry," and "issues"— but not racial, racist, racially, or bigoted. LDX61 at 5-12; D.E.120 at 90-91; *see* Op.91, 94-95. Even under that absurd method, he still found racial appeals in at least 15% of contests (3 of 20)—proof enough of their persistence. D.E.120 at 97-98, 103-04, 107-08.

On factor after factor, Plaintiffs offered extensive—and often unrebutted—evidence, which the district court ignored while leaning on invented legal requirements and arguments Legislative Defendants never pressed.

## II.   The Court Should Grant Initial En Banc Review

This case will determine whether North Carolina's Black Belt voters have a fair chance to elect candidates in the remaining three state

Senate elections this decade. But the district court's misinterpretations of Section 2 have far broader implications. This appeal merits initial en banc review in light of its importance, the serious time constraints, and the district court's purported reliance on this Court's prior preliminary injunction opinion to justify its legal conclusions—in particular to justify its holding that *any* white crossover voting forecloses a showing under *Gingles* Three. That holding would effectively eliminate Section 2.

1.   Plaintiffs filed suit nearly two years ago and have sought expedition at every stage. The court declined to expedite preliminary injunction proceedings, instead extending them. D.E.23, D.E.28. The court denied plaintiffs' request for an earlier trial. D.E.70-2, D.E.81. Candidate filing for 2026 begins December 1, 2025, and primaries are scheduled for March.

2.   Legislative Defendants will surely contend that this appeal cannot be cleanly resolved by a new three-judge panel. The district court repeatedly invoked the preliminary injunction panel opinion as support for its incorrect holdings, including its holding that if a so-called "district effectiveness analysis" shows that there is *any* crossover voting and a Black-preferred candidate could be elected without a majority-Black

20

district, then *Gingles* Three is not satisfied. *See* Op.52-53. Citing the panel opinion, the court held that the purported existence of "notable crossover voting … demonstrates that legally significant racially polarized voting does not exist," Op.53—even though it was undisputed that any crossover voting was insufficient for Black-preferred candidates to win in the *challenged* Senate Districts. D.E.119 at 81-82.

The court also cited the panel opinion throughout its Senate Factors analysis, including to declare that evidence of discrimination from the 2010 or earlier cycles was too old. Op.76-77; *see Pierce*, 97 F.4th at 241 (Gregory, J., dissenting) ("courts regularly look to history to evaluate this factor"). And the court cited the panel's discussion of disentangling race from partisanship, Op.122—reasoning Judge Gregory warned could "threaten[] the viability of any Section 2 claim." 97 F.4th at 244.

While plaintiffs believe that their Section 2 claim would succeed under existing Circuit precedent, Legislative Defendants will contend that the prior panel opinion forecloses or at least heavily constrains reconsideration of the district court's holdings. The preliminary-injunction decision was an interlocutory ruling, made on a truncated record and heavily reliant on a standard of review that does not apply

21

here. But that opinion will complicate a new panel's consideration of this case, for example by forcing the parties to spend significant time interpreting the prior panel's statement that a district-effectiveness analysis could be "probative." Op.53.

3. Only initial hearing en banc ensures that the full Court addresses this case on a clean slate, without a flawed interlocutory decision. If time were not an issue, plaintiffs would not seek initial en banc review. But given the position Legislative Defendants have previously taken on *Purcell*, there is limited time for this Court's review, for remedial proceedings to occur, and for the State to implement new districts. Holding a panel *and* en banc hearing is unrealistic on this timeline. If a panel concludes that precedent compels it to bless the district court's egregiously wrong "district-effectiveness" holding, Plaintiffs will be denied an opportunity for en banc review before the 2026 elections. Indeed, depending how long a panel takes, Legislative Defendants may well argue that it is too late for 2028.

The challenged plan cracks apart more than 100,000 Black voters in northeastern Black Belt counties with some of the highest Black populations in the State. These are the very communities that gave rise

22

to *Gingles*, and whether § 2 still protects them is of profound local and national significance. En banc review now is the only way to ensure that Black voters are not denied relief by the calendar.

## III. En Banc Proceedings Should Be Expedited To Allow Relief For 2026

If en banc review is granted, Plaintiffs respectfully propose the following expedited schedule:

- Opening Brief: October 21, 2025

- Response Brief(s): November 7, 2025

- Reply: November 12, 2025

- Oral Argument: Week of November 17, 2025

This schedule would facilitate a decision before candidate filing opens on December 1.

Alternatively, the Court could order a brief extension of the candidate-filing period for SD1 and SD2 to allow time for remedial proceedings. North Carolina's primaries are not until March 3, 2026—three months after the filing deadline—leaving ample flexibility to adjust the calendar, as the State has done in other recent redistricting cycles.

Finally, plaintiffs request that the Court expedite this petition and order an expedited response.

23

## CONCLUSION

The Court should grant initial hearing en banc.

Dated: October 6, 2025

Respectfully submitted,

*s/ Elisabeth S. Theodore*

Caroline P. Mackie
N.C. Bar No. 41512
Edwin M. Speas, Jr.
N.C. Bar No. 4112
POYNER SPRUILL LLP
Post Office Box 1801
Raleigh, NC 27602-1801
(919) 783-1108
cmackie@poynerspruill.com
espeas@poynerpsruill.com

Elisabeth S. Theodore
R. Stanton Jones
Orion de Nevers
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
elisabeth.theodore@arnoldporter.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing
Petition for Initial Hearing En Banc was filed electronically on October
6, 2025 and will, therefore, be served electronically upon all counsel.

s/ *Elisabeth S. Theodore*

Elisabeth S. Theodore

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 32(g), the undersigned counsel for appellants certifies that:

1.    This petition complies with the type-volume limitation of Fed. R. App. P. 40(d)(3) because it contains 3,900 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.    This petition complies with the typeface requirements of Fed. R. App. P. 32(a) because it has been prepared using Microsoft Office Word and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

s/ *Elisabeth S. Theodore*
Elisabeth S. Theodore

**ADDENDUM**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:23-CV-193-D

RODNEY D. PIERCE and )
MOSES MATTHEWS, )
)
Plaintiffs, )
)
v. )                           **ORDER**
)
THE NORTH CAROLINA STATE )
BOARD OF ELECTIONS, et al., )
)
Defendants. )

This case involves two plaintiffs who contend that the North Carolina General Assembly violated Section 2 of the Voting Rights Act ("VRA") of 1965, codified at 52 U.S.C. § 10301, by not engaging in race-based districting and not creating a majority-black Senate district in northeast North Carolina. See Am. Compl. [D.E. 13] ¶¶ 4, 5, 84–98. On November 20, 2023, plaintiffs filed suit [D.E. 1]. On November 22, 2023, plaintiffs moved for the extraordinary remedy of a mandatory preliminary injunction [D.E. 16].

On January 26, 2024, this court denied plaintiffs' requested mandatory preliminary injunction. See Pierce v. N.C. State Bd. of Elections, 713 F. Supp. 3d 195 (E.D.N.C. 2024). On March 28, 2024, the United States Court of Appeals for the Fourth Circuit affirmed. See Pierce v. N.C. State Bd. of Elections, 97 F.4th 194 (4th Cir. 2024).

"Racial classifications with respect to voting carry particular dangers." Shaw v. Reno, 509 U.S. 630, 657 (1993) ("Shaw I"). "Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions . . . ." Id. "[I]t threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth

Amendments embody, and to which the Nation continues to aspire." Id. Thus, "race-based districting by our state legislatures demands close judicial scrutiny." Id.

The Supreme Court repeatedly has described "sort[ing] voters on the basis of race" as "odious." Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. 398, 401 (2022) (per curiam); Shaw I, 509 U.S. at 643. When the government sorts voters "on the basis of race, it engages in the offensive and demeaning assumption that [voters] of a particular race, because of their race, 'think alike.'" Miller v. Johnson, 515 U.S. 900, 911–12 (1985) (quoting Shaw I, 509 U.S. at 647). "Race-based assignments embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution." Id. at 912 (quotation omitted). Nonetheless, the Supreme Court has assumed that complying with Section 2 of the Voting Rights Act is a compelling state interest that permits the "race-based sorting of voters" where such sorting "is narrowly tailored to comply with the" Voting Rights Act. Wis. Legislature, 595 U.S. at 401.[1]

This case does not involve the General Assembly engaging in race-based districting or the odious practice of sorting voters based on race. Indeed, the record demonstrates that when the General Assembly drew the maps and created all the districts in North Carolina Senate Bill 758 ("S.B. 758") in October 2023 for use in the 2024 elections, the General Assembly did not have racial data in the computer. The General Assembly did not have racial data in the computer in 2023, in part, because federal litigation from 2011 to 2016 demonstrated that there was not legally

---

[1] On August 1, 2025, the United States Supreme Court ordered briefing on whether a district drawn under Section 2 "violates the Fourteenth or Fifteenth Amendments to the U.S. Constitution." Louisiana v. Callais, No. 24-109, 2025 WL 2180226 (U.S. Aug. 1, 2025) (mem.). The Supreme Court's decision in Callais may moot this case. The court has considered staying this case in light of Callais but has determined that the interests of justice favor resolving the parties' dispute.

2

significant racially polarized voting in North Carolina, including in the counties in northeast North Carolina at issue in this case. See Covington v. North Carolina, 316 F.R.D. 117, 124, 128, 142–65, 167–74 (M.D.N.C. 2016) (three-judge court), aff'd, 581 U.S. 1015 (2017); Harris v. McCrory, 159 F. Supp. 3d 600, 624–25 (M.D.N.C. 2016) (three-judge court), aff'd sub nom., Cooper v. Harris, 581 U.S. 285 (2017). Moreover, on November 5, 2024, North Carolina voters voted in the Senate and House districts created in these maps without racial data and elected 10 out of 50 African-American Senators (i.e., 20% of the Senate) and 28 out of 120 African-American Representatives (i.e., 23.3% of the House). Thus, African-American legislators in North Carolina hold 21.7% of the legislative seats. These numbers approximate or exceed North Carolina's African-American voting age population of 21.37% and its African-American population of 22%.

On February 7, 2025, the court concluded a five-day bench trial. The court has reviewed the entire record and assessed the credibility of the witnesses. The court enters these findings of fact and conclusions of law. See Fed. R. Civ. P. 52(a)(1). To the extent any finding of fact should be designated as a conclusion of law, it should be considered a conclusion of law. To the extent any conclusion of law should be designated a finding of fact, it should be considered a finding of fact.

As explained below, plaintiffs Rodney D. Pierce ("Pierce") and Moses Matthews ("Matthews") (collectively "plaintiffs") lack standing to challenge Senate District 1. As for Senate District 2, plaintiffs failed to prove that the North Carolina State Board of Elections and its five members in their official capacities (collectively "the board defendants"), Philip E. Berger in his official capacity as President Pro Tempore of the North Carolina Senate ("Berger"), and Destin Hall in his official capacity as Speaker of the North Carolina House of Representatives ("Hall")

3

(collectively "the legislative defendants") violated Section 2 of the VRA.[2]  Thus, the court enters judgment for defendants and against plaintiffs.

In entering judgment, the court finds that plaintiffs have failed to prove their Section 2 claim.  Thus, the General Assembly need not use the odious practice of sorting voters based on race or the "politics of second best" to create a majority-black Senate district in northeast North Carolina.  See Johnson v. De Grandy, 512 U.S. 997, 1020 (1994).  As the Supreme Court observed in De Grandy 31 years ago, "for all the virtues of majority-minority districts as remedial devices, they rely on a quintessentially race-conscious calculus aptly described as the politics of second best."  Id. (quotation omitted).  "If the lesson of [Thornburg v. ]Gingles, [478 U.S. 30 (1986),] is that society's racial and ethnic cleavages sometimes necessitates majority-minority districts to ensure equal political and electoral opportunity, that should not obscure the fact that there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice."  Id.

The record in this case demonstrates that the communities in northeast North Carolina at issue in this case are such communities.  Likewise, communities throughout North Carolina are such communities.  Thus, the court enters judgment for defendants and declines to use Section 2 to direct the General Assembly to engage in the odious practice of sorting voters by race in order to create a majority-black Senate district in northeast North Carolina.

---

[2]  On January 9, 2025, Hall replaced Timothy K. Moore as Speaker of the House of the North Carolina House of Representatives.  See [D.E. 95].  Under Federal Rule of Civil Procedure 25(d), Hall replaces Moore as a named defendant.  See id.

4

I.

On November 20, 2023, Pierce and Matthews filed a complaint against the board defendants and the legislative defendants alleging that S.B. 758, which establishes new state Senate districts for North Carolina, violates Section 2 [D.E. 1]. Plaintiffs specifically challenge Senate Districts 1 and 2 in S.B. 758. See id.

Senate District 1 includes the following counties: Bertie, Camden, Currituck, Dare, Gates, Hertford, Northampton, Pasquotank, Perquimans, and Tyrell. See id. Senate District 2 includes the following counties: Carteret, Chowan, Halifax, Hyde, Martin, Pamlico, Warren, and Washington. See id.

On November 22, 2023, plaintiffs filed an amended complaint [D.E. 13], moved to enjoin S.B. 758 [D.E. 16], filed a memorandum in support [D.E. 17], and filed expert reports [D.E. 17-1, 17-2, 17-3]. On December 22, 2023, the legislative defendants responded in opposition to plaintiffs' motion for a preliminary injunction [D.E. 39] and filed exhibits and expert reports [D.E. 39].

On December 29, 2023, the court set a hearing on plaintiffs' preliminary injunction for January 10, 2024 [D.E. 43]. The same day, plaintiffs filed an interlocutory appeal arguing that the court's scheduling order functioned as a constructive denial of their motion for a preliminary injunction [D.E. 44]. On January 9, 2024, the Fourth Circuit dismissed plaintiffs' interlocutory appeal for lack of jurisdiction [D.E. 50].

On January 10, 2024, the court held a hearing on plaintiffs' motion for a preliminary injunction [D.E. 53, 67]. At that hearing, the court noted that one of plaintiffs' experts, Dr. Matthew Barreto ("Barreto"), opined that a black-preferred candidate would have won Senate District 2 had it been enacted for the 2022 election. See [D.E. 67] 34–35. Plaintiffs stated that

5

Barreto had made a typo and asked the court to permit Barreto to supplement his report. See id. at 74. The court allowed Barreto to supplement his report. See id. On January 12, 2024, Barreto filed a supplemental declaration stating that his own methodology was flawed and applied a new methodology showing that a black-preferred candidate would have lost Senate District 2 had it been enacted for the 2022 election [D.E. 55-1]. On January 22, 2024, the legislative defendants responded to Barreto's supplemental declaration [D.E. 60].

On January 26, 2024, the court issued a written order and made findings of fact and conclusions of law. See Pierce v. N.C. State Bd. of Elections, 713 F. Supp. 3d 195, 232 (E.D.N.C.), aff'd, 97 F.4th 194 (4th Cir. 2024). The court found that "Dr. Barreto's belated explanation undercuts all of Dr. Barreto's conclusions by demonstrating that fuller data sets could change his estimated outcomes." Id. at 229. The court found that "the white voting-age population in the communities at issue do not vote as a bloc against black-preferred candidates to enable the white bloc usually to defeat the black-preferred candidates." Id. at 233. The court found that "the black and white voting-age populations in the counties at issue in this case do pull, haul, and trade to find common political ground." Id. (quotation omitted). The court found that "partisanship better explains polarized voting in North Carolina than race." Id. at 238. The court also found that "the black voting-age population in the counties at issue in this case" have no need to be a majority within a single district in order to elect candidates of their choice. Id. at 232–33. After making these findings, the court found that plaintiffs were not likely to succeed on the merits and denied plaintiffs' request for a preliminary injunction. See id. at 240–41. The same day, plaintiffs appealed [D.E. 62]. On March 28, 2024, the Fourth Circuit affirmed. See Pierce v. N.C. State Bd. of Elections, 97 F.4th 194 (4th Cir. 2024). On June 18, 2024, the Fourth Circuit denied plaintiffs' petition for rehearing en banc [D.E. 77].

6

On June 26, 2024, the court ordered the parties to submit proposed scheduling orders not later than July 1, 2024 [D.E. 79]. On July 1, 2024, the parties filed two proposed scheduling orders [D.E. 80]. On July 2, 2024, the court issued its scheduling order with plaintiffs' expert disclosures and reports due on July 16, 2024, defendants' expert disclosures and reports due on August 16, 2024, plaintiffs' rebuttal expert reports due on August 30, 2024, and trial set for February 3, 2025 [D.E. 81].

On October 18, 2024, the legislative defendants moved to exclude certain expert materials from trial [D.E. 86] and filed a memorandum in support [D.E. 87]. On October 28, 2024, plaintiffs responded in opposition [D.E. 88]. On November 4, 2024, the legislative defendants replied [D.E. 89]. On December 18, 2024, the court granted the legislative defendants' motion to exclude [D.E. 91].

On February 3, 2025, the court convened for a five-day bench trial [D.E. 115–20]. Plaintiffs called State Senator Dan Blue ("Senator Blue"), State Representative Robert Reives II ("Representative Reives"), former United States Congressman George Kenneth Butterfield Jr. ("Congressman Butterfield"), plaintiff Moses Matthews ("Matthews"), plaintiff State Representative Rodney Pierce ("Representative Pierce"), Dr. Jonathan Mattingly ("Mattingly"), Mr. Blakeman Esselstyn ("Esselstyn"), Dr. Loren Collingwood ("Collingwood"), and Dr. Traci Burch ("Burch"). The legislative defendants called State Senator Ralph Hise Jr. ("Senator Hise"), Dr. Sean Trende ("Trende"), Dr. John Alford ("Alford"), Dr. Donald Critchlow ("Critchlow"), and Dr. Andrew Taylor ("Taylor"). Both parties filed numerous exhibits. See [D.E. 121] 1–10.

7

At trial, plaintiffs moved to exclude Trende's testimony and report under Federal Rule of Evidence 702. See [D.E. 119] 204–07.[3]  On February 7, 2025, the court concluded the bench trial but held the record open for the parties to submit supplemental expert reports concerning the 2024 election results [D.E. 111]. On March 10, 2025, the parties filed supplemental expert reports from Alford and Collingwood [D.E. 122].  On March 13, 2025, the legislative defendants filed a correction to one of their expert reports [D.E. 123].

On March 14, 2025, the legislative defendants filed their proposed findings of fact [D.E. 124] and conclusions of law [D.E. 125].  The same day, plaintiffs filed their proposed findings of fact and conclusions of law [D.E. 126].

On March 24, 2025, plaintiffs objected to the admission of certain portions of Alford's supplemental report and correction and filed a memorandum in support [D.E. 127].  On April 7, 2025, the legislative defendants responded in opposition [D.E. 128].  On April 14, 2025, plaintiffs replied [D.E. 129].

II.

This case is the latest episode in over 40 years of redistricting litigation in North Carolina. The history provides context to the General Assembly's 2023 enactment of Senate Districts 1 and 2, including the General Assembly's decision not to include race in the computer when drawing any Senate or House districts.

In 1982, the modern era of Section 2 litigation began with a challenge brought in the Eastern District of North Carolina to the General Assembly's state legislative redistricting plan.

---

[3]  Plaintiffs argue that Trende's testimony and report are unreliable.  See [D.E. 126] 42–53.  The legislative defendants disagree.  See [D.E. 119] 204–07.  The court does not rely on Trende's testimony or report in making any findings or conclusions.  Thus, the court denies as moot plaintiffs' motion to strike Trende's testimony and report.

8

That litigation ultimately resulted in Thornburg v. Gingles, 478 U.S. 30, 34 (1986), and the creation of various majority-black legislative districts under Section 2.

In the 1990 redistricting cycle, "North Carolina created two majority-minority congressional districts" in response to a demand from the United States Attorney General. Pierce, 97 F.4th at 204 n.2. One of those districts was the infamous I-85 district snaking up I-85 from Charlotte to Durham and gobbling up pockets of African-American voters in various urban areas between Charlotte and Durham. In Shaw I, the Court recognized a racial gerrymandering claim under the Fourteenth Amendment's Equal Protection Clause concerning North Carolina's two majority-minority districts. See 509 U.S. at 649. In Shaw v. Hunt, 517 U.S. 899 (1996) ("Shaw II"), the Supreme Court held that the I-85 district was not narrowly tailored to North Carolina's asserted interest in complying with Section 2 and violated the Equal Protection Clause. See id. at 918. North Carolina redrew the plan. After a challenge alleging race impermissibly predominated in the districting process, the Supreme Court upheld North Carolina's redistricting plan. See Easley v. Cromartie, 532 U.S. 234, 258 (2001).

In 2003, the General Assembly adopted a redistricting plan that divided Pender County between two state House districts. See Pender Cnty. v. Bartlett, No. 4-CVS-6966, 2006 WL 4077037 (N.C. Super. Ct. Jan. 9, 2006).[4] Pender County sued, arguing the 2003 redistricting plan violated the North Carolina Constitution's Whole County Provision, which prohibits counties from being divided "in the formation of a representative district." N.C. Const. art. II, § 5(3); see also id. § 3(3). The State defended the map as an effort to comply with Section 2 by creating a crossover district—i.e., a district in which the minority population is not a majority but is large enough to

---

[4] For completeness, the court incorporates the modern history of North Carolina redistricting litigation as the Fourth Circuit described it. See Pierce, 97 F.4th at 204–06.

9

elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate. See Pender Cnty. v. Bartlett, 361 N.C. 491, 494–95, 649 S.E.2d 364, 367 (2007) ("Past election results in North Carolina demonstrate[d] that a legislative voting district with . . . an African-American voting age population of at least 38.37 percent, create[d] an opportunity to elect African-American candidates," so "the General Assembly fashioned House District 18 with . . . an African-American voting age population of 39.36 percent" to create an "effective black voting district." (internal quotation marks omitted)).

The Supreme Court rejected the State's VRA defense, explaining that "Section 2 does not impose on those who draw election districts a duty to give minority voters the most potential, or the best potential, to elect a candidate by attracting crossover voters." Bartlett v. Strickland, 556 U.S. 1, 15 (2009) (plurality opinion). Instead, the Court held that the first Gingles precondition requires "the minority population in the potential election district [to be] greater than 50 percent." Id. at 20. Because Section 2 did not require crossover districts, Section 2 could not justify a violation of state law. Id. at 14; see also id. at 21 ("If [Section] 2 were interpreted to require crossover districts throughout the Nation, it would unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions." (internal quotation marks omitted)).

In the 2011 redistricting cycle, in order to comply with Section 2, the General Assembly created 23 majority-black state House districts and nine majority-black state Senate districts. See Covington v. North Carolina, 316 F.R.D. 117, 134 (M.D.N.C. 2016) (three-judge court), aff'd, 581 U.S. 1015 (2017) (mem.). A group of voters challenged 28 of those districts, which included the northeast counties relevant in this latest dispute. Id. at 128, 142, 151–52, 159. The State defended the districts as an effort to comply with Section 2. A three-judge court rejected the State's defense under the third Gingles precondition. Id. at 124. The court reasoned that the General Assembly

10

did not have "a strong basis in evidence" for thinking that racial bloc voting under Gingles operated at such a level as "would enable the majority usually to defeat the minority group's candidate of choice" in those districts. Id. at 167. As the three-judge court explained, the mere existence of racially polarized voting was not enough to justify the districts under Section 2. Id. at 167–68. Moreover, evidence demonstrated that minority-preferred candidates "were already consistently winning" in the challenged areas without majority-black districts. Id. at 172–73; see id. at 126.

Another lawsuit challenged two majority-minority congressional districts in the 2011 redistricting plan, one of which ("CD 1") included multiple northeast counties at issue here. See Harris v. McCrory, 159 F. Supp. 3d 600, 604 (M.D.N.C. 2016) (three-judge court), aff'd sub nom., Cooper v. Harris, 581 U.S. 285, 323–25 (2017). A three-judge court concluded that "there [was] no evidence that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate" in CD 1. Harris, 159 F. Supp. 3d at 624 (internal quotation marks omitted). In fact, the evidence "vividly demonstrate[d]" that "significant crossover voting by white voters" occurred in CD1. Id. at 625; see id. at 606 ("For decades, African-Americans enjoyed tremendous success in electing their preferred candidates in former versions of CD 1 and CD 12 regardless of whether those districts contained a majority black voting age population."). The Supreme Court agreed. See Cooper, 581 U.S. at 299. Electoral history "provided no evidence that a [Section] 2 plaintiff could demonstrate the third Gingles prerequisite" for CD 1. Id. at 302. Rather, the evidence showed that "the district's white population did not vote sufficiently as a bloc to thwart black voters' preference." Id. at 303 (internal quotation marks and brackets omitted). Thus, the General Assembly had "no reason to think that the VRA required it" to create a majority-black district to avoid Section 2 liability. Id.; see id. at 304 ("North Carolina too far downplays

11

the significance of a longtime pattern of white crossover voting in the area that would form the core of the redrawn District 1.").

For the 2017 remedial redistricting after Covington, the General Assembly adopted a policy forbidding consideration of race. See North Carolina v. Covington, 585 U.S. 969, 971 (2018) (per curiam). Yet the "dizzying succession of litigation" over North Carolina's electoral districts continued—now on a partisan gerrymandering theory. See Common Cause v. Lewis, No. 18-CVS-14001, 2019 WL 4569584, at *1 (N.C. Super. Ct. Sept. 3, 2019). A state court declared the partisan gerrymandering theory justiciable under the North Carolina Constitution and ordered the General Assembly to revise its state House and Senate districting maps. Id. at *124, *135–37. "As part of the remedial phase of that litigation, the state court endorsed the analysis of the plaintiffs' experts that, based on the minimum black voting-age population necessary for black voters to elect their candidates of choice, Gingles would not justify any majority-black district in any of the areas at issue there." Pierce, 97 F.4th at 206.

In 2021, North Carolina's next round of redistricting litigation began. On February 12, 2021, the United States Census Bureau ("Census") announced that, due to the COVID-19 pandemic, it would delay releasing the decennial census population data necessary for redistricting. See [D.E. 105] ¶ 9. On August 12, 2021, the Census released its population data. See id. From August to October, the General Assembly discussed, debated, and held hearings on proposed redistricting plans without considering racial data. See id. at ¶¶ 10–16. On November 4, 2021, the General Assembly ratified the new redistricting plan. See id. at ¶ 16.

Private groups challenged the 2021 redistricting plan as an unlawful partisan gerrymander under the North Carolina Constitution. See N.C. League of Conservation Voters, Inc. v. Hall, No. 21-CVS-15426, 2022 WL 124616, at *1–3 (N.C. Super. Ct. Jan. 11, 2022). Ultimately, the

12

Supreme Court of North Carolina held that partisan gerrymandering claims under the State's constitution were justiciable. See Harper v. Hall, 380 N.C. 317, 403, 868 S.E.2d 499, 559 (2022) ("Harper I"). The Supreme Court of North Carolina also ordered the maps intended for the 2022 election to be redrawn. Id.; see Harper v. Hall, 383 N.C. 89, 93–94, 881 S.E.2d 156, 161–62 (2022) ("Harper II") (reviewing constitutionality of remedial maps after 2022 elections). The Supreme Court of North Carolina, however, then granted rehearing in Harper I and reversed course. See Harper v. Hall, 384 N.C. 292, 325–26, 886 S.E.2d 393, 416 (2023) ("Harper III"). The Supreme Court of North Carolina held that partisan gerrymandering claims were "nonjusticiable, political questions under the North Carolina Constitution." Id., 886 S.E.2d at 416. It ordered that, because both the 2021 and 2022 maps were the byproduct of a "mistaken understanding of the North Carolina Constitution," the General Assembly would "have the opportunity to enact a new set of legislative and congressional redistricting plans" guided by federal and state law. Id. at 375–78, 886 S.E.2d at 446–48 (referring to maps required by erroneous decisions in Lewis and Harper I).

After Harper III, the General Assembly embarked on yet another round of redistricting. Under the North Carolina Constitution, the General Assembly has the sole authority to redraw districts and formally adopts new district maps by passing a bill through the House and Senate. See N.C. Const. § 22(5)(b)–(d). From September 25 to September 27, 2023, the General Assembly hosted three listening sessions on how the General Assembly should draw the next set of maps. See [D.E. 105] ¶ 24. The General Assembly held these sessions in Hickory, Raleigh, and Elizabeth City. See id. The General Assembly also provided an online portal where any member of the public could provide comments or feedback on the redistricting process. See [D.E. 118] 117.

13

On October 18, 2023, legislators filed an initial draft of S.B. 758 which proposed new Congressional, State House, and State Senate maps. See [D.E. 105] ¶ 25. The same day, Senator Blue and Representative Reives released a statement that they would "no doubt find [S.B. 758's maps] to be partisan gerrymanders that violate the rights of minority voters in North Carolina." [J.X. 15] 1; [D.E. 116] 153–54.[5]

On October 19, 2023, the General Assembly referred S.B. 758 to the Senate Committee on Redistricting and Elections ("Committee"). See [D.E. 105] ¶ 26. The Committee then drafted and adopted criteria that the General Assembly would use to guide its districting decisions. See id.; [J.X. 4] 1. The General Assembly did not consider race or include race in the computer when drawing the district lines. See [D.E. 118] 114–15. The General Assembly considered factors such as equal population, county groupings, compactness, contiguity, and the boundaries of political subdivisions. See [J.X. 4] 1. The General Assembly also took political considerations and incumbent residency into account. See id.; [D.E. 118] 115.

In compliance with the Whole County Provision ("WCP") of the North Carolina Constitution and governing North Carolina precedent applying the WCP,[6] the county groupings and traversals criterion required a structured method for grouping counties while minimizing unnecessary splits. See [J.X. 4]; [D.E. 118] 114. Under this pyramid structure, drawers first identify if any single county could be its own district. See [D.E. 118] 114. Next, drawers must look for any two whole counties, with a contiguous border, which could be their own district—

---

[5] The court refers to the parties' joint trial exhibits as "[J.X.]", plaintiffs' trial exhibits as "[P.X.]", and defendants' trial exhibits as "[D.X.]."

[6] See, e.g., Stephenson v. Bartlett, 355 N.C. 354, 370, 562 S.E.2d 377, 389 (2002) (Stephenson I); Stephenson v. Bartlett, 357 N.C. 301, 302, 582 S.E.2d 247, 248 (2003) (Stephenson II); Dickson v. Rucho, 368 N.C. 481, 571, 766 S.E.2d 238, 258 (2014), vacated on other grounds, 575 U.S. 959 (2015).

14

and so on, until and unless, the drawer must start splitting counties to form the final districts in compliance with the equal population requirement. See [J.X. 4]; [D.E. 118] 114. Senator Hise testified that the General Assembly first tries to comply with both Stephenson and federal law, but that if the two ever conflict, federal law supersedes the Stephenson county-grouping system. See [D.E. 119] 8–9. Senator Blue agreed and testified that he believed both Stephenson and the VRA were successfully harmonized in the 2018-2020 redistricting cycles. See [D.E. 116] 73, 102.

In compliance with court rulings, in 2023, the General Assembly did not use race when drawing districts. See [J.X. 4]; [D.E. 118] 114. Moreover, the General Assembly concluded that there was insufficient evidence that the Gingles criteria could be met to justify using race to draw districts or to depart from the Stephenson grouping requirements to achieve racial targets. See [D.E. 118] 118; [D.E. 119] 116.

During Committee meetings and hearings, Senator Hise and the other co-chairs asked anyone with evidence of legally significant racially polarized voting to submit that evidence to the Committee. See [D.E. 118] 117; [D.E. 119] 5, 10. Nobody presented evidence of legally significant racially polarized voting. See [D.E. 118] 118.

On October 18, 2023, the Committee released the first draft of the 2023 Senate Plan to the public as S.B. 758. [D.E. 105] ¶ 25; [D.E. 118] 118; [D.E. 119] 4–5. The Committee co-chairs supervised and directed all drawing of the 2023 Senate Plan. See [D.E. 118] 115. Staff was responsible for physically implementing changes in the map software, and staff could not, and did not, work on the maps without supervision and direction from a co-chair. See id.

After implementing the equal population and county groupings and traversals criterion, the co-chairs were left with 18 counties in northeast North Carolina that, following the other 2023 Senate criteria, could be grouped two different ways to make an eight-county district and a ten-

15

county district. See [D.E. 116] 105; [J.X. 1]; [D.E. 118] 116. Neither grouping option creates a majority-black district. See [D.E. 116] 105; [J.X. 69] 11, 13. The co-chairs chose the same configuration used in 2021, which grouped Northampton, Hertford, Gates, Bertie, Perquimans, Pasquotank, Camden, Currituck, Tyrrell, and Dare Counties in Senate District 1 and Warren, Halifax, Martin, Chowan, Washington, Hyde, Pamlico, and Carteret Counties in Senate District 2. See [J.X. 1]. Under Stephenson, the groupings left no further discretion to alter the borders of Senate District 1 and Senate District 2. All other county groupings remained the same as in the 2022 Remedial Senate Plan. See [D.E. 105] ¶ 26.

The co-chairs preferred the enacted northeastern county grouping configuration because it kept intact four of the five "fingerling counties" in northeast North Carolina, along with parts of the coastal region, together as a recognized community of interest. See [J.X. 1]; [D.E. 118] 116. The co-chairs also heard testimony that, of the counties included in enacted Senate District 1, the majority were in the Norfolk media market whereas those in Senate District 2 were largely in the Greenville media market. See [D.E. 118] 116.

On October 22, 2023, members of the Committee and General Assembly leadership received a letter from the Southern Coalition for Social Justice ("SCSJ"). See [D.E. 118] 118; [P.X. 179]. Based on a preliminary study, the SCSJ letter requested that the county groupings for Senate District 1 and 2 revert to the versions used in the 2022 Senate map. See [D.E. 118] 118; [P.X. 179]; [D.E. 119] 16. The SCSJ letter did not claim that a majority-black district was necessary in northeast North Carolina to enable black voters to elect Senate candidates of their choice. See [D.E. 118] 118. Senator Hise did not recall the letter requesting that a majority-black district be drawn. See id. After reviewing the letter and all other public comments, the co-chairs of the Committee determined that there was no evidence of legally significant racially polarized

16

voting that could justify the use of race in drawing districts or departing from Stephenson I and its progeny to create a majority-black district. See id. at 118–20.

On October 23, 2023, the Committee continued debating S.B. 758. Democratic Senators Woodard and Garrett each offered an amendment about Durham and Guilford Counties respectively. [D.E. 105] ¶ 26; [D.E. 118] 119. The amendments passed unanimously. [D.E. 105] ¶ 26; [D.E. 118] 119. Those amendments were not prepared with racial data. See [J.X. 24]; [J.X. 25]. S.B. 758's committee substitute was adopted and sent to the Senate for debate. See [D.E. 105] ¶ 26.

On October 24, 2023, Senator Blue, a member of the Committee, offered two amendments to S.B. 758 on the Senate floor, Amendments A-2 and A-3. Both Amendments proposed changes to the Senate districts in northeast North Carolina. See [D.E. 118] 119; [J.X. 16]; [J.X. 17]; [D.E. 105] ¶ 27. Unlike the amendments approved in Committee, Senator Blue used racial data to prepare the amendments in violation of the 2023 Senate Criteria. See [D.E. 116] 119–21; [D.E. 118] 120; [J.X. 4].

Amendment A-2 split Pitt County into three separate districts, and split Wilson, Lenoir, and Wayne Counties into two districts. See [D.E. 116] 115–16; [D.X. 1]; [D.X. 2]. In contrast, Pitt, Wilson, Lenoir, and Wayne Counties are kept whole under the enacted 2023 Senate Plan. See [D.E. 116] 115; [D.X. 1]; [D.X. 2]; [J.X. 1]. Similarly, Amendment A-3 split Pitt County twice, and introduced splits into Nash, Wilson, Wayne, and Lenoir Counties. See [D.E. 116] 121; [D.X. 3]; [D.X. 4]; [J.X. 1]. Senator Blue admitted that in drafting his amendments, he was attempting to draw to a racial black voting age population ("BVAP") target of about 47% because he did not believe reaching a 50% threshold was necessary for black voters to have an opportunity to elect a candidate of their choice. See [D.E. 116] 124. Essentially, Senator Blue departed from the

17

Stephenson groupings to create a minority crossover district.  Cf. Strickland, 556 U.S. at 20–24 (holding that Section 2 does not require the creation of crossover districts).

At trial, Senator Blue admitted that his Amendment A-3 had numerous similarities to the 2011 State Senate Plan struck down as a racial gerrymander in Covington.  See [D.E. 116] 122–24.  It split Pitt and Lenoir Counties in largely the same way as in 2011, and then used Greene County to connect those splits to oddly drawn appendages into the center of Wayne County.  See id.; [D.X. 3]; [D.X. 4]; [J.X. 65].  Senator Blue also used Amendment A-3 to double-bunk all Republican incumbents in the region.  See [D.E. 116] 125; [D.X. 4] 53.  At trial, Senator Blue incredibly testified that he was not aware that his amendment double-bunked all Republican incumbents in the region.  See [D.E. 116] 118–21.

Both of Senator Blue's Amendments were tabled.  See id. at 120; [J.X. 16]; [J.X. 17].  Senator Hise credibly testified that he did not support Senator Blue's Amendments because, contrary to the requirements stated in the 2023 Senate criteria, Senator Blue drew the amendment using racial data and then failed to include the racial data in the accompanying StatPack that Senator Blue distributed before the vote.  See [D.E. 118] 120; [J.X. 16]; [J.X. 17].

On October 25, 2023, the General Assembly passed and ratified S.L. 2023-146 (i.e., S.B. 758) into North Carolina law as the 2023 Senate Plan.  The final version of S.B. 758 designated the two districts in northeast North Carolina as "Senate District 1" and "Senate District 2."  [J.X. 1].  Senate District 1 covers much of North Carolina's Tidewater region and is composed of Northampton, Hertford, Bertie, Gates, Perquimans, Pasquotank, Camden, Currituck, Tyrrell, and Dare Counties.  See id.  Senate District 2 includes portions of North Carolina's Piedmont and Tidewater regions and is composed of Warren, Halifax, Martin, Washington, Chowan, Hyde, Pamlico, and Carteret Counties.  See id.  Both districts cover a loosely defined region that some

18

colloquially call the "Black Belt" which hosts a substantial, but geographically dispersed, black population. See Esselstyn Rep. [P.X. 69] 6. The voting age population in Senate District 1 is 29.49% black. See id. at 13. The voting age population in Senate District 2 is 30.01% black. See id. Consistent with the WCP in North Carolina's Constitution, neither Senate district splits a county between other Senate districts. See id.

The court finds Senator Hise's testimony credible concerning the enactment of S.B. 758. Moreover, the court finds that the General Assembly's districting criteria reflects legitimate and weighty districting considerations. On October 25, 2023, the General Assembly ratified S.B. 758. See [D.E. 105] ¶ 29.

III.

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" Murthy v. Missouri, 603 U.S. 43, 56 (2024); see U.S. Const. art. III, § 2. "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Raines v. Byrd, 521 U.S. 811, 818 (1997) (quotation omitted); see Simon v. E. Ky. Welfare Rts. Org., 426 U.S. 26, 37 (1976). "A proper case or controversy exists only when at least one plaintiff establishes that [it] has standing to sue." Murthy, 603 U.S. at 57 (cleaned up).

To have standing, each plaintiff must (1) have "suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) show "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable

19

decision" from the court.  Chambers Med. Techs. of S.C., Inc. v. Bryant, 52 F.3d 1252, 1265 (4th

Cir. 1995) (cleaned up); see Diamond Alt. Energy, LLC v. EPA, 145 S. Ct. 2121, 2133–34 (2025);

FDA v. All. for Hippocratic Med., 602 U.S. 367, 378–85 (2024); TransUnion LLC v. Ramirez,

594 U.S. 413, 422–24 (2021); Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016); Clapper v.

Amnesty Int'l USA, 568 U.S. 398, 408–09 (2013); Friends of the Earth, Inc. v. Laidlaw Env't

Servs. Inc., 528 U.S. 167, 180–81 (2000); Lujan v. Defs. of Wildlife, 504 U.S. 555, 559–61 (1992);

Md. Election Integrity, LLC v. Md. State Bd. of Elections, 127 F.4th 534, 538–40 (4th Cir. 2025);

Sierra Club v. U.S. Dep't of Interior, 899 F.3d 260, 282–83 (4th Cir. 2018).

The legislative defendants contend that plaintiffs lack standing to challenge Senate

District 1 because neither Pierce nor Matthews live in Senate District 1.  See [D.E. 125-1] ¶¶ 5–9;

[D.E. 100] 2–3.  Plaintiffs stipulate that neither Pierce nor Matthews live in Senate District 1, but

they argue that they have standing to challenge Senate District 1.  See [D.E. 126] ¶¶ 351–53; [D.E.

105] ¶¶ 2, 4; [D.E. 101] 2–3.  According to plaintiffs, because both Pierce and Matthews "live in

the area that Plaintiffs assert should have contained an additional minority-opportunity district,"

they have standing to challenge both senate districts.  [D.E. 101] 3; see [D.E. 126] ¶ 353.

The Supreme Court has not directly addressed Article III's injury requirement in a Section

2 vote-dilution case.  In Gill v. Whitford, 585 U.S. 48 (2018), however, the Supreme Court

addressed the required injury for vote-dilution claims in a political gerrymandering case.  See id.

at 64–73.  There, the plaintiffs argued that they had standing to challenge Wisconsin legislative

districts where they did not live because those districts diluted their votes, creating a "statewide

injury."  Id. at 67.  The Supreme Court rejected plaintiffs' argument and held that when "plaintiffs'

alleged harm is the dilution of their votes, that injury is district specific."  Id. at 66.  Indeed, "[t]hat

harm arises from the particular composition of the voter's own district, which causes his vote—

20

having been packed or cracked—to carry less weight than it would carry in another, hypothetical district." Id. at 67. The Supreme Court remanded with instructions to determine whether the plaintiffs "live in districts where [voters] like them have been packed or cracked." Id. at 73.

Pierce and Matthews reiterate the failed injury argument in Gill. See [D.E. 101] 3. Because a dilutive injury "arises from the particular composition of the voter's own district," plaintiffs must at least live in the district they challenge. Gill, 585 U.S. at 67; see Harding v. Cnty. of Dallas, 948 F.3d 302, 307 (5th Cir. 2020); cf. Ala. Legis. Black Caucus v. Alabama, 575 U.S. 254, 262–63 (2015); Shaw II, 517 U.S. at 904; United States v. Hays, 515 U.S. 737, 745–47 (1995); Md. Election Integrity, 127 F.4th at 539–40; Agee v. Benson, No. 1:22-CV-272, 2024 WL 1298018, at *4 (W.D. Mich. Mar. 27, 2024) (three-judge court) (per curiam) (unpublished). A three-judge court in the United States District Court for the Middle District of North Carolina reached the same conclusion when considering, inter alia, Section 2 claims brought by out-of-district voters. See Williams v. Hall, No. 1:23-CV-1057, 2025 WL 1553759, at *3–4 (M.D.N.C. Apr. 8, 2025) (three-judge court) (unpublished) ("Because no allegedly injured Plaintiff . . . resides in those districts, Consolidated Plaintiffs lack standing as to those districts"). Neither Pierce nor Matthews live in Senate District 1. See [D.E. 105] ¶¶ 2, 4. Thus, plaintiffs lack standing to challenge Senate District 1.[7]

## IV.

After the trial, the court issued an amended scheduling order to hold the record open for the parties to submit supplemental reports concerning the 2024 election results. See [D.E. 113] 1–2. On March 10, 2025, plaintiffs moved to admit Collingwood's supplemental opening and

---

[7] Even if plaintiffs had standing to challenge Senate District 1, the court's findings and conclusions would be the same.

21

rebuttal reports, and Legislative Defendants moved to admit Alford's supplemental opening and rebuttal reports. See [D.E. 122] 1–2. On March 13, 2025, Legislative Defendants moved to correct Alford's rebuttal report under Federal Rule of Civil Procedure 26(e). See [D.E. 123] 1; Fed. R. Civ. P. 26(e). Plaintiffs object to Part A and Part C of Alford's supplemental rebuttal report, and Alford's Rule 26(e) correction. See [D.E. 127-1] 3. Legislative defendants do not object to Collingwood's supplemental opening or rebuttal reports. See [D.E. 122] 2.

The court's February 18, 2025, amended scheduling order states: "The parties' RPV experts' supplemental reports analyzing the November 2024 election results are due by February 28, 2025." [D.E. 113] 1. The parties dispute the scope of the term "supplemental." See [D.E. 127-1] 7; [D.E. 128] 13–15.

To resolve this dispute, the court construes its amended scheduling order. See JTH Tax, Inc. v. H & R Block E. Tax Servs., Inc., 359 F.3d 699, 705 (4th Cir. 2004) ("[D]istrict courts are in the best position to interpret their own orders."); Anderson v. Stephens, 875 F.2d 76, 80 n.8 (4th Cir. 1989); Vaughns v. Bd. of Educ., 758 F.2d 983, 989 (4th Cir. 1985). The court construes the term "supplemental" to be analogous to the term as used in Federal Rule of Evidence 26(e). Earlier in this case, the court noted that "[c]orrecting an inadvertent error or completing a report with information that was not available by the initial disclosure deadline exemplify proper supplemental reports." Pierce v. N.C. State Bd. of Elections, No. 4:23-CV-193, 2024 WL 5170738, at *3 (E.D.N.C. Dec. 18, 2024) (unpublished); see EEOC v. Freeman, 961 F. Supp. 2d 783, 797 (D. Md. 2013), aff'd in part, 778 F.3d 463 (4th Cir. 2015); Keener v. United States, 181 F.R.D. 639, 640 (D. Mont. 1998). Given the unique post-trial posture of the parties' supplemental reports, the court distinguishes "true supplementation . . . from gamesmanship." Gallagher v. S. Source Packaging, LLC, 568 F. Supp. 2d 624, 631 (E.D.N.C. 2008) (quotation omitted).

22

Alford and Collingwood's supplemental opening reports properly update their analysis with 2024 election data. See [D.E. 122-1] 2–10; [D.E. 122-2] 2–27. Likewise, the parties do not dispute that Collingwood's supplemental rebuttal report and Part B of Alford's supplemental rebuttal report are proper supplementation. See [D.E. 122-1] 18–22; [D.E. 122-2] 28–40. Thus, the court admits Collingwood's supplemental opening report, Collingwood's supplemental rebuttal report, Alford's supplemental opening report, and Part B of Alford's supplemental rebuttal report.

Plaintiffs contend that Part A and Part C of Alford's supplemental rebuttal report are improper rebuttal or supplementation. See [D.E. 122-1] 7–14. Part A concerns an updated ecological inference analysis. See [D.E. 122-1] 12–17. In Alford's initial report, Alford conducted his own ecological inference analysis and included his calculations but chose to "rely on Dr. Collingwood's EI estimates" because Alford's analysis "produced substantively similar results." [D.E. 122-1] 12; see [D.X. 59] App. A. In Part A of his supplemental rebuttal report, Alford added the previously unavailable 2024 election results to his ecological inference analysis in response to Collingwood doing the same. See [D.E. 122-2] 6–14; [D.E. 122-1] 12–17. Thus, Part A of Alford's supplemental rebuttal report is proper supplementation. To the extent plaintiffs contend that Alford's analysis of 2024 exit polls in Part A are improper, Alford permissibly included those previously unavailable exit polls and analysis "to directly contradict or rebut" Collingwood's 2024 election analysis. See Withrow v. Spears, 967 F. Supp 2d 982, 1002 (D. Del. 2013) (quotation omitted); see also Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Tr. v. State St. Bank & Tr. Co., 290 F.R.D. 11, 16 (D. Mass. 2013); Funderburk v. S.C. Elec. & Gas Co., No. 3:15-CV-4660, 2019 WL 3406814, at *4 (D.S.C. July 9, 2019) (unpublished). Thus, Part A of Alford's supplemental rebuttal report is proper and admitted.

23

The court also admits the polls and the corrected table citations referenced in Alford's Rule 26(e) correction. See [D.E. 123-1] 2. Rule 26(e) requires a party to file a correction when he "learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A).

Part C of Alford's supplemental rebuttal report concerns a district effectiveness analysis to respond to Collingwood's BVAP needed to win analysis under the 2024 elections. See [D.E. 122-1] 22–25. The court also finds this to be proper supplementation. Thus, the court admits Alford's supplemental report.

## V.

Redistricting "is primarily the duty and responsibility of the State," and "[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions." Miller, 515 U.S. at 915 (cleaned up). The "good faith of [the] state legislature must be presumed." Id. "Because the States do not derive their reapportionment authority from the Voting Rights Act, but rather from independent provisions of state and federal law, the federal courts are bound to respect the States' apportionment choices unless those choices contravene federal requirements." Voinovich v. Quilter, 507 U.S. 146, 156 (1993) (cleaned up). "In assessing the sufficiency of a challenge to a districting plan, a court must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." Abbott v. Perez, 585 U.S. 579, 603 (2018) (cleaned up); Alexander v. S.C. State Conf. of the NAACP, 602 U.S. 1, 9–12 (2024).

Here, the VRA operates against a complex backdrop of state redistricting rules imposed by the North Carolina Constitution and Supreme Court of North Carolina. The North Carolina Constitution enumerates four limitations on the General Assembly's redistricting and reapportionment authority in drawing Senate and House districts. See N.C. Const. art. II, §§ 3, 5.

24

(1) Each Senator and Representative shall represent, as nearly as possible, an equal number of inhabitants.

(2) Each senate and representative district shall at all times consist of contiguous territory.

(3) No county shall be divided in the formation of a senate or representative district.

(4) Once established, the senate and representative districts and apportionment of Senators and Representatives shall remain unaltered until the next decennial census of population taken by order of Congress.

Pierce, 713 F. Supp. 3d at 217–18; Stephenson v. Bartlett, 355 N.C. 354, 362–63, 562 S.E.2d 377, 384 (2002) ("Stephenson I"); Stephenson v. Bartlett, 357 N.C. 301, 304–05, 582 S.E.2d 247, 249 (2003) ("Stephenson II").

The third rule is the Whole County Provision ("WCP"). The Stephenson I court noted that federal law required the General Assembly to comply with "(1) one-person, one-vote principles requiring some measure of population equality between state legislative districts as articulated in Baker v. Carr, 369 U.S. 186 (1962), and Reynolds v. Sims, 377 U.S. 533 (1964), and their progeny; and (2) the Voting Rights Act of 1965," including Section 2 of the VRA. See Stephenson I, 355 N.C. at 363–64, 562 S.E.2d at 384–85.

The Stephenson I court reviewed the significant historical roles of counties as political subdivisions of the State of North Carolina. See id. at 364–66, 562 S.E.2d at 385–86. The Stephenson I court described the "long-standing tradition of respecting county lines during the redistricting process." Id. at 366, 562 S.E.2d at 386. The Stephenson I court then reviewed the development of redistricting jurisprudence in North Carolina from 1965 to 1983. See id. at 366–68, 562 S.E.2d at 386–88. The Stephenson I court explained why the WCP remains enforceable throughout North Carolina to the extent not preempted or otherwise superseded by federal law. See id. at 369–72, 562 S.E.2d at 388–90. The Stephenson I court observed that the North Carolina

25

Constitution's limitations "upon redistricting and apportionment uphold what the United States Supreme Court has termed traditional districting principles," which "include compactness, contiguity, and respect for political subdivisions." Id. at 371, 562 S.E.2d at 389 (cleaned up). The Stephenson I court noted the Supreme Court of the United States' observation that "these criteria are important not because they are constitutionally required—they are not—but because they are objective factors that may serve to defeat a claim that a district has been gerrymandered on racial lines." Id., 562 S.E.2d at 389 (quotation omitted). The Stephenson I court then observed that "the right of the people of this State to legislative districts which do not divide counties is not absolute," but the WCP is not "rendered a legal nullity if its beneficial purposes can be preserved consistent with federal law and reconciled with other state constitutional guarantees." Id., 562 S.E.2d at 389.

The Stephenson I court invalidated the 2001 House redistricting plan and the 2001 Senate redistricting plan and held that "the WCP remains valid and binding upon the General Assembly during the redistricting and reapportionment process . . . , except to the extent superseded by federal law." Id. at 371, 562 S.E.2d at 390. The Stephenson I court held that where "the primary purpose of the WCP can be effected to a large degree without conflict with federal law, it should be adhered to by the General Assembly to the maximum extent possible." Id. at 374, 562 S.E.2d at 391. The Stephenson I court observed that "[a]lthough no federal law has preempted this Court's authority to interpret the WCP as it applies statewide, we acknowledge that complete compliance with federal law is the first priority before enforcing the WCP." Id. at 374 n.4, 562 S.E.2d at 391 n.4.

The Stephenson I court then provided its remedial analysis. See id. at 375–86, 562 S.E.2d at 392–98. In that analysis, the Stephenson I court held that the North Carolina Constitution required single-member House and Senate districts. Id. at 382, 562 S.E.2d at 396. As for federal law, the Stephenson I court observed that "operation of federal law does not preclude states from

26

recognizing traditional political subdivisions when drawing their legislative districts." Id. at 381, 562 S.E.2d at 396. Rather, federal law "preempts the State Constitution only to the extent that the WCP actually conflicts with the VRA and other federal requirements relating to state legislative redistricting and reapportionment." Id., 562 S.E.2d at 396.

With respect to reconciling the WCP, the rest of the North Carolina Constitution, and federal law, the Stephenson I court held that "the boundaries of . . . single-member districts . . . may not cross county lines except as outlined" in Stephenson I. Id. at 382, 562 S.E.2d at 396. The Stephenson I court directed the trial court to ensure that legislative districts "required by" the VRA are "formed prior to the creation of non-VRA districts." Id. at 383, 562 S.E.2d at 396–97. The Stephenson I court also instructed that "[t]o the maximum extent practicable, such VRA districts shall also comply with the legal requirements of the WCP, as herein established for all redistricting plans and districts throughout the State." Id., 562 S.E.2d at 397. As for the federal one-person, one-vote requirement, "any deviation from the ideal population for a legislative district shall be at or within plus or minus five percent." Id., 562 S.E.2d at 397.

The Stephenson I court held that in counties having a census population "sufficient to support the formation of one non-VRA legislative district falling at or within plus or minus five percent deviation from the ideal population consistent with 'one-person, one-vote' requirements, the WCP requires that the physical boundaries of any such non-VRA legislative district not cross or traverse the exterior geographic line of any such county." Id., 562 S.E.2d at 397. The Stephenson I court also held that:

> When two or more non-VRA legislative districts may be created within a single county, which districts fall at or within plus or minus five percent deviation from the ideal population consistent with "one-person, one-vote" requirements, single-member non-VRA districts shall be formed within said county. Such non-VRA districts shall be compact and shall not traverse the exterior geographic boundary of any such county.

27

Id., 562 S.E.2d at 397.

As for "counties having a non-VRA population pool which cannot support at least one legislative district at or within plus or minus five percent of the ideal population for a legislative district or, alternatively, counties having a non-VRA population pool which, if divided into districts, would not comply with the at or within plus or minus five percent 'one-person, one-vote' standard," then

> the requirements of the WCP are met by combining or grouping the minimum number of whole, contiguous counties necessary to comply with the at or within plus or minus five percent "one-person, one-vote" standard. Within any such contiguous multi-county grouping, compact districts shall be formed, consistent with the at or within plus or minus five percent standard, whose boundary lines do not cross or traverse the "exterior" line of the multi-county grouping; provided, however, that the resulting interior county lines created by any such groupings may be crossed or traversed in the creation of districts within said multi-county grouping but only to the extent necessary to comply with the at or within plus or minus five percent "one-person, one-vote" standard.

Id. at 383–84, 562 S.E.2d at 397. The Stephenson I court emphasized that the "intent underlying the WCP must be enforced to the maximum extent possible." Id. at 384, 562 S.E.2d at 397. "[T]hus, only the smallest number of counties necessary to comply with the at or within plus or minus five percent 'one-person, one-vote' standard shall be combined, and communities of interest should be considered in the formation of compact and contiguous electoral districts." Id., 562 S.E.2d at 397.

The Stephenson I court directed that "any new redistricting plans . . . shall depart from strict compliance with the legal requirements set forth herein only to the extent necessary to comply with federal law." Id., 562 S.E.2d at 397. The Stephenson I court closed by observing that "[e]nforcement of the WCP will, in all likelihood, foster improved voter morale, voter turnout, and public respect for State government, and specifically the General Assembly as an institution."

Id. at 385, 562 S.E.2d at 398. The Stephenson I court also opined that enforcing the WCP "will assist election officials in conducting elections at lower cost to the taxpayers of this State," and "will instill a renewed sense of community and regional cooperation within the respective countywide or regionally formed legislative delegations mandated by the WCP." Id., 562 S.E.2d at 398.

In Stephenson II, the Supreme Court of North Carolina affirmed the trial court's decision that the General Assembly's 2002 revised redistricting plans for the House and Senate failed "to attain strict compliance with the legal requirements set forth in Stephenson I and are unconstitutional." Stephenson II, 357 N.C. at 314, 582 S.E.2d at 254 (quotation omitted). In reaching this conclusion, the Stephenson II court explained how in Stephenson I, "this Court harmonized the provisions of Article I, Sections 2, 3, and 5, and the WCP of Article II, Sections 3(3) and 5(3) of the State Constitution and mandated that in creating legislative districts, counties shall not be divided except to the extent necessary to comply with federal law, including the 'one-person, one-vote' principle and the VRA." Id. at 309, 582 S.E.2d at 251. The General Assembly's deficiencies in 2002 included "excessive division of counties; deficiencies in county groupings; and substantial failures in compactness, contiguity, and communities of interest." Id., 582 S.E.2d at 252.

This court construes Stephenson I and Stephenson II to require harmonizing the VRA and the WCP (including the requirement of county groupings). See id. at 309–14, 582 S.E.2d at 251–54; Stephenson I, 355 N.C. at 369–75, 381–86, 562 S.E.2d at 388–92, 396–98. The Supreme Court of North Carolina held in Stephenson I that the WCP gives way when "required by the VRA." Id. at 383, 562 S.E.2d at 396–97 (emphasis added). Thus, the court must examine Section 2 to

29

determine whether Section 2 <u>requires</u> a majority-black Senate district in northeast North Carolina. <u>See</u> <u>id.</u>, 562 S.E.2d at 396–97.

Section 2 provides that no state may impose a "voting qualification or prerequisite to voting or standard, practice, or procedure . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). To establish a Section 2 violation, a plaintiff must satisfy three preconditions under <u>Gingles</u>, and "go on to prove that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group." <u>Perez</u>, 585 U.S. at 614 (quotation omitted).

Section 2 does not require a state to employ "race-based districting" unless the state has "a strong basis in evidence for concluding that" Section 2 required such race-based districting. <u>Cooper</u>, 581 U.S. at 292 (quotation omitted); <u>see</u> <u>Ala. Legis. Black Caucus</u>, 575 U.S. at 278. Without a strong basis in evidence to conclude that Section 2 requires a majority-minority district, a state violates the Fourteenth Amendment if it groups voters by race into a majority-minority district. <u>See, e.g.</u>, <u>Perez</u>, 585 U.S. at 587; <u>Cooper</u>, 581 U.S. at 322–23; <u>Shaw II</u>, 517 U.S. at 907–09; <u>Miller</u>, 515 U.S. at 927–28; <u>Shaw I</u>, 509 U.S. at 648; <u>Covington</u>, 316 F.R.D. at 178; <u>cf.</u> <u>Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.</u>, 600 U.S. 181, 206 (2023) ("Eliminating racial discrimination means eliminating all of it."); <u>Flowers v. Mississippi</u>, 588 U.S. 284, 298 (2019) ("In the eyes of the Constitution, one racially discriminatory . . . strike is one too many.")

As for the <u>Gingles</u> preconditions, plaintiffs must prove that their minority group is "sufficiently large and geographically compact to constitute a majority in a reasonably configured district." <u>Allen v. Milligan</u>, 599 U.S. 1, 18 (2023) (cleaned up). "A district will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and

30

reasonably compact." Id. "Second, the minority group must be able to show that it is politically cohesive." Gingles, 478 U.S. at 51. Third, plaintiffs must show that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." Id.; see Milligan, 599 U.S. at 18 (quotation omitted). Courts refer to this third Gingles precondition as "racially polarized voting." See, e.g., Covington, 316 F.R.D. at 167. A plaintiff must prove the three Gingles preconditions whether challenging a multi-member district or a single-member district. See, e.g., Growe v. Emison, 507 U.S. 25, 39–41 (1993).

Once a plaintiff has proven all three preconditions, a plaintiff also must prove that, based on the totality of the circumstances, "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). In other words, "a plaintiff who demonstrates the three preconditions must also show, under the totality of circumstances, that the political process is not equally open to minority voters." Milligan, 599 U.S. at 18 (quotation omitted); see De Grandy, 512 U.S. at 1011–12; Gingles, 478 U.S. at 36–38. In the vote dilution context, a plaintiff must prove "that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group." Perez, 585 U.S. at 614 (quotation omitted); Milligan, 599 U.S. at 18; De Grandy, 512 U.S. at 1011–12; Gingles, 478 U.S. at 36–38.

Section 2 places the burden of "proving an apportionment's invalidity squarely on plaintiff[s'] shoulders." Quilter, 507 U.S. at 155. "Before courts can find a violation of [Section] 2, . . . they must conduct an intensely local appraisal of the electoral mechanism at issue, as well as a searching practical evaluation of the past and present reality." Milligan, 599 U.S. at 19

31

(quotation omitted). "Courts cannot find [Section] 2 effects violations on the basis of <u>uncertainty</u>." <u>Perez</u>, 585 U.S. at 619 (emphasis in original).

Plaintiffs contend that North Carolina's Senate map impermissibly dilutes black voters' electoral power and that Section 2 requires a majority-black Senate district in northeast North Carolina. <u>See</u> Am. Compl. [D.E. 13] ¶¶ 84–98. Thus, plaintiffs contend that the General Assembly violated Section 2 when it enacted S.B. 758 without a majority-black Senate district in northeast North Carolina. <u>See</u> <u>id.</u> at ¶¶ 1, 2, 84–98; [D.E. 126] ¶¶ 21, 24–525. The legislative defendants disagree. <u>See</u> [D.E. 125] ¶¶ 5–139.[8]

### A.

As for the first <u>Gingles</u> precondition, the "minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district." <u>Milligan</u>, 599 U.S. at 18; <u>see</u> <u>Strickland</u>, 556 U.S. at 14–20; <u>Growe</u>, 507 U.S. at 37–41 & n.4; <u>Gingles</u>, 478 U.S. at 50. Section 2 requires plaintiffs challenging a redistricting plan to prove that a challenged practice impairs their ability to win, not merely influence, an election. <u>See, e.g.</u>, <u>Dillard v. Baldwin</u>

---

[8] There was no strong basis in evidence for the General Assembly to conclude that Section 2 required it to draw a majority-black district in northeast North Carolina. <u>See</u> <u>Pierce</u>, 713 F. Supp. 3d at 211–13. As mentioned, at trial, plaintiffs offered little new evidence for the court to consider. Plaintiffs cite the 2023 SCSJ letter and Blue's trial testimony. <u>See</u> [D.E. 126] 190. The court, again, finds that the SCSJ letter was insufficient to provide a strong basis in evidence. <u>See</u> <u>Pierce</u>, 713 F. Supp. 3d at 211–13. At trial, plaintiffs offered the SCSJ letter merely for notice purposes, not for the truth of its analysis. <u>See</u> [D.E. 116] 83. Senator Blue did not testify that he believed that the SCSJ letter, or anything else submitted to the General Assembly, provided a strong basis in evidence to create a new Section 2 majority-black district. Senator Blue merely testified that he placed the SCSJ letter in the legislative record and that his colleagues did not ask him questions about it. <u>See</u> [D.E. 116] 83–84. Moreover, Senator Blue testified that he was concerned about packing, not cracking, black voters leading into the 2023 redistricting process. <u>See</u> <u>id.</u> at 100–01. Furthermore, the Committee chairs determined that the Committee received nothing that "indicated . . . legally significant racially polarized voting." [D.E. 118] 118. Thus, the court finds that there was no strong basis in evidence for the General Assembly to conclude that Section 2 required a majority-black district in northeast North Carolina.

32

Cnty. Comm'rs, 376 F.3d 1260, 1269 (11th Cir. 2004); Cousin v. Sundquist, 145 F.3d 818, 828 (6th Cir. 1998); McNeil v. Springfield Park Dist., 851 F.2d 937, 947 (7th Cir.1988); Rodriguez v. Pataki, 308 F. Supp. 2d 346, 376 (S.D.N.Y. 2004) (per curiam) (three-judge court); Ill. Legis. Redistricting Comm'n v. LaPaille, 786 F. Supp. 704, 715–17 (N.D. Ill. 1992) (three-judge court); Turner v. Arkansas, 784 F. Supp. 553, 568–70 (E.D. Ark. 1991) (three-judge court), aff'd, 504 U.S. 952 (1992). This principle applies because "[u]nless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." Gingles, 478 U.S. at 50 n.17 (emphasis in original). Moreover, the minority population under a reasonably configured alternative demonstration district must be "greater than 50 percent." Strickland, 556 U.S. at 20; see Cooper, 581 U.S. at 305–06. A district shy of a 50% majority, a so-called "crossover district," does not satisfy the first Gingles precondition. See, e.g., Strickland, 556 U.S. at 20.

As for compactness under the first Gingles precondition, the court focuses on "the compactness of the minority population," not "the compactness of the contested district." League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 433 (2006) [hereinafter "LULAC"]; see Milligan, 599 U.S. at 18; Bush v. Vera, 517 U.S. 952, 997 (1996) (Kennedy, J., concurring); Houston v. Lafayette Cnty., 56 F.3d 606, 611 (5th Cir. 1995) ("The district court should have focused on the size and concentration of the minority population, rather than only on the shape of the districts in the plaintiff residents' specific proposals." (emphasis in original)); Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs, 950 F. Supp. 2d 1294, 1307 (N.D. Ga. 2013), vacated on other grounds, 775 F.3d 1336 (11th Cir. 2015); Fletcher v. Lamone, 831 F. Supp. 2d 887, 899 (D. Md. 2011) (three-judge court), aff'd, 567 U.S. 930 (2012) (mem.). The statistical compactness of an alternative demonstration district "is of only limited relevance" when

33

addressing the compactness of a minority population. Fletcher, 831 F. Supp. 2d at 899. "If, because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, [Section] 2 does not require a majority-minority district." Bush, 517 U.S. at 979 (plurality opinion). The compactness inquiry, however, largely merges with the next part of Gingles' first precondition: whether a district is reasonably configured. Compare LULAC, 548 U.S. at 433 ("[T]he inquiry should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries." (quotation omitted)), with Milligan, 599 U.S. at 18 ("A district will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact." (quotation omitted)).

A district is reasonably configured "if it comports with traditional districting criteria." Milligan, 599 U.S. at 18. Traditional districting criteria include "compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, incumbency protection, and political affiliation." Ala. Legis. Black Caucus, 575 U.S. at 272 (cleaned up); see Milligan, 599 U.S. at 21; Bush, 517 U.S. at 963 (plurality opinion). Analysis using traditional districting criteria guards against the assumption that voters of the same race "think alike, share the same political interests, and will prefer the same candidates at the polls." LULAC, 548 U.S. at 433. Statistical evidence may be useful when determining whether a district is compact for the purposes of satisfying traditional districting criteria. See, e.g., Alpha Phi Alpha Fraternity Inc. v. Raffensperger, 700 F. Supp. 3d 1136, 1296 (N.D. Ga. 2023), appeal filed, No. 23-13914 (11th Cir. Nov. 28, 2023); Nairne v. Ardoin, 715 F. Supp. 3d 808, 848–49 (M.D. La. 2024), aff'd sub nom., Nairne v. Landry, 2025 WL 2355524, __ F.4th __ (5th Cir. 2025) (per curiam). Whether a district is reasonably configured is not a "beauty contest[]." Bush, 517 U.S. at 977 (plurality opinion)

34

(quotation omitted); see Milligan, 599 U.S. at 21. But "tentacles, appendages, bizarre shapes, or any other obvious irregularities" are strong indicators that a district is not reasonably configured. Milligan, 599 U.S. at 20; see Miller, 515 U.S. at 913–14. For example, "[a] district that reaches out to grab small and apparently isolated minority communities is not reasonably compact." LULAC, 548 U.S. at 433 (cleaned up).

Race may not predominate in drawing a reasonably configured district under the first Gingles precondition. See Milligan, 599 U.S. at 30–33 (plurality opinion); id. at 64–65 (Thomas, J., dissenting) (describing consensus); id. at 98 (Alito, J., dissenting); Miss. State Conf. of the NAACP v. State Bd. of Election Comm'rs, 739 F. Supp. 3d 383, 415 (S.D. Miss. 2024) (per curiam) (three-judge court), appeal filed, No. 25-234 (U.S. Aug. 28, 2025); Alpha Phi Alpha Fraternity Inc., 700 F. Supp. 3d at 1261–62. The Supreme Court has recognized "a difference between being aware of racial considerations and being motivated by them." Milligan, 599 U.S. at 30 (plurality opinion). Mere awareness of racial considerations while proposing a district under the first Gingles precondition is permissible because "Section 2 itself demands consideration of race." Id. (quotation omitted).

"Race predominates in the drawing of district lines . . . when race-neutral considerations come into play only after the race-based decision had been made." Id. at 31 (cleaned up); see Bethune-Hill v. Va. State Bd. of Elections, 580 U.S. 178, 188–89 (2017). "That may occur where race for its own sake is the overriding reason for choosing one map over others." Milligan, 599 U.S. at 31 (quotation omitted). Racial predominance may be proven through direct or circumstantial evidence. See Alexander, 602 U.S. at 8–9; Bethune-Hill, 580 U.S. at 188. A district's shape may "be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the . . . dominant and controlling rationale in drawing its district

lines." Miller, 515 U.S. at 913. Race predominates even when a proposed district under the first Gingles precondition respects traditional principles "if race was the criterion that . . . could not be compromised." Bethune-Hill, 580 U.S. at 189; see Shaw II, 517 U.S. at 907.

1.

Plaintiffs provide two metrics to measure the black population in northeast North Carolina, BVAP and black citizen age voting population ("BCVAP"). See, e.g., [D.E. 126] ¶¶ 31–32, 41, 49, 55, 62. Plaintiffs contend that BCVAP data is relevant. See id. at ¶¶ 31–32, 368. The court, however, previously identified accuracy and reliability issues with plaintiffs' BCVAP data. See Pierce, 713 F. Supp. 3d at 224–27. The court noted the large margins of error associated with plaintiffs' BCVAP data and plaintiffs' failure to explain why plaintiffs' BCVAP percentages were higher than BVAP percentages. See id.

At trial, plaintiffs failed to allay the court's concerns with their BCVAP data. Plaintiffs' push to use BCVAP is understandable given that BCVAP raises the black population share in plaintiffs' demonstration districts. See [D.E. 126] ¶¶ 41, 49, 55, 62.[9] Notably, one of plaintiffs' four proposed districts—Demonstration District D—is a majority-black district under BCVAP, but not under BVAP. See id. at ¶ 62.

The court finds that plaintiffs' BCVAP data is not accurate or reliable. Plaintiffs source their BCVAP figures from the 2022 American Community Survey ("ACS"). See [D.E. 26] ¶ 61. The ACS is a statistical estimate of population and demographics based on sampling. See Pierce, 713 F. Supp. 3d at 225. The 2022 ACS estimates for North Carolina are based on 110,296

---

[9]    Plaintiffs created various demonstration districts to help prove the first Gingles precondition. Demonstration District A has a BVAP of 51.47%, but a BCVAP of 52.71%. See [D.E. 126] ¶ 41. Demonstration District B has a BVAP of 48.41% and a BCVAP of 49.41%. See id. at ¶ 49. Demonstration District C has a BVAP of 50.21% and a BCVAP of 51.24%. See id. at ¶ 55. Demonstration District D has a BVAP of 49.22% and a BCVAP of 50.14%. See id. at ¶ 62.

36

households initially selected for survey interviews. See [D.X. 35] 1. But only 60,632 households were selected for final survey interviews. See [D.X. 35] 1; [D.E. 117] 98. As a result, ACS data is subject to substantial sampling error. See Pierce, 713 F. Supp. 3d at 225; [D.E. 117] 98–102. The margins of sampling error vary dramatically between geographic areas. See Pierce, 713 F. Supp. 3d at 225. Moreover, ACS data is less accurate for districting purposes because it is only provided at the aggregate census block group level, rather than the individual census block level. See [D.E. 117] 55–56. To draw plaintiffs' demonstration districts, Esselstyn downloaded disaggregated ACS data from a private organization, the Redistricting Data Hub. See id. at 56–57. Esselstyn knew about tools that would allow him to personally disaggregate the ACS data, but he did not use them. See id. Notably, Esselstyn "did not independently verify" the disaggregated ACS data he used to draw plaintiffs' demonstration districts. Id. at 57. Esselstyn also failed to report the margins of error attached to the ACS data he used to draw plaintiffs' demonstration districts. See id. at 58. Esselstyn also admitted that he did not know how many, if any, of the 60,632 households selected for final surveys in North Carolina were in plaintiffs' Demonstration Area. See id. at 98; [D.X. 35] 1. The data is filled with uncertainty. See [D.E. 117] 91–102. Esselstyn was not a credible witness in explaining his use of the ACS data. See id.

As for BVAP, both parties source their data from the decennial census. See [D.E. 126] ¶¶ 29–33; [D.E. 125-1] ¶¶ 14–15. Unlike the ACS, the census is a definite count of the nation's population that includes demographic information. See Pierce, 713 F. Supp. 3d at 225. As a definite count, the census has no sampling error. See id. Moreover, courts typically presume census data is accurate and reliable until proven otherwise. See, e.g., Baker, 369 U.S. at 189 n.4; McNeil, 851 F.2d at 946; Johnson v. DeSoto Cnty. Bd. of Comm'rs, 204 F.3d 1335, 1341 (11th Cir. 2000); United States v. Vill. of Port Chester, 704 F. Supp. 2d 411, 439 (S.D.N.Y.2010); Perez

37

v. Pasadena Indep. Sch. Dist., 958 F. Supp. 1196, 1210–13 (S.D. Tex. 1997), aff'd, 165 F.3d 368 (5th Cir. 1999).

In places like south Texas, south Florida, and New York City, courts use CVAP to correct for large noncitizen populations. See LULAC, 548 U.S. at 429 ("[T]he relevant numbers must include citizenship. . . . [B]ecause only eligible voters affect a group's opportunity to elect candidates."); Negron v. City of Miami Beach, 113 F.3d 1563, 1567–71 (11th Cir. 1997) (considering CVAP when about half of the Hispanic population in Miami Beach were not citizens); Vill. of Port Chester, 704 F. Supp. 2d at 419–20 (considering CVAP when around one-third of the Hispanic population in a municipality outside New York City were not citizens). Courts use CVAP in such scenarios because VAP, when expressed as a percentage of a population, may dramatically overstate the electoral power of a minority group by including noncitizens who are unable to vote. See Negron, 113 F.3d 1563, 1567–71 (considering CVAP when raw VAP was double that of calculated CVAP); Vill. of Port Chester, 704 F. Supp. 2d at 419–20 (S.D.N.Y. 2010) (considering CVAP when VAP was more than 20 points higher than CVAP). In that context, CVAP can be the better metric. In mine-run Section 2 cases, however, VAP from the decennial census is the proper standard. See, e.g., Strickland, 556 U.S. at 20 (referring to "African-American voting-age population"); Pope v. Cnty. of Albany, 687 F.3d 565, 575 (2d Cir. 2012) (using VAP); Westwego Citizens for Better Gov't v. City of Westwego, 946 F.2d 1109, 1117 & n.7 (5th Cir. 1991) (same); Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist., 201 F. Supp. 3d 1006, 1033–35 (E.D. Mo. 2016), aff'd, 894 F.3d 924 (8th Cir. 2018) (using decennial census BVAP over ACS BVAP estimates).

No reason exists to use "CVAP where there is no evidence of a significant noncitizen population." Pope v. Cnty. of Albany, No. 1:11-CV-736, 2014 WL 316703, at *13 & n.22

38

(N.D.N.Y. Jan. 28, 2014) (unpublished); see, e.g., Barnett v. City of Chicago, 141 F.3d 699, 705 (7th Cir. 1998). The counties in northeast North Carolina are a world away from south Texas, south Florida, or New York City. Moreover, plaintiffs provided no evidence of a significant black noncitizen population in northeast North Carolina. See Pope, 2014 WL 316703, at *13.

Plaintiffs also failed to justify the increased uncertainty that comes with ACS data in light of the decennial census data's accuracy and reliability. Esselstyn concedes that he almost exclusively uses decennial census data, rather than ACS data, when drawing districts. See [D.E. 117] 53. Plaintiffs also vacillate between BCVAP and BVAP as it suits their needs. Esselstyn used BCVAP and BVAP when constructing plaintiffs' demonstration districts, but Collingwood used decennial census BVAP when analyzing political polarization. Compare Esselstyn Rep. at 14 n.6, with Collingwood Rep. [P.X. 36] 2; see [D.E. 117] 62, 66–67. Considering the margins between plaintiffs' BCVAP data and BVAP data, the higher BCVAP numbers could easily be the result of sampling error. The court has no way of knowing because Esselstyn failed to report the margins of error for the ACS data he used. See [D.E. 117] 58. Furthermore, courts embroiled in North Carolina redistricting litigation for the past 40 years have traditionally relied on BVAP. See Cooper, 581 U.S. at 303 (using BVAP); Strickland, 556 U.S. at 20 (same); Shaw II, 517 U.S. at 914 (referring to "voting strength of members of the minority population"); Shaw I, 509 U.S. at 634; Gingles, 478 U.S. at 47 (referring to "racial minorities in the voting population" (cleaned up)). Thus, in analyzing the Gingles preconditions, the court finds that the parties' BVAP data is accurate and reliable. See, e.g., Pasadena Indep. Sch. Dist., 958 F. Supp. at 1210–13. The court finds that plaintiffs' ACS-derived BCVAP data is not accurate or reliable and does not credit Esselstyn's analysis using such data.

39

Only Demonstration District A and Demonstration District C contain sufficient black majorities. Demonstration District A has a BVAP of 51.47%. See [D.E. 126] ¶ 41. Thus, Demonstration District A contains a sufficient black majority. See Strickland, 556 U.S. at 20. Demonstration District C has a BVAP of 50.21%. See [D.E. 126] ¶ 55. Thus, Demonstration District C also contains a sufficient black majority. See Strickland, 556 U.S. at 20. Demonstration District B, however, has a BVAP of 48.41%. See [D.E. 126] ¶ 49. Even if the court considered BCVAP data, Demonstration District B only has a BCVAP of 49.41%. See id. Under either measure, Demonstration District B falls short of the required "greater than 50 percent" majority. Strickland, 556 U.S. at 20. Thus, Demonstration District B does not contain a sufficient black majority. See id. Demonstration District D has a BVAP of 49.22%. See [D.E. 126] ¶ 62. Thus, Demonstration District D does not contain a sufficient black majority. See Strickland, 556 U.S. at 20. Accordingly, the court finds that Demonstration District B and Demonstration District D fail Gingles' first precondition.

2.

Plaintiffs do not directly address whether the black population in northeast North Carolina is sufficiently geographically compact under Gingles' first precondition. Instead, plaintiffs skip directly to Gingles' reasonable configuration inquiry. According to plaintiffs, "[t]he remaining requirements are satisfied if the district comports with traditional districting criteria, such as being contiguous and reasonably compact." [D.E. 126] ¶ 194 (quotation omitted). The reasonable configuration inquiry, however, does not fully eclipse the requirement that a minority population be sufficiently geographically compact. See LULAC, 548 U.S. at 433 ("[Section] 2 compactness . . . should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries." (cleaned up)). Geographic compactness focuses on the

40

distribution of a population in an area, while reasonable configuration focuses on whether district lines can be reasonably drawn around them.  Compare Milligan, 599 U.S. at 21, and Ala. Legis. Black Caucus, 575 U.S. at 272, and Bush, 517 U.S. at 997 (Kennedy, J., concurring), with Houston, 56 F.3d at 611, and Ga. State Conf. of NAACP, 950 F. Supp. 2d at 1307, and Fletcher, 831 F. Supp. 2d at 899.  Simply because both geographic compactness and reasonable configuration consider traditional districting criteria does not make them the same.  See, e.g., Kumar v. Frisco Indep. Sch. Dist., 476 F. Supp. 3d 439, 494 (E.D. Tex. 2020).  Both concepts overlap to a degree; therefore, plaintiffs' omission is not fatal.

Plaintiffs' failure to provide geographic compactness evidence weighs against a finding that plaintiffs have proven Gingles' first precondition.  Indeed, Esselstyn admitted at trial that he did not measure the compactness of black populations in northeast North Carolina generally or within plaintiffs' demonstration districts specifically.  See [D.E. 117] 63.  Esselstyn also admitted that "there are peer-reviewed means of measuring population compactness within a district."  Id. He did not use them.  Instead, Esselstyn focused on measuring the geometric compactness of plaintiffs' demonstration districts using two statistical measures: Polsby-Popper and Reock scores. See Esselstyn Rep. at 27–30.

Esselstyn's statistics do not address "the Gingles compactness inquiry [which] focuses on the compactness of the minority population itself, not the shape of the proposed minority district." Fletcher, 831 F. Supp. 2d at 899 (quotation omitted).  Thus, the court does not credit Esselstyn's analysis as applied to the compactness inquiry in Gingles' first precondition.

3.

According to plaintiffs, Demonstration Districts A, C, and D are reasonably configured because they are contiguous, compact, respect political subdivisions, preserves communities of

41

interest, and satisfy equal population requirements. See [D.E. 126] ¶¶ 374–408 (omitting Demonstration District B).[10]  The legislative defendants disagree. See [D.E. 125-1] ¶¶ 24–47.

The court finds that Demonstration Districts B and D are not reasonably configured. As crossover districts, Demonstration Districts B and D are not required by Section 2 and violate North Carolina's WCP. See Strickland, 556 U.S. at 20–24; Pierce, 97 F.4th at 228.  Moreover, even if Demonstration Districts B and D contained sufficient BVAP majorities (they do not), Demonstration Districts B and D are not reasonably configured.  Both demonstration districts carve a jagged crescent (or claw-like shape) into northeast North Carolina and fail to respect political subdivisions. See, e.g., Ala. Legis. Black Caucus, 575 U.S. at 272; Bush, 517 U.S. at 964. Such "bizarre shapes" suggest these demonstration districts are not compact. See Milligan, 599 U.S. at 20; Miller, 515 U.S. at 913–14.  Both demonstration districts also cut Pasquotank County in half to capture Elizabeth City's majority black areas. See, e.g., Esselstyn Rep. at 18, 24; [D.E. 117] 50–51, 78–80.  Esselstyn's decision to reach into Pasquotank County to capture isolated majority black areas helps to show that race for its own sake, rather than traditional districting criteria, motivated plaintiffs' districting decisions. See Miller, 515 U.S. at 913–14.  Accordingly, Demonstration Districts B and D are not reasonably configured.[11]

---

[10] Plaintiffs offer Demonstration District B "for remedial purposes only." [D.E. 126] ¶ 48. As discussed, Demonstration Districts B and D do not have a black majority and fail the first Gingles' precondition. Furthermore, as discussed, Section 2 "does not require crossover districts." Strickland, 556 U.S. at 22; see Pierce, 97 F.4th at 213.  Nonetheless, the court evaluates Demonstration Districts B and D.

[11] Before trial, the court excluded plaintiffs' evidence concerning Demonstration District E. See [D.E. 91] 2–9. The court, however, notes that Demonstration District E also fails Gingles' first precondition.  Demonstration District E fails to contain a sufficient black majority. See Mattingly Rebuttal Rep. at 10 (listing BVAP at 49.64%).  Demonstration District E also is unreasonably configured in that it splits counties, stretches to capture black population centers, and features an unusual claw-like shape. See id.  Thus, even if admissible, Demonstration District E fails under Gingles.

42

The court also finds that Demonstration District C is not reasonably configured. Demonstration District C features a tail-like appendage and fails to respect the boundaries of political subdivisions by splitting Vance County and the city of Henderson. See [D.E. 117] 80; [D.E. 125-1] ¶ 35. Esselstyn drew Demonstration District C by reaching into Vance County to capture Henderson's majority black areas. See Esselstyn Rep. at 21; [D.E. 117] 85–90. Demonstration District C's tail alone accounts for 63% of Vance County's BVAP. See [D.E. 124] ¶ 177;[D.E. 117] 15, 46–47. Demonstration District C's tail-like "appendage" evinces that it is not a compact district. See Milligan, 599 U.S. at 20; Miller, 515 U.S. at 913–14.

In opposition, Esselstyn notes that, using Polsby-Popper and Reock scores, Demonstration District C is quantitatively more compact than Senate Districts 1 and 2. See Esselstyn Rep. at 26–29. The court has considered this one data point. Esselstyn's Polsby-Popper and Reock scores, however, show that Demonstration District C is substantially less compact than other nearby Senate districts. See Esselstyn Rep. at 29 (calculating Polsby-Popper and Reock scores for Senate Districts 4 and 11).



43

See Esselstyn Rebuttal Rep. [P.X. 147] 27.[12] Moreover, the court finds that Esselstyn surgically reached into Vance County to target black population centers, and this conduct shows that race for its own sake, rather than traditional districting criteria, motivated plaintiffs' districting decisions. See Miller, 515 U.S. at 913–14. As the Supreme Court explained in Milligan, "satisfying traditional districting criteria such as the compactness requirement" has "becomes more difficult" because residential segregation has "sharply" decreased since the 1970s. 599 U.S. at 28–29. The court finds that Demonstration District C is not reasonably configured.

The court also finds that Demonstration District A is not reasonably configured. Demonstration District A grossly distorts county groupings and surrounding senate districts. To draw Demonstration District A, plaintiffs selected Bertie, Halifax, Hertford, Martin, Northampton, Vance, Warren, and Washington Counties. See Mattingly Rep. [P.X. 1] 6–7; [D.E. 117] 75. Plaintiffs then "froze" Demonstration District A as a county group and calculated new county groups surrounding Demonstration District A purportedly to comport with Stephenson. See [D.E. 116] 158; Mattingly Rep. at 6–7; [D.E. 117] 12–13. Plaintiffs produced twelve county grouping variations, all requiring two additional county splits than the current Senate map. See Mattingly Rep. at 4–7. Thus, while Demonstration District A does not split counties itself, Demonstration District A mathematically requires surrounding districts to split at least two more counties. See [D.E. 117] 76, 103–04; [D.E. 125-1] ¶ 27. As drawn, Demonstration District A forces surrounding districts to split Wilson County and Carteret County. See [D.E. 117] 76–82.

Esselstyn notes that, using Polsby-Popper and Reock scores, Demonstration District A is quantitatively more compact than Senate Districts 1 and 2. See Esselstyn Rep. at 26–29. The

---

[12] Each blue dot represents 10 black residents, and each orange dot represents 10 white residents. See Esselstyn Rebuttal Rep. at 27.

44

court has considered this data point. Esselstyn's Polsby-Popper and Reock scores, however, also show that Demonstration District A is substantially less compact than other nearby Senate districts. See Esselstyn Rep. at 29 (calculating Polsby-Popper and Reock scores for Senate Districts 4, 9, and 11).

Demonstration District A also forces the creation of a county grouping that is massive, gangly, and outlandish. See, e.g., [D.E. 117] 76; [P.X. 69] 13, Fig. 6; [P.X. 69] 16, Fig. 8; [P.X. 69] 17, Fig. 9.[13] This county grouping includes 23 of North Carolina's 100 counties and snakes from Lee County in the middle of North Carolina to coastal Currituck County. See [D.E. 117] 76–77.



See Esselstyn Rep. at 16; id. at 16, Fig. 8. Such a grouping violates Stephenson I's command to consider "communities of interest . . . in the formation of compact and contiguous electoral districts." 355 N.C. at 384, 562 S.E.2d at 397.

---

[13] There are three variations of this county grouping. See Mattingly Rep. at 6–7. The court refers to the county grouping that plaintiff selected, but all three variations are outlandish. See id.

In opposition, plaintiffs contend that large groupings "aren't unprecedented" and analogize their 23-county grouping to the 20-county grouping in North Carolina's 2011 Senate map. See [D.E. 117] 108–09. That 20-county grouping, however, was the result of what turned out to be an unconstitutional racial gerrymander. See Covington, 316 F.R.D. at 138–39, 163 (considering large 20-county grouping as evidence of race predominating districting decisions). Indeed, the Covington three-judge court found that "race was the predominant factor" for the General Assembly that drew the 2011 Senate map. Id. at 319 (cleaned up). As in Covington, plaintiffs' 23-county grouping shows that plaintiffs impermissibly "subordinated" districting criteria in favor of race. Id. at 138.

Demonstration District A also impermissibly cracks an adjacent performing crossover district. In the enacted plan, Pitt County and Edgecombe County form Senate District 5, a performing crossover district with a BVAP of 40.35%. See Esselstyn Rep. at 13; [D.E. 117] 151. Senator Kandie Smith, an African-American Democrat, represents Senate District 5. Senator Smith won the 2024 election with 55% of the vote. Outside the artifice of plaintiffs' expert reports and testimony, Demonstration District A would crack Senate District 5's black voters into two districts. See Mattingly Rebuttal Rep. [P.X. 114] 1–2; [D.E. 117] 12–14, 103–05. As Esselstyn admitted at trial, a Senate map including Demonstration District A requires Pitt and Edgecombe Counties to be split into different districts. See [D.E. 117] 14 (testifying that mapmakers would have "no discretion"). Under each of plaintiffs' alleged Stephenson-compliant Demonstration District A grouping permutations, the General Assembly would have to dismantle Senate District 5. See id.; Mattingly Rebuttal Rep. at 1–2. Plaintiffs could only create Demonstration District A and its necessary 23-county grouping by artificially "freezing" Senate District 5 in the same way plaintiffs created Demonstration District A. See id.; [D.E. 117] 14. Mattingly explained that

46

"freezing" counties effectively removes them from his algorithm. Mattingly Rep. at 1. Originally, Mattingly intended this function to allow users to "freeze" areas to simulate the creation of VRA districts. See id. Plaintiffs, however, have no legal justification to "freeze" Senate District 5, an area outside Demonstration District A. Moreover, Mattingly admitted that "freezing" various counties was not part of his peer-reviewed article on the algorithm. See [D.E. 116] 178–81. The court finds that Mattingly's manipulation of the algorithm discredits his testimony and report.

Although Stephenson's requirements yield to federal law, Section 2 does not require a district if it would destroy another performing opportunity district. See De Grandy, 512 U.S. at 1008; Strickland, 556 U.S. at 24; cf. LULAC, 548 U.S. at 435. Indeed, "if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." Strickland, 556 U.S. at 24 (emphasis added). In other words, plaintiffs cannot use Section 2 to trade a preexisting crossover district in District 5 for their ideal majority-black district in Demonstration District A. See, e.g., Strickland, 556 U.S. at 24; De Grandy, 512 U.S. at 1008. Here, Demonstration District A would do just that. As Mattingly concedes, plaintiffs' lawyers directed him, only for Demonstration District A, to freeze Senate District 5 as if the VRA required District 5. See [D.E. 116] 164–68; [D.E. 117] 12–14, 103–05; Mattingly Rebuttal Rep. at 1. Thus, Demonstration District A requires mapmakers to destroy an already performing crossover district. See Strickland, 556 U.S. at 24; De Grandy, 512 U.S. at 1008; Pierce, 97 F.4th at 228; cf. LULAC, 548 U.S. at 435. This fact provides more evidence that Demonstration District A is not reasonably configured.

47

Demonstration District A forces additional county splits in surrounding districts, requires a 23-county grouping that frustrates Stephenson I, and destroys a performing crossover district in Senate District 5. Thus, the court finds that Demonstration District A is not reasonably configured.

4.

Even if plaintiffs' demonstration districts did comport with traditional districting criteria, the court finds that race predominated over plaintiffs' districting decisions in drawing the demonstration districts. At trial, Esselstyn testified that he used "a number of considerations and criteria" to draw plaintiffs demonstration districts. [D.E. 117] 76. The court finds, however, that Esselstyn used race as the "dominant and controlling rationale in drawing" plaintiffs' demonstration districts. Miller, 515 U.S. at 913. To the extent Esselstyn suggests that race did not predominate over his districting decisions, Esselstyn was not a credible witness.

At every turn, Esselstyn made decisions designed to draw majority-black districts or near majority-black districts. Esselstyn began his districting process by identifying the counties and specific areas in northeast North Carolina with more than 50% BVAP. See Esselstyn Rep. at 5–7. Esselstyn did not consult materials from the General Assembly's listening sessions or Committee hearings concerning the 2023 districting process. See [D.E. 117] 64, 66. To draw plaintiffs' demonstration districts, Esselstyn used Maptitude, a piece of mapping software that allowed him to view district demographics as he drew them. See id. at 65. Esselstyn could load a variety of data into Maptitude. See id. Esselstyn, however, chose not to load any socioeconomic data such as income, age, or party registration. See id. Instead, Esselstyn loaded BVAP data into Maptitude and opened a "view pane" that allowed him to monitor a district's BVAP as he was drawing it. Id. Esselstyn also used DRA 2020, another piece of mapmaking software, "as a quick cross-check to corroborate results produced by . . . Maptitude." Esselstyn Rep. at 49. Esselstyn used DRA 2020

48

in "Hide Election Data and Partisan Analytics" mode. Id.; Esselstyn Rebuttal Rep. at 48. The only district characteristic Esselstyn appears to have viewed in DRA 2020 are measures of population sorted by race. See Esselstyn Rebuttal Rep. at 59–62 (several screenshots of Esselstyn's DRA 2020 user interface). The court finds that race drove Esselstyn's districting decisions. Esselstyn's contrary testimony was not credible.

Esselstyn's maps also help demonstrate that race drove his districting decisions. Demonstration District A is an artifice that would crack Senate District 5, a performing crossover district. Demonstration District A's outlandish 23-county grouping is another distortion that evinces race-based districting. See Covington, 316 F.R.D. at 162–63 (considering large 20-county grouping as evidence of race predominating districting decisions).

Demonstration District C has a tail-like appendage that reaches into Vance County and captures majority-black areas. See, e.g., [D.E. 117] 16, 46–47, 80; Esselstyn Rebuttal Rep. at 27, Fig. 5. Moreover, Demonstration District C splits Vance County and Wilson County, which the General Assembly kept whole in the enacted plan. See [D.E. 117] 80–82. Furthermore, Esselstyn split Vance County and Wilson County even though Franklin County and Nash County have larger populations than Vance and Wilson. See id. at 84–85. Esselstyn's treatment of these counties violates Stephenson. See Pender Cnty., 361 N.C. at 507–09, 649 S.E.2d at 374–76. This conduct evinces racial predominance. Similarly, Mattingly's confused and not credible explanation of the groupings associated with Demonstration District C further evinces racial predominance. See [D.E. 116] 202–08. Tellingly, Mattingly's explanation conflicted with his report. See Mattingly Rep. at 5.

As for Demonstration Districts B and D, Esselstyn split Pasquotank County and created claw-like protrusions that surgically target the majority-black areas in Pasquotank County. Indeed,

49

Esselstyn admitted that he placed voter tabulation districts ("VTDs") in Pasquotank County with 50% or higher BVAP into Demonstration District B-1. He did so while attempting to make the district majority-black. See [D.E. 117] 78–79.

The court finds that Esselstyn's choice to incorporate ACS-derived CVAP estimates also indicates that race drove his districting decisions. In the only other Section 2 case where Esselstyn testified as a mapping expert, he exclusively relied on BVAP data taken from the decennial census. See [D.E. 117] 94; Alpha Phi Alpha Fraternity Inc., 587 F. Supp. 3d at 1272. Here, however, when ACS estimates yielded higher black population numbers, Esselstyn used ACS estimates. Esselstyn failed to credibly explain why he made this change. The answer is race. Notably, even Collingwood, plaintiffs' racial polarization expert, chose to use decennial-census BVAP data over BCVAP ACS estimates. On this record, the court finds that race was the consideration that "could not be compromised" when plaintiffs drew their demonstration districts. Bethune-Hill, 580 U.S. at 189; see Bush, 517 U.S. at 994 (O'Connor, J., concurring); Shaw II, 517 U.S. at 907.

Plaintiffs' demonstration districts either fail to include a black majority, are unreasonably configured, or race predominated over plaintiffs' districting decisions. See Milligan, 599 U.S. at 18; Strickland, 556 U.S. at 14–20; Bush, 517 U.S. at 994 (O'Connor, J., concurring); Growe, 507 U.S. at 37–41 & n.4; Gingles, 478 U.S. at 50. Thus, the court finds that plaintiffs failed to prove Gingles' first precondition by a preponderance of the evidence.

### B.

As for the second Gingles precondition, plaintiffs must show that their minority group is "politically cohesive." Gingles, 478 U.S. at 51; see Milligan, 599 U.S. at 18. Plaintiffs may show political cohesion by "showing that a significant number of minority group members usually vote for the same candidates." Gingles, 478 U.S. at 56. "Unlike the first Gingles prong, which has an

50

established bright-line test of 50%+, there is no cutoff for political cohesion." Pope v. Cnty. of Albany, 94 F. Supp. 3d 302, 333 (N.D.N.Y. 2015) (cleaned up). Over the past five election cycles, an average of 97.5% of black voters in North Carolina backed the same candidate. See [D.E. 126] ¶ 99. Collingwood and Alford agree that black voters in North Carolina are politically cohesive. See id. at ¶¶ 99–101. The court finds that plaintiffs have proven Gingles' second precondition by a preponderance of the evidence.

## C.

### 1.

"The key inquiry" under Gingles' third precondition "is whether racial bloc voting is operating at such a level that it would actually minimize or cancel minority voters' ability to elect representatives of their choice, if no remedial district were drawn." Pierce, 97 F.4th at 212 (cleaned up); see Milligan, 599 U.S. at 18; Gingles, 478 U.S. at 51; Covington, 316 F.R.D. at 168. Such a finding "requires racial bloc voting that is legally significant." Covington, 316 F.R.D. at 167 (quotation omitted). As the Covington three-judge court explained, "a general finding regarding the existence of any racially polarized voting, no matter the level, is not enough." Id.; see Bush, 517 U.S. at 994 (O'Connor, J., concurring) (observing that a party "cannot simply rely on generalized assumptions about the prevalence of racial bloc voting"). Without "significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." Gingles, 478 U.S. at 48 n.15; Voinovich, 507 U.S. at 158; Pierce, 97 F.4th at 212. Moreover, the "minority-preferred candidate need not match the voter's race." Ala. State Conf. of the NAACP v. Alabama, 612 F. Supp. 3d 1232, 1271 (M.D. Ala. 2020); see Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ., 4 F.3d 1103, 1125–26 (3d Cir. 1993).

51

When considering Gingles' third precondition, courts ask "merely whether . . . voters are racially polarized," not "why." United States v. Charleston Cnty., 365 F.3d 341, 348 (4th Cir. 2004). "[C]ausation is relevant," but only "in the totality of circumstances inquiry," not the three Gingles preconditions. Id. at 347–48; see Lewis v. Alamance Cnty., 99 F.3d 600, 615–16 & n.12 (4th Cir. 1996).

Courts have emphasized the "crucial difference between legally significant and statistically significant racially polarized voting." Covington, 316 F.R.D. at 170 (emphasis in original). The term "racially polarized voting" only means "different racial groups 'vote in blocs for different candidates.'" Id. (quoting Gingles, 478 U.S. at 62). As the Covington three-judge court explained, mere statistically significant racially polarized voting cannot prove the third Gingles precondition because that label "applies equally well where there is only a minimal degree of polarization." Covington, 316 F.R.D. at 170 (quotation omitted). Instead, the third Gingles precondition "is concerned only with legally significant racially polarized voting, which occurs when the majority group votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." Id. (cleaned up); see Gingles, 478 U.S. at 51, 55–56. Thus, Gingles requires legally significant racially polarized voting, "not merely statistically significant" polarized voting. Pierce, 97 F.4th at 212.

Courts often consider a "district effectiveness analysis" when analyzing whether legally significant polarized voting exists. See id. at 217; Covington, 316 F.R.D. at 168 & n.46; Common Cause v. Lewis, No. 18-CVS-14001, 2019 WL 4569584, at *100 (N.C. Super. Ct. Sept. 3, 2019) (three-judge court) (unpublished). A district effectiveness analysis is "a district-specific evaluation used to determine the minority voting-age population level at which a district becomes effective in providing a realistic opportunity for . . . voters of that minority group to elect candidates

52

of their choice." Covington, 316 F.R.D. at 168 n.46. In other words, the analysis determines whether minority voters' candidates of choice "would usually be defeated without a VRA remedy." Id. at 168. Although such analysis is not required or dispositive, it is probative. See Pierce, 97 F.4th at 218.

As the Fourth Circuit observed in this case, "[p]laintiffs' own evidence [at the preliminary injunction stage] demonstrates notable crossover voting statewide and locally." Id. at 222. The evidence presented at trial only confirms that observation. The evidence demonstrates that legally significant racially polarized voting does not exist in North Carolina generally, in northeast North Carolina specifically, in plaintiffs' Demonstration Area specifically, or in Senate District 1 and Senate District 2 specifically.

Plaintiffs' expert Collingwood conducted an effectiveness analysis on plaintiffs' hand-picked 12-county Demonstration Area in northeast North Carolina where plaintiffs contend a black opportunity district should exist. See [D.E. 122-2] 21–22.[14] Collingwood calculated that the average BVAP percentage necessary for a district in this region to elect their preferred candidate is merely 47.7%. See id. Collingwood's calculated median is even lower at 47%. See id. Collingwood's analysis shows that black voters can elect their choice-candidate in districts with BVAP percentages in the low-40s. See id. at 22. In other words, plaintiffs' expert Collingwood demonstrates that black voters do not need a majority-black district to elect their candidate of choice in plaintiffs' Demonstration Area. See id.

---

[14] The twelve counties in plaintiffs' Demonstration Area are Bertie, Chowan, Gates, Halifax, Hertford, Martin, Northampton, Pasquotank, Tyrell, Vance, Warren, and Washington Counties. See [D.E. 117] 174; Collingwood Rep. at 11. This area includes counties that were not in every demonstration district, [D.E. 118] 54, and excluded four counties in enacted Senate District 1 (i.e., Camden, Currituck, Dare, and Perquimans Counties), and three counties in enacted Senate District 2 (i.e., Carteret, Hyde, and Pamlico Counties). Moreover, plaintiffs do not contend that the twelve counties should be or could be a single Senate District.

53

Both expert witnesses on racially polarized voting (Collingwood for plaintiffs and Alford for defendants) agree that black voters do not need a majority-black district to elect their candidates of choice in plaintiffs' Demonstration Area. Moreover, defendants' expert Alford credibly concluded that Senate District 1 and Senate District 2 have higher levels of white crossover voting than the Demonstration Area. See [D.E. 122-1] 5. Consistent with Collingwood's average and median calculations, Alford opined that "the BVAP needed to elect a Black preferred candidate (a Democrat) will very likely fall well below the 47% that Dr. Collingwood suggested based on the Demonstration Area results for earlier elections." [D.E. 122-1] 5. The court finds Alford's testimony and conclusions on this point both credible and compelling.

At a more granular level, endogenous data from Senate Districts 1 and 2 and plaintiffs' Demonstration Area show substantial crossover voting. Collingwood conducted a racially polarized voting analysis for plaintiffs' Demonstration Area as well as Senate Districts 1 and 2. See Collingwood Rep. at 12–25. Collingwood's initial analysis covered all statewide elections conducted from 2016 to 2022 and measured the level of crossover support from white voters for black-preferred candidates. See id. at 27–41. Collingwood's supplemental report includes analysis for the 2024 statewide elections. See [D.E. 122-2] 25–27.

For North Carolina's 2024 statewide elections, Collingwood's data shows that Senate Districts 1 and 2 featured higher levels of crossover voting than plaintiffs' Demonstration Area. See id. Crossover voting support in Senate Districts 1 and 2 ranged from 15.7% to 26.6%. See id. at 25–26. Crossover voting support in plaintiffs' Demonstration Area ranged from 7.3% to 18.5%. See id. at 27.

For North Carolina's 2022 statewide elections, Collingwood's data shows that Senate Districts 1 and 2 featured higher levels of crossover voting than plaintiffs' Demonstration Area.

54

See Collingwood Rep. at 27–28; [D.E. 115] 23–24. Crossover voting support in Senate Districts 1 and 2 ranged from 15.8% to 22.3%. See Collingwood Rep. at 28. Crossover voting in plaintiffs' Demonstration Area ranged from 10% to 13.4%. See id. at 27.

The results comport with North Carolina's 2020 statewide contests. Crossover voting in Senate Districts 1 and 2 ranged from 12.6% to 22.6%. See id. at 31; [D.E. 115] 24. Crossover voting in plaintiffs' Demonstration Area ranged from 8.9% to 18%. See Collingwood Rep. at 32; [D.E. 115] 24.

North Carolina's 2018 statewide elections also show substantial crossover voting. Crossover voting in Senate Districts 1 and 2 ranged from 20% to 26.2%. See Collingwood Rep. at 36; [D.E. 115] 25. Crossover voting in plaintiffs' Demonstration Area ranged from 16% to 18.3%. See Collingwood Rep. at 38; [D.E. 115] 25.

North Carolina's 2016 statewide elections again show substantial crossover voting. Crossover voting in Senate Districts 1 and 2 ranged from 18% to 51.6%. See Collingwood Rep. at 40; [D.E. 115] 25–26. Crossover voting in plaintiffs' Demonstration Area ranged from 18.9% to 43.4%. See Collingwood Rep. at 41; [D.E. 115] 25–26.

Collingwood's racial polarization analysis shows substantial and consistent levels of crossover voting in plaintiffs' Demonstration Area. See Collingwood Rep. at 27–41; [D.E. 115] 23–26. Collingwood's data comports with his analysis that black-preferred candidates do not need a majority BVAP district to win an election in plaintiffs' Demonstration Area. See Collingwood Rep. at 22.

Collingwood's analysis of the 2024 election also confirms high levels of crossover voting in Senate District 1 and 2 compared to the Demonstration Area. Crossover voting in enacted Senate District 1 ranged from 17.1% to 23.1% and 13.3% to 26.6% in enacted Senate District 2.

55

See [P.X. 279] 24–25. In the Demonstration Area, crossover voting ranged from 7.3% to 18.5%. See id. at 26.

Collingwood's analysis of Senate District 5 (40.35% BVAP), comprising Pitt and Edgecombe Counties, also showed black-preferred candidates won all but one of the 2022 contests with over 52% of the vote. See [D.E. 118] 72; [P.X. 128] 23; [D.E. 105] ¶ 38. Moreover, black-preferred candidates won all of the 2020 contests with over 54% of the vote, and some around 60% of the vote. Furthermore, they won all of the 2018 contests with over 52% of the vote. And they won all of the 2016 contests with over 53% of the vote. See [D.E. 118] 72–73; [P.X. 128] 24–26.

To the extent Collingwood concludes that legally significant polarized voting exists and compels dismantling Senate District 1 and 2 and creating a majority-black Senate district in northeast North Carolina, the court finds that Collingwood is not credible. The evidence does not remotely support such a conclusion.

Collingwood's electoral performance analysis shows that the black-preferred candidate won all of the contests in the demonstration districts with win margins on average between 10 and 20 points. See [D.E. 115] 4. In 2022, the black-preferred candidate wins every contest in Demonstration Districts A, B, C, and D by an average of between 6 and 10 percentage points. See id. at 181; Collingwood Rep. at 19–20. In 2020, the black-preferred candidate wins every contest, with an average win margin of 21% in Demonstration District A, 19% in Demonstration District C, and 18% in Demonstration District D. See [D.E. 115] 181–82; Collingwood Rep. at 20–21.

In 2018, the black-preferred candidate wins every contest in Demonstration Districts A, B, C, and D with around 60% of the vote. See [D.E. 115] 182; Collingwood Rep. at 21–22. In 2016, the black-preferred candidate wins every contest in Demonstration Districts A, B, C, and D typically by a margin of greater than 20%. See [D.E. 115] 182–83; Collingwood Rep. at 22–23.

56

Collingwood admitted that the results of his performance analysis were evidence that Demonstration Districts A, C, and D—drawn at 51.47% BVAP, 50.21% BVAP, and 49.22% BVAP, respectively—did not need to be drawn above 50% BVAP to perform as black opportunity districts. See [D.E. 115] 6–7. Moreover, even in Demonstration District D, the district with the lowest BVAP of 49.2%, the black-preferred candidate won every election in 2022 by an average of 7.4%. See id. at 7–9; Collingwood Rep. at 20.

Collingwood's performance analysis based on the 2024 elections confirms the demonstration districts do not need to be drawn above 50% BVAP to perform and featured average margins of victory in the double-digits. In the 2024 elections, the black-preferred candidates win all demonstration districts 100% of the time. See [P.X. 279] 19. The average margin of victory was 16.7% in Demonstration District A, 11.2% in Demonstration District B, 13.7% in Demonstration District C, and 13% in Demonstration District D. See id.

Collingwood analyzed the BVAP percentage that a district in the Demonstration Area requires to afford at least equal black electoral opportunity and concluded that the threshold is 47%. See Collingwood Rep. at 24. The evidence shows that Collingwood's estimate is not credible and is much too high.

Collingwood testified that his BVAP analysis was a "simulation" analysis, i.e., simulating each theoretical level of black voting population from one to one hundred. See [D.E. 115] 35–36. Collingwood, however, has not conducted his BVAP analysis "in another court context" and does not know if other courts have accepted it. Id. at 36–37. Moreover, Collingwood's methodology differed significantly from analyses that other voting rights experts in redistricting cases performed, including in cases in North Carolina. See [D.E. 20-1]; Bernard Grofman, Lisa Handley, David Lublin, Drawing Effective Minority Districts: A Conceptual Framework and Some

57

Empirical Evidence, 79 N.C. L. Rev. 1383 (2001). For example, experts in voting rights litigation typically conduct a "district-specific, functional analysis that considers the participation rates and voting patterns of whites" in order "to determine the percentage of the minority population that is needed to provide minority voters with an opportunity to elect candidates of their choice." [D.E. 20-1] 8; Grofman, Drawing Effective Minority Districts, 79 N.C. L. Rev. at 1423 ("A case-specific functional analysis . . . must be conducted to determine the percentage minority necessary to create an effective minority district.").

Collingwood did not calculate the percent needed to elect a black-preferred candidate at any district level or at the county level. See [D.E. 115] 38–39. Collingwood claimed that this analysis could not be conducted at the county level. Id. at 44–45 ("But if you have a county set at -- you know what the BVAP is -- say it's 50 percent -- you can't, like, do a simulation and say, 'Well, if this county was actually 45 percent,' or 35 percent, because that's not possible."); id. at 43 ("If you're looking at a full county, you know what the BVAP is of that full county, so you wouldn't be able to simulate a change in BVAP there."). The court disagrees. You can calculate the BVAP needed for a single-member district within a county to qualify as an opportunity district, just as Collingwood calculated that number for his "Demonstration Area."

Collingwood also testified that he could not conduct this analysis at the district level. See id. at 47–48 ("And the reason I say that is because any district, once you have it set in stone, the BVAP is fixed . . . once it is fixed, you know what the BVAP is. And so you just can't say that, well, we know the BVAP here is 47 but if we shift it down to 39, what would it be?"). Moreover, he rejected any analysis that adjusted the BVAP of an existing district to determine at what level that district would perform, claiming "that wouldn't make sense because that district is already set at the BVAP." Id. at 49; see id. at 50–51 ("[Y]ou have a fixed Black voting age population in

58

SD1. And so you cannot make it go lower and say, oh, if SD1 were two points black higher, now I conduct my turnout analysis and I conduct my racially polarized voting and I say now they win. We just -- we can't do that. It's fixed.").

Again, the court disagrees. An expert can calculate the BVAP needed to elect a black-preferred candidate in a given district, which could then be reconfigured to achieve that BVAP threshold. District lines are not "fixed." The premise of redistricting is that district lines can be redrawn. Experts have done a district-specific functional analysis for decades. See Grofman, Drawing Effective Minority Districts, 79 N.C. L. Rev. at 1408–22 (Tbls. 5-10).

Dr. Lisa Handley, Dr. Bernard Grofman, and others have formulated a method to determine the percentage of BVAP needed in an existing district to perform in a given election:

| Table 6: Percent Black Needed for Black Candidate to Win, Incorporating Cohesion & Crossover: Selected Southern Congressional Primary, Runoff & General Elections with Black Candidates | | | | | | | |
|---|---|---|---|---|---|---|---|
| Congressional District | Year | % Black Participation | % White Participation | % Black Needed To Equalize Turnout | % Black Votes for Black Candidate* (Cohesion) | % White Votes For Black Candidate* (Crossover) | % Black Needed Given Both Cohesion & Crossover |
| DEMOCRATIC PRIMARY | | | | | | | |
| FL 3 (Brown) | 1992 Primary | 28.7 | 21.6 | 42.9 | 93.5 | 34.4 | 31.9 |
| GA 2 (Bishop) | 1992 Primary | 39.8 | 44.4 | 52.7 | 64.4 | 51.2 | 43.7 |
| GA 11 (McKinney) | 1992 Primary | 27.3 | 38.2 | 58.3 | 89.7 | 60.4 | 22.4 |
| GA 4 (McKinney) | 1996 Primary | 30.5 | 12.8 | 28.6 | 93.3 | 24.6 | 22.0 |
| DEMOCRATIC RUNOFF | | | | | | | |
| FL 3 (Brown) | 1992 Runoff | 24.0 | 14.5 | 37.7 | 92.0 | 15.8 | 36.7 |
| GA 2 (Bishop) | 1992 Runoff | 35.3 | 30.3 | 46.2 | 79.0 | 23.5 | 43.7 |
| GA 11 (McKinney) | 1992 Runoff | 20.9 | 34.6 | 62.5 | 90.8 | 36.5 | 49.3 |
| GENERAL ELECTION | | | | | | | |
| FL 3 (Brown) | 1992 General | 37.8 | 68.6 | 54.3 | 97.1 | 25.6 | 41.7 |
| GA 2 (Bishop) | 1992 General | 55.9 | 62.6 | 53.8 | 96.3 | 32.4 | 36.5 |
| GA 11 (McKinney) | 1992 General | 60.3 | 57.8 | 48.9 | 96.7 | 36.0 | 33.0 |
| GA 4 (McKinney) | 1996 General | 58.3 | 66.4 | 53.2 | 98.1 | 31.2 | 37.5 |
| * The estimates of % white & black votes for black candidates is the % of whites & blacks voting for any of the black candidates, not simply the winning black candidate. | | | | | | | |

See id. at 1420. When questioned about the differences between his methodology and the methodology that Dr. Handley used in another North Carolina redistricting case, [D.E. 20-1],

59

Collingwood suggested that he and Dr. Handley were "basically doing the same thing." [D.E. 115] 46. Collingwood repeatedly admitted, however, that he did not know how those analyses were conducted. See [D.E. 115] 45 ("I just don't know what Dr. Handley is doing here."); id. at 44 ("I just don't know, you know, what she's doing. So I can't really speak to what she's doing."); id. at 47 ("But again, I just don't know what she's doing."); id. at 53 ("Well, I don't know exactly what she's doing because I don't know her"). The court does not credit Collingwood's analysis.

Collingwood's analysis differed from the analyses generally accepted in redistricting cases in several key respects. Dr. Handley's analysis was conducted in several county groupings and in individual counties. See [D.E. 115] 43, 53; [D.E. 20-1] 3–4, 12–13, Tbls. 3–22B. Collingwood's analysis was conducted as "a regionwide, 12-county analysis" in a "broader" region than a district. See [D.E. 115] 38, 54; see also Collingwood Rep. at 24 ("I use an area wider than any of the demonstration districts.").

Collingwood arbitrarily chose the Demonstration Area without a reliable methodology. As mentioned, this 12-county Demonstration Area region excluded several counties in enacted Senate District 1 (Perquimans, Camden, Currituck, Tyrell, and Dare Counties) and Senate District 2 (Carteret, Pamlico, Hyde Counties). See [D.E. 105] ¶¶ 31–32. The Demonstration Area also included counties that are not in every demonstration district. See [D.E. 115] 54. Collingwood also failed to include every county in the area plaintiffs have identified as the "Black Belt" by excluding Edgecombe County. See id. at 176–77.

The 12-county Demonstration Area also does not align with any enacted county grouping, or even with any of Mattingly's proposed county groupings. For example, the 12-county Demonstration Area is larger than (1) the 1-district grouping for Demonstration District A (Vance, Warren, Halifax, Northampton, Hertford, Bertie, Martin, and Washington Counties), Mattingly

60

Rep. at 6; (2) the 2-district grouping for Demonstration District B (Warren, Halifax, Northampton, Hertford, Bertie, Martin, Gates, Chowan, and part of Pasquotank Counties (District B); Camden, Currituck, Perquimans, Chowan, Washington, Tyrrell, Dare, Hyde, Pamlico, Carteret, and part of Pasquotank Counties (District B-1)), id. at 8; (3) the 3 district-grouping for Demonstration District C (Bertie, Chowan, Gates, Halifax, Hertford, Martin, Northampton, Warren, Washington, and part of Vance Counties) (District C); Franklin, Nash, part of Vance, and part of Wilson Counties (District C-11); Wayne, Green, and part of Wilson Counties (District C-4), id. at 9; or (4) the 2-district grouping for Demonstration District D (Warren, Halifax, Northampton, Hertford, Bertie, Gates, Martin, Washington, Tyrell, part of Pasquotank Counties (District D); Camden, Currituck, Perquimans, Chowan, Dare, Hyde, Pamlico, Carteret, and part of Pasquotank Counties (District D-2)). See id. at 10.

Collingwood's 12-county Demonstration Area is also noncontiguous. It excludes Perquimans County and leaves a hole in the northeast corner of North Carolina.

In contrast to Collingwood, Dr. Handley used both statewide and state legislative elections. Collingwood excluded state legislative contests. See [D.E. 115] 39–44. Incredibly, Collingwood claimed that state legislative contests cannot be used for this type of analysis, even though Dr. Handley used them for this type of analysis. See id. at 43.

Collingwood admitted that the black percentage needed to win will vary across both the grouping of the geography of voters and the election contests considered. See [D.E. 115] 39. Collingwood, however, only looked at two election years (2022 and 2020) for his BVAP analysis, even though he included four election years (2022, 2020, 2018, and 2016) for his performance analysis and his racially polarized voting analysis. See [D.E. 115] 43, 55; Collingwood Rep. at 2. In contrast, Dr. Handley used four election years in her analysis. See [D.E. 115] 43. Collingwood

61

did not credibly explain this change in datasets. Collingwood's analysis reflects result-driven analysis. Cf. In re Lipitor (Atorvastatin Calcium) Mktg. Sales Prac. & Prods. Liab. Litig., 892 F.3d 624, 634 (4th Cir. 2018) ("Result-driven analysis or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion.") A court may "exclude" or not credit such testimony. See id.

Collingwood's analysis has more problems. Collingwood's BVAP analysis based on 27 elections is reported as a histogram showing the estimated BVAP required in a particular contest for the black-preferred candidate to win. See [D.E. 115] 55; Collingwood Rep. at 25. His analysis showed two election contests where the BVAP needed was between 42% and 43% in order for the black-preferred candidate to win, 10 election contests where the BVAP needed to win was between 44% and 45%, and seven elections where the BVAP needed to win was between 46% and 47%. See [D.E. 115] 57–58; Collingwood Rep. at 25. Thus, in 19 of the 27 elections included in the analysis, 47% or less BVAP was necessary to guarantee victory for the black-preferred candidate. See [D.E. 115] 58.

In the remaining eight elections, there was one election where the BVAP needed to win was between 48% and 49% for the black-preferred candidate to win, one election between 50% and 51%, and six elections between 52% and 53%. See [D.E. 115] 58–60; Collingwood Rep. at 25. Thus, very few elections support a 47% BVAP estimate as the percent required for a performing district.

Collingwood did not report, and did not know, where all of the different election contests were in his histogram. See [D.E. 115] 60–61. He claimed that "[t]he exercise is to basically take . . . the results of these 27 separate contests and to show what the overall average is." Id. at 61.

62

Collingwood, however, only reported the mean of his analysis—47.07% BVAP—and did not report, and did not know, the median value in his analysis. See id. at 64. Moreover, he admitted that most of the values fall below a 47.07% BVAP. See id. at 62–63. Collingwood also admitted that his analysis did not show variation across counties, across districts, or across precincts. See id. at 61, 68. As discussed, however, variations exist across these counties, districts, and precincts.

Collingwood also admitted that his BVAP analysis did not discern between the precincts in split counties that were included in plaintiffs' demonstration districts as compared to the precincts in split counties that were not included. See id. at 68. He also agreed that if a given county or area has higher crossover voting than its neighbor, then that county or area would need less BVAP than a neighbor to elect the black-preferred candidate. See [D.E. 115] 62.

Unlike Dr. Handley, Collingwood failed to show his work. He reports no details about the specific contests falling within each BVAP level. He also failed to show "the percentage of vote a black-preferred candidate would receive in each House and Senate grouping of interest, given the turnout rates of blacks and whites and the degree of black cohesion and white crossover voting for each election, in a 50%, 45%, 40% and 35% black VAP district," as Dr. Handley's analysis did. See [D.E. 20-1] 12.

Collingwood also acknowledged that including Pitt and Edgecombe Counties, which he excluded from his BVAP analysis, would reduce the BVAP level needed to win in northeast North Carolina. See [D.E. 115] 75. Collingwood also admitted that his BVAP analysis "certainly demonstrates that a . . . Black performing district could be drawn under 50 percent." Id. at 76–77.

At bottom, Collingwood cherry-picked the election contests, the years, and the counties and ran his BVAP analysis in a manner inconsistent with generally accepted methods. Nonetheless, even with all of Collingwood's methodological deficiencies, Collingwood's BVAP

63

analysis confirms that 50% BVAP is not required in the Demonstration Area, and that the percent needed to win is likely well below 47%.

The court credits Alford's response to Collingwood's analysis. Alford found it was clear from Collingwood's analysis that 50% BVAP is not required to elect the black candidate of choice. See [D.E. 119] 54–55; [D.X. 59] 15. As Alford credibly explained, because all the black-preferred candidates are the Democratic candidates, the electoral performance of a district is the expected Democratic share of the general election vote in the district. See [D.E. 119] 51–52; [D.X. 59] 15. Moreover, Alford credibly testified that he had never seen the type of BVAP analysis Collingwood performed and called it "unusual." See [D.E. 119] 52, 55; see also id. at 114 ("It's not the way I would do that or the way I've seen other experts do it.").

Alford reproduced Dr. Baretto's graph depicting precinct-level election results graphed against the precinct-level 2020 census BVAP. For example, in 2020, the vote for white Democratic governor candidate Cooper, who was the black-preferred candidate, starts to move to about 50% around 35% BVAP, and Cooper wins in all precincts well below 50% BVAP. See [D.E. 119] 55–56; [D.X. 59] 16. Alford produced the same chart for Collingwood's 12-county Demonstration Area, which shows the vote for Cooper starting to move to about 50% in precincts around 37% BVAP and that Cooper wins all precincts well below 50% BVAP. See [D.E. 119] 55–56; [D.X. 59] 16–17. The 2016 Governor's race produced a very similar result. See [D.X. 59] 16–17.

Plaintiffs served supplemental reports from Collingwood that updated his BVAP analysis to add the 2024 election results and that increased his BVAP needed to win estimate to 47.7% BVAP. See [P.X. 279] 20. This analysis suffers from the same methodological flaws, and the court declines to credit it.

64

Collingwood again conducted his analysis on the 12-county Demonstration Area and did not analyze at the district-level or county-level.  See [P.X. 279] 20.  Collingwood reported the same "histogram" for his results, and again failed to report which elections fall within which BVAP ranges in his histogram.  Id. at 20–21.

As with his initial analysis, Collingwood's updated BVAP analysis shows that 50% districts are not necessary in the Demonstration Area, and the number is much lower than 47.7%. Moreover, it appears from the histogram that two elections fall within the 41% to 43% range, eleven elections fall between the 43% and 45% range, nine elections fall between the 45% and 47% range, and six elections fall between the 47% and 49% range.  See id. at 21.  Thus, more than half of the 42 elections Collingwood analyzed fall below the 47% BVAP range, and 28 out of 42 elections need 49% or less BVAP.  See id. at 21.

Collingwood engaged in other cherry-picking that affects the accuracy of his analysis. Collingwood only analyzed the behavior of black voters and white voters, and did not consider the voting behavior of non-black minority voters (i.e., voters other than black and white voters).  See [D.X. 76] 13.  This choice matters because the crossover proportion among white voters can be different from the level of crossover support among voters that are neither black nor white.  See id.  This difference is not important for assessing the impact of candidate party versus race, but it is important in a BVAP needed to win analysis because that analysis is impacted by the level of all non-black voting for the black-preferred candidate.  See id.

To respond to Collingwood's updated BVAP analysis, Alford first analyzed black versus "non-Black" (i.e., all voters who are not black) voting behavior, and found the estimates for crossover voting for non-black voters are "systematically higher" than the estimates of crossover voting based on white voters alone.  See id. at 13–14, Tbl. 5.

65

Alford then estimated the BVAP needed to win based on the 2024 elections following the procedure that Dr. Handley used in her work and used the black versus non-black voter estimates. Id. at 12–15. That analysis shows an average of 42% BVAP needed to win in the Demonstration Area, and also shows the levels needed in each of the 2024 contests analyzed. See [D.X. 76] 15–16, Tbl. 6. This 42% BVAP needed to win number, which is more than five percentage points lower than Collingwood's estimate, reflects higher crossover voting of all non-black voters in the Demonstration Area (roughly 23% on average) than for white voters alone (roughly 15% on average). See [D.X. 76] 15.

Alford also analyzed the BVAP needed to win in relevant areas in northeastern North Carolina, and he found that the average BVAP needed to win in Senate District 1 and in Senate District 2 was 41%. Id. at 16, Tbl. 6. In Edgecombe and Pitt Counties, that number drops to 30% and to 22% statewide. Id.

Alford's analysis contradicts Collingwood's updated BVAP analysis, and it also demonstrates that the analysis can be conducted at the district-level (such as Senate District 1 and 2) and at the county-grouping level (such as in the case of Edgecombe and Pitt Counties). In opposition, Collingwood rejects Alford's contention that the BVAP needed to elect a black-preferred candidate is less than 47%. See [P.X. 280] 2. In support, Collingwood cites lower black turnout in the 2024 election and claims that his BVAP estimate increased because of lower black turnout in 2024 compared to white voter turnout. See id. at 2, 7. But Collingwood overemphasizes the impact of these turnout differences given the "miniscule" increase—from 47% to 47.7%—in his BVAP estimates. Id. at 7. Moreover, Alford's BVAP needed to win analysis accounts for actual turnout in the 2024 election. See [D.X. 76] 5.

66

Collingwood also contends that the higher white crossover voting in Senate District 1 and Senate District 2 compared to the Demonstration Area "is attributable to coastal Outer Banks counties" that "cannot easily be combined with the Black-Belt counties of the Demonstration Area to construct a black-performing district." [P.X. 280] 2; see id. at 10. Collingwood's assertions about crossover voting, however, are based on his calculations that excluded the crossover voting of voters who are neither white nor black, which results in lower levels of crossover voting than when all non-black voters are considered.

At bottom, Collingwood's analysis is deeply flawed, and the court does not credit it. Moreover, Alford's analysis shows that even in Collingwood's Demonstration Area, and even using 2024 turnout data, the average BVAP needed to win is 42%. Furthermore, the court credits Alford's entire analysis as more reliable and accurate than Collingwood's entire analysis.

2.

Collingwood was not a credible witness at trial for other reasons. For example, before trial, Collingwood provided the legislative defendants with a copy of his resume. See [D.E. 115] 85; [P.X. 37] 1. On that resume, Collingwood prominently listed Dr. Barreto as the chair of Collingwood's Ph.D. committee. See [P.X. 37] 1. As the court discussed in its preliminary injunction order, the court found Dr. Baretto's "belated explanation undercut[] all of Dr. Barreto's conclusions by demonstrating that fuller data sets could change his estimated outcome." Pierce, 713 F. Supp. 3d at 229. Plaintiffs did not use Dr. Baretto at trial and instead retained his student, Collingwood.

After the first day of trial, plaintiffs served the legislative defendants with an updated version of Collingwood's resume. See [D.E. 115] 85. Collingwood testified that he personally edited this latest version of his resume. See id. When asked, under oath, if he removed anything

67

from his resume, Collingwood replied with an unqualified "no." Id. Collingwood went further, stating that "[y]ou would never do that in academia." Id.

But Collingwood did. Collingwood intentionally removed Dr. Barreto from his resume and plaintiffs served Collingwood's updated resume on the legislative defendants only after the start of trial. See [D.E. 115] 85–86. When confronted at trial about removing Dr. Barreto from his resume, Collingwood, visibly nervous, gave a rambling answer and disclosed other things he removed from his resume, including a personal website. See [D.E. 115] 86. Collingwood attempted to explain that "people at my level of associate professor who is [sic] going up for full [sic] in academia do not have their chair or their committee or the people like that." Id.

Collingwood's explanation is unconvincing and reflects poorly on his credibility. Moreover, Collingwood admits that he removed Dr. Barreto from his resume only after he was deposed. See id. Collingwood's credibility is also undermined because the resume listed on his University of New Mexico faculty page still prominently identifies Dr. Barreto as the chair of his Ph.D. committee.[15] The court finds that Collingwood's transparently false excuses undermine his credibility.

The record contains other examples of Collingwood's lack of candor. Collingwood included two contests—the 2018 State Supreme Court race and 2018 Court of Appeals 2—involving three candidates in his analysis. See Collingwood Rep. at 6. In both his performance analysis and his racially polarized voting analysis, Collingwood combined the two candidates who obtained high levels of support from white voters together to indicate the contests as "Blocked" and as not performing for the black-preferred candidate. Id. at 6, 15–16; [D.E. 115] 9–21. But

---

[15] The resume available on Collingwood's faculty page lists Barreto as the chair of his Ph.D. committee on the first page. See Univ. of N.M., Faculty, Loren Collingwood, https://polisci.unm.edu/people/faculty/profile/collingwood1.pdf (last visited Sept. 29, 2025).

68

Collingwood admitted that the black-preferred candidate received a higher vote total than either of the white-preferred candidates individually. See [D.E. 115] 10, 12, 19. The black-preferred candidate was not "blocked." Collingwood made "an assumption" that a white-preferred candidate would win Senate District 1 and 2 in a two-candidate race. See id. at 15–15. The analysis, however, is supposed to observe voting preference by race, not to assume that question away. Collingwood had no basis to speculate where white support for one or the other of the white-preferred candidates would go in the event of a two-candidate race. The only observable fact is that the black-preferred candidate actually received the most votes and was not blocked. Alford credibly responded and explained that the black-preferred candidate did not lose this election and that white voters did not block the black-preferred candidate. See [D.E. 119] 122.

Collingwood also lacks experience analyzing North Carolina voting patterns and geography. Collingwood has never served as an expert witness in a case in North Carolina or submitted an analysis of racially polarized voting to a court in North Carolina before this case. See [D.E. 117] 173. Collingwood has only ever advised jurisdictions during redistricting in California and New Mexico and a significant amount of his experience is in California. See id. at 172–73. Other than one paper that included some data from North Carolina, Collingwood has not analyzed racially polarized voting in North Carolina in an academic setting. See id. at 173. The court does not credit Collingwood's analysis.

3.

The court also finds that the success of minority-preferred candidates in crossover districts supports a finding that legally significant racially polarized voting does not exist in North Carolina, including in northeast North Carolina. For example, Senate District 5 in Edgecombe County and Pitt County had a BVAP of 40.5% and comfortably elected a black Democrat (Kandie Smith) in

69

2022 and 2024. See [D.E. 105] ¶¶ 38, 67. Likewise, House District 8 in Pitt County had a BVAP of 45.35% in 2024 and 38.13% in 2022 and comfortably elected a black Democrat (Gloristine Brown) in 2022 and 2024. See id. at ¶¶ 45, 73. Similarly, House District 24 in Wilson County and Nash County had a BVAP of 38.5% and comfortably elected a black Democrat (Dante Pittman). See id. at ¶ 55. And House District 27 in Halifax County, Northampton County, and Warren County had a BVAP of 39.5% and comfortably elected a black Democrat who is also the lead plaintiff in this case (Rodney Pierce). See [D.E. 105] ¶ 55. The list goes on throughout North Carolina. For example, Sydney Batch, a black Senator and current Senate Democratic Leader, represents a district in Wake County "that's less than 20 percent" black, and she comfortably won her district. [D.E. 116] 99. Senator Blue, a black Senator and former Senate Democratic Leader, represents a district in Wake County that is only 40% black, and he comfortably won his district. See id. Representative Reives, a black Representative and Minority Leader in the House, represents House District 54 in Chatham and Randolph Counties. See [D.E. 116] 148. House District 54 has a BVAP of 11.6%. See [D.E. 118] 101. Representative Reives has comfortably won five straight elections. See [D.E. 116] 148.

The success of black-preferred candidates also exists in congressional races. For example, in 2022, Congressman Don Davis (an African-American Democrat) won Congressional District 1 in northeast North Carolina with a BVAP of 41.23%. See [D.E. 116] 31–32. Congressional District 1 includes Bertie, Camden, Chowan, Currituck, Edgecombe, Gates, Granville, Greene, Halifax, Hertford, Lenoir, Martin, Nash, Northampton, Pasquotank, Perquimans, Tyrell, Vance, Warren, Washington, Wayne, and Wilson Counties. See [D.E. 105] ¶ 117. Congressman Davis comfortably won reelection in 2024. See id. Congressman Davis's experience with North Carolina voters is not unique. See Pierce, 713 F. Supp. 3d at 232 n.11. Congresswoman Alma

70

Adams (an African-American Democrat) represents the people in Congressional District 12, which encompasses a portion of Mecklenburg County and Cabarrus County. District 12 is in western North Carolina. See id. Congresswoman Valerie Foushee (an African-American Democrat) represents the people in Congressional District 4, which encompasses Alamance County, Durham County, Granville County, Orange County, Person County, and a portion of Caswell County. District 4 is in central North Carolina. See id. They were elected in districts in 2022 with a BVAP below 50%. See id. Congresswoman Adams and Congresswoman Foushee were comfortably reelected in 2024.

Notably, Congressman Davis represents most of plaintiffs' Demonstration Area. In fact, most, if not all of plaintiffs' Demonstration Area has been represented in Congress by a black Democrat since 1992. See [D.E. 116] 16–32.

Congressman Butterfield, who represented most, if not all of plaintiffs' Demonstration Area in Congress from 2004 to 2020, testified as a lay witness and does not believe that black candidates need a majority BVAP district to win throughout much of North Carolina. See id. at 25. Congressman Butterfield also testified that black-preferred candidates could succeed in districts with less than 50% BVAP  See id. at 24–25. Congressman Butterfield admitted that he won overwhelmingly in Congressional District 1 from 2004 to 2010, when the BVAP in the district was 47%. See id. at 16–22. Likewise, he won even bigger in 2012 and 2014 when the BVAP in the district was 52.65%. See id. at 22–26. Moreover, he won big in 2016, 2018, and 2020, when the BVAP in the district was 44.5%. See id. at 28–29. Furthermore, as mentioned, Congressman Davis (a black Democrat) won the district comfortably in 2022 and 2024, when the district's BVAP was 41.23%. See id. at 31–32.

71

Oddly, Congressman Butterfield also testified that a higher BVAP is necessary in plaintiffs' Demonstration Area for black-preferred candidates to win. See id. at 25–26. The court does not credit Congressman Butterfield's testimony concerning the Demonstration Area given his self-described "back-of-the-envelope analysis," the demonstrated white crossover voting in northeast North Carolina reflected in Congressman Butterfield and Congressman Davis's electoral success in districts with a BVAP below 50%, the flaws in Collingwood's analysis, and the persuasiveness of Alford's analysis. Cf. id. at 16–32.

The court finds that racial block voting does not "operat[e] at such a level that it would actually minimize or cancel . . . minority voters' ability to elect representatives of their choice." Pierce, 97 F.4th at 212 (quotation omitted); see Milligan, 599 U.S. at 18; Gingles, 478 U.S. at 51; Covington, 316 F.R.D. at 168. Accordingly, having reviewed the entire record, the court finds that plaintiffs failed to prove Gingles' third precondition by a preponderance of the evidence.

### D.

Courts consider whether a Section 2 violation has occurred based on the totality of the circumstances only after a party has established the three Gingles preconditions. See Strickland, 556 U.S. at 11–12, see Covington, 316 F.R.D. at 167. As discussed, plaintiffs failed to prove the first and third Gingles preconditions. Thus, plaintiffs' Section 2 claim fails.

Even if plaintiffs did satisfy Gingles' three preconditions, the court finds that plaintiffs failed to prove under the totality of the circumstances that the district lines in northeast North Carolina dilute the votes of black voters. See Perez, 585 U.S. at 64; 52 U.S.C. § 10301(b); Milligan, 599 U.S. at 18; Abbott, 585 U.S. at 614; De Grandy, 512 U.S. at 1011–12 ("[I]f Gingles so clearly identified the three [preconditions] as generally necessary to prove a [Section] 2 claim, it just as clearly declined to hold them sufficient . . . . [C]ourts must also examine other evidence

72

in the totality of circumstances . . . ."); Gingles, 478 U.S. at 44–46; Pierce, 97 F.4th at 218;

Covington, 316 F.R.D. at 125. The Gingles totality-of-the-circumstances inquiry about vote

dilution is "peculiarly dependent upon the facts of each case." Milligan, 599 U.S. at 19 (quotation

omitted); Abbott, 585 U.S. at 614. Moreover, this court has examined the facts and conducted "an

intensely local appraisal of the electoral mechanism at issue, as well as a searching practical

evaluation of the past and present reality." Milligan, 599 U.S. at 19 (quotation omitted); see De

Grandy, 512 U.S. at 1018; Gingles, 478 U.S. at 79; Charleston Cnty., 365 F.3d at 349.

> Among other local considerations, the court has considered:
>
> (1) the extent of the state's historical discrimination concerning the right to vote
> against plaintiffs' minority group; (2) the extent of racially polarized voting; (3) the
> extent to which the state has adopted other voting practices that may exacerbate
> discrimination against the minority group; (4) whether members of plaintiffs'
> minority group have been denied access to a candidate slating process; (5) whether
> members of plaintiffs' minority group in the state "bear the effects of
> discrimination" in education, employment, or health, hindering their ability to
> participate in the political process; (6) whether political campaigns have been
> characterized by overt or subtle racial appeals; (7) the extent to which members of
> plaintiffs' minority group have been elected to public office in the jurisdiction; (8)
> whether there is a significant lack of responsiveness by the state's elected officials
> to the "particularized needs" of plaintiffs' minority group; and (9) whether the
> state's policy underlying its use of the challenged voting procedure is tenuous.

Pierce, 97 F.4th at 219 (quotation omitted); see Gingles, 478 U.S. at 36–38; S. Rep. No. 97-417,

at 28–29 (1982). Courts call these considerations the Senate Factors. See, e.g., Milligan, 599 U.S.

at 69–70 (Thomas, J., dissenting); United States v. Charleston Cnty., 318 F. Supp. 2d 302, 321

(D.S.C. 2002).

"There is no requirement that any particular number of factors be proved, or that a majority

of them point one way or the other." Pierce, 97 F.4th at 219 (cleaned up); see Gingles, 478 U.S.

at 45; Magnolia Bar Ass'n, Inc. v. Lee, 994 F.2d 1143, 1147 (5th Cir. 1993). Senate Factors aside,

the court may consider "any circumstance that has a logical bearing on whether voting is equally

open and affords equal opportunity." Brnovich v. Democratic Nat'l Comm., 594 U.S. 647, 668–

73

69 (2021) (quotation omitted). But "equal openness and equal opportunity are not separate requirements." Id. at 668. At bottom, "the core of [Section 2 requires] that voting be equally open." Id. (quotation omitted).

As a threshold matter and before examining the nine Senate Factors, the court notes the mismatch between plaintiffs' racially polarized voting analysis and their Senate Factors analysis. Plaintiffs' expert Collingwood performed a racial polarization analysis on plaintiffs' 12-county Demonstration Area (i.e., Bertie, Chowan, Gates, Halifax, Hertford, Martin, Northampton, Pasquotank, Tyrrell, Vance, Warren, and Washington Counties). See Collingwood Rep. at 11. For the Senate Factors, however, plaintiffs' expert Burch analyzed only 11 counties (Bertie, Chowan, Edgecombe, Gates, Halifax, Hertford, Martin, Northampton, Vance, Warren, and Washington Counties). See, e.g., Burch Rep. [P.X. 21] 10. Burch's substitution of Edgecombe County for Pasquotank County and Tyrrell County undermines the credibility of Burch's Senate Factors analysis. Notably, in the amended complaint, plaintiffs cabined their requested relief to "leav[e] intact the current district comprised of Pitt and Edgecombe Counties." Am. Compl. at 22. This district is Senate District 5, which is a black-performing crossover district drawn without considering race, who Senator Kandie Smith (an African-American Democrat) represents. Nonetheless, plaintiffs purport to rely on Edgecombe County's unique demographics, circumstances, and history to prove the necessity of a majority-black Senate district that will not include Edgecombe County. Moreover, the court is left without a Senate Factors analysis from plaintiffs that includes Tyrrell County and Pasquotank County.

The court gives much less weight to Burch's Senate Factors analysis due to her cherry-picked inclusion of Edgecombe County and cherry-picked omission of Tyrell County and

74

Pasquotank County. Such cherry-picking undermines Burch's credibility and analysis. See, e.g., In re Lipitor, 892 F.3d at 634.

1.

The first Senate Factor concerns "the extent of the state's historical discrimination concerning the right to vote against plaintiffs' minority group." Pierce, 97 F.4th at 219; see Gingles, 478 U.S. at 36–37; S. Rep. No. 97-417, at 28–29 (1982). Courts addressing the first Senate Factor emphasize that "contemporary examples of discrimination are more probative than historical examples." Veasey v. Abbott, 830 F.3d 216, 257 (5th Cir. 2016) (en banc); Pierce, 97 F.4th at 221.

At the preliminary injunction stage, plaintiffs mustered "very old" and "overwhelmingly outdated" evidence of historical discriminatory practices and cases. Pierce, 97 F.4th at 220; see Pierce, 713 F. Supp. 3d at 234. At trial, plaintiffs called Congressman Butterfield, Senator Blue, Representative Reives, Representative Pierce, and Matthews to recount instances of historical electoral discrimination in North Carolina. See [D.E. 116] 6–155. Plaintiffs' witnesses are not trained historians, were not qualified as experts, and could only testify to their personal knowledge. See Fed. R. Evid. 602. They testified about very old cases in North Carolina. Thus, the court gives this testimony little weight.

Plaintiffs reiterate many of their argument about old cases in their post-trial briefing. See [D.E. 126] 221–27. The court acknowledges North Carolina's long history. The court, however, places greater weight on contemporary evidence. See, e.g., Pierce, 97 F.4th at 221; Veasey, 830 F.3d at 257.

In their post-trial briefing, plaintiffs cite two cases as contemporary evidence that North Carolina implements "intentionally racially discriminatory" election laws. See [D.E. 126] 225

75

(citing N.C. State Conf. of the NAACP v. McCrory, 831 F.3d 204 (4th Cir. 2016), and N.C. A. Philip Randolph Inst. v. N.C. State Bd. of Elections, 730 F. Supp. 3d 185 (M.D.N.C. 2024), aff'd, 2025 WL 2627027, __ F.4th __ (4th Cir. 2025)).  In McCrory, however, the Fourth Circuit did "not suggest[] that any member of the General Assembly harbored racial hatred or animosity toward any minority group." 831 F.3d at 233.  As for North Carolina A. Philip Randolph Institute, that case discussed a felon-disenfranchisement law that the General Assembly originally enacted more than 150 years ago.  See 730 F. Supp 3d at 194.  The General Assembly does not intentionally discriminate against black voters and has not for a long time.  See Strickland, 556 U.S. at 24 ("There is no evidence of discriminatory intent in this case."); Covington, 316 F.R.D. at 124 n.1 (making "no finding that the General Assembly acted in bad faith or with discriminatory intent in drawing the challenged districts."); Harris, 159 F. Supp. 3d at 604 (declining to find the General Assembly acted in bad faith in drawing challenged congressional districts).

Considering the paucity of contemporary evidence of intentional discrimination concerning the right to vote against black voters, the court gives plaintiffs' evidence little weight. Thus, the court finds that Senate Factor one weighs against plaintiffs and favors defendants.

### 2.

The second Senate Factor concerns the extent of racially polarized voting.  See Gingles, 478 U.S. at 36–38; Pierce, 97 F.4th at 219; S. Rep. No. 97-417, at 28–29 (1982).  When analyzing this factor, courts consider whether "the State or political subdivision is racially polarized." Raffensperger, 587 F. Supp. 3d at 1316 (quotation omitted); see LULAC, 548 U.S. at 426 (quotation omitted); Wright v. Sumter Cnty. Bd. of Elections & Registration, 979 F.3d 1282, 1305 (11th Cir. 2020).  "This factor will ordinarily be the keystone of a dilution case." Alpha Phi Alpha Fraternity Inc., 587 F. Supp. 3d at 1316; Wright, 979 F.3d at 1305.

76

As discussed, plaintiffs failed to prove that legally significant racially polarized voting occurs in North Carolina generally, in northeast North Carolina specifically, in the Demonstration Area specifically, or in Senate Districts 1 and 2 specifically. In fact, the evidence shows substantial crossover voting statewide, in northeast North Carolina, in the Demonstration Area, and in Senate Districts 1 and 2. Furthermore, the court finds that, to the extent racially polarized voting exists in North Carolina, including in northeast North Carolina, the Demonstration Area, or in Senate Districts 1 and 2, it does not materially affect black voters' ability to participate in the electoral process or to elect the candidate of their choice. Thus, the court finds that Senate Factor two weighs against plaintiffs and strongly favors defendants.

3.

The third Senate Factor concerns the extent to which the state has adopted other voting practices that may exacerbate discrimination against the minority group. See Gingles, 478 U.S. at 36–38; Pierce, 97 F.4th at 221; S. Rep. No. 97-417, at 28–29 (1982). In other words, the court asks "whether other voting practices or procedures amplify the discriminatory effect of the challenged voting procedure." *Pierce*, 97 F.4th at 221. The court looks to voting practices and procedures "in operation at the time of the suit." Id. (quotation omitted); see Gingles, 478 U.S. at 39–40, 56; Charleston Cnty., 365 F.3d at 351 (analyzing practices and procedures contemporaneous with the lawsuit).

North Carolina employs typical voting practices and procedures. See Taylor Rep. [D.X. 62] 18. As Taylor noted at trial, North Carolina does not have unusually large Senate districts, does not employ cumulative voting, and does not have a single-shot provision. See [D.E. 119] 235. Far from exacerbating discrimination, North Carolina's voting procedures specifically cater to black voters in northeast North Carolina. For example, in 2022, the North Carolina Board of

77

Elections placed 131 polling places, or 4.93% of the state's total polling places, in plaintiffs' Demonstration Area even though only 2.68% of the state's voting age population resides there. See Taylor Rep. at 19. Moreover, North Carolina placed 14 out of the 19 early voting locations for the 2022 election in predominantly black census tracts. See Taylor Rep. at 19–20; [D.E. 119] 238.[16]

To the extent plaintiffs rely on racial gerrymandering cases from last decade, that reliance fails. Last decade, the General Assembly relied on the mistaken but sincere belief that Section 2 required the majority-black districts it drew. See Covington, 316 F.R.D. at 124 n.1 ("[W]e make no finding that the General Assembly acted in bad faith or with discriminatory intent in drawing the challenged districts . . . ."). Section 2 did not, however, require the districts, and the court rejects plaintiffs' request to adopt a view of Section 2 that Covington rejected. Likewise, the court rejects plaintiffs' contention that Covington concerned packing. The Covington three-judge court expressly noted that plaintiffs in Covington did not "bring [a packing] claim." Id. Thus, the court finds that the third Senate Factor weighs against plaintiffs and strongly favors defendants.

4.

The fourth Senate Factor concerns whether members of plaintiffs' minority group have been denied access to a candidate slating process. See Gingles, 478 U.S. at 36–38; Pierce, 97 F.4th at 219; S. Rep. No. 97-417, at 28–29 (1982). North Carolina does not use a candidate slating process. Thus, the court finds that the fourth Senate Factor does not apply.

---

[16] Taylor used American Community Survey data to conclude that the early voting place census tracts were majority black. See Taylor Rep. at 20 n.41. As discussed, the court discounts American Community Survey data. Thus, the court finds that early polling places were located in predominantly black census tracts rather than, as Tayor states, census tracts with a numerical majority of black voting age individuals.

78

5.

The fifth Senate Factor concerns whether members of plaintiffs' minority group in the state "bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process." Gingles, 478 U.S. at 45; Pierce, 97 F.4th at 222; see S. Rep. No. 97-417, at 28–29 (1982).

Burch cites a litany of social statistics to show that black North Carolinians still bear the effects of past discrimination. The fifth Senate Factor, however, contemplates the "effects of past discrimination," not merely outcomes that happen to correlate with race. Gingles, 478 U.S. at 45. Indeed, "the fact that two variables are correlated does not guarantee the existence of a relationship." Federal Judicial Center, Reference Manual on Scientific Evidence 310 (3d ed. 2011); see People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205, 111 F.3d 528, 537 (7th Cir. 1997) ("[A] statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation."). While a statistically rigorous analysis is not required to prove causation, Burch failed to conduct her own causal analysis, rely on a persuasive causal analysis, or explore alternative explanations. For example, Burch states that black communities in plaintiffs' Demonstration Area lack access to "supermarkets and other vendors of nutritious food." Burch Rep. at 20. Burch simply assumes past racial discrimination caused this result. See id. at 2–3, 19–20. Taylor, however, notes that white communities in western North Carolina face the same circumstances. See Taylor Rep. at 14–15. Predominantly white rural counties, such as Allegheny, Avery, Clay, Graham, and Mitchell Counties, also lack access to "supermarkets and other vendors of nutritious food." Burch Rep. at 20; see Taylor Rep. at 15. The court credits Taylor's opinion over Burch's opinion that

79

the rural-urban divide, rather than the effects of past race discrimination, explains Burch's highlighted statistic. See Taylor Rep. at 15.

As mentioned, Burch failed to include her own causal analysis, and the cited causal analyses in her testimony and report do not support her conclusions. Cf. [D.E. 115] 124–26; [D.E. 118] 4–9, 15–17, 19–20, 22–23, 27–28. The court does not credit Burch's other highlighted disparities in her testimony and report as the "effects of past discrimination." Gingles, 478 U.S. at 45. Several other factors, besides past racial discrimination, could cause the disparities that Burch identifies and are unaccounted for in her analysis. For example, with respect to disparate educational performance, Burch failed to consider the effects of growing up in a single-parent household, a child's peers, early childhood care, and other factors on educational performance. Likewise, with respect to disparate employment outcomes, Burch failed to account for job availability, job interests, and job skills, among other factors. Similarly, with respect to disparate health outcomes, Burch failed to account for differences in exercise, diet, and other lifestyle choices in arriving at her conclusions. If these factors affect racial groups at different rates, these factors could cause the disparities Burch identifies. See, e.g., Federal Judicial Center, Reference Manual on Scientific Evidence 285 (3d ed. 2011) (defining "confounding variable"); id. at 221 (noting that causal inference based upon observational data "rest[s] on a foundation that is less secure than that provided by randomized controlled trials").[17]

---

[17] A confounding variable is a variable that "correlate[s] with the independent and dependent variable[s] and cause[s] a correlation to exist between those variables without causation being present." In re Lipitor, 892 F.3d at 633 n.6 (cleaned up); cf. United States v. Moore, 145 F.4th 572, 583 (4th Cir. 2025) ("Statistics can shed light on the presence of discriminatory intent if race can be isolated from other confounding variables." (cleaned up)). Thus, if the factors that Burch did not analyze are correlated with race, the disparate outcomes she identifies are not the "effects of past discrimination." Gingles, 478 U.S. at 45.
   In short, the problem is not that the court believes or does not believe that the above listed factors caused the disparities identified. The problem is that Burch failed to present evidence

80

The court cannot say these other factors caused or contributed to the disparities, but an expert needs to control for other relevant variables to infer a causal relationship. At bottom, the court is unwilling to attribute present-day disparities to past racial discrimination on the sole basis of Burch's "ipse dixit." See Pierce, 97 F.4th at 222; cf. Flowers, 588 U.S. at 335 (Thomas, J., dissenting) ("Deciding whether a statistical disparity is caused by a particular factor requires controlling for other potentially relevant variables; otherwise, the difference could be explained by other influences."); Engilis v. Monsanto Co., 2025 WL 2315898, at *7–10, __ F.4th __ (9th Cir. 2025); In re Lipitor, 892 F.3d at 644–45; Reyes v. Waples Mobile Home Park Ltd. P'ship, 903 F.3d 415, 425 (4th Cir. 2018); Belville v. Ford Motor Co., 919 F.3d 224, 234 (4th Cir. 2019); Nease v. Ford Motor Co., 848 F.3d 219, 232–33 (4th Cir. 2017); Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 203 (4th Cir. 2001).

a.

As for education, Taylor and Burch agree that North Carolina has a "checkered past" with race and education. Taylor Rep. at 7; Burch Rep. at 4–8. The court, however, credits Taylor's opinion that "[t]hings are different today." Taylor Rep. at 7. North Carolina schools are less segregated than the national average. See id. at 9; [D.E. 119] 218. While schools in North Carolina's Black Belt are slightly more segregated than the North Carolina average, those schools are less segregated today than they were in 1991. See Taylor Rep. at 9–10. Taylor presented comparative and temporal analysis that provided important context missing from Burch's incomplete analysis. See [D.E. 125-1] 42–43. Moreover, Burch examined educational disparities, but she did not analyze the degree to which educational attainments contributed to any observed

---

sufficient to prove by a preponderance of the evidence that past racial discrimination caused the disparities she identified.

81

voter turnout differences in North Carolina.  See [D.E. 118] 64–65.  Burch also cites studies showing a "powerful relationship between education and voting."  [D.E. 115] 111; see Burch Rep. at 4.  Burch, however, does not persuasively link present-day educational disparities to past racial discrimination in North Carolina.

Burch cites a racial gap between white and black students for reading and math scores.  See Burch Rep. at 10–11.  Taylor, however, correctly notes that North Carolina's racial gap concerning these scores is indistinguishable from, if not slightly smaller than, the national average.  See Taylor Rep. at 10; [D.E. 119] 221–23.  Moreover, schools in the Demonstration Area have smaller racial gaps than schools in North Carolina's most-populous counties.  See Taylor Rep. at 11.

In conducting her analysis, Burch used statewide data to analyze racial disparities between black and white students in North Carolina.  See Burch Rep. at 4–13; [D.E. 115] 111–12.  Burch also used data from the North Carolina Department of Public Instruction to analyze student proficiency in reading and math, which was statewide data.  See [D.E. 115] 116–17.  Burch used data from the Stanford Education Data Archive to analyze county health rankings, which included reading and math test scores of third graders at the county level.  See [P.X. 27]; [D.E. 115] 118–20.

Burch relied on the 2022 ACS one-year estimates for data regarding statewide racial disparities in educational attainment.  See [D.E. 115] 112–13.  Burch, however, admitted that not every county is surveyed, and some may be missing in the ACS one-year estimates.  Id. at 113.  Thus, it is unlikely that all relevant North Carolina counties were included in the estimate.  For other portions of her socioeconomic disparity analysis, Burch relied on the 2021 five-year ACS estimates.  There were, however, more recent 2022 five-year ACS estimates available when Burch

82

issued her report. See [D.E. 117] 92. Burch did not use that more recent data. See [D.E. 118] 67; Burch Rep. at 12–17 & Figs. 4–8.

In contrast to Burch, Taylor analyzed data from the National Center for Education Statistics compiled from 1990 to 2024 by education researchers to create a "Segregation Index." See [D.E. 119] 206, 218; Taylor Rep. at 7–8. The Segregation Index provides a score that is a variance ratio or evenness index measuring the difference between white and nonwhite students in their exposure to students from the other group. See [D.E. 119] 217–18; Taylor Rep. at 8. A perfect exposure score would reflect an exposure rate that is roughly proportionate to the population of a given racial group in the jurisdiction. See [D.E. 119] 218–19. As Taylor testified, however, it is practically impossible for a jurisdiction to have a perfect exposure score because of residential patterns. See id. at 219.

Using the Segregation Index, Taylor found that North Carolina schools are less segregated compared to the rest of the nation. See id. at 218; Taylor Rep. at 9. The average white student in North Carolina attends a school that is 30-35% nonwhite, while the average white student in the U.S. nationally attends a school that is 25-30% nonwhite. See [D.E. 119] 218; Taylor Rep. at 9. At these rates, North Carolina schools are not considered "predominantly same race/ethnicity," according to the Government Accountability Office. See Taylor Rep. at 9. Taylor's analysis provides context to the dissimilarity index Burch uses in her report. See [D.E. 120] 46–47; Burch Rep. at 6 n.19.

Analyzing the segregation rates in the eleven counties that Burch analyzed, Taylor found that the population makeup of the schools was roughly proportionate to the overall population averaged across the eleven counties. See [D.E. 119] 219; Taylor Rep. at 9–10. In fact, comparing white versus black student population scores for 2022, Taylor found that, although schools in the

83

eleven counties were slightly more segregated compared to the rest of the State, school segregation for the region had improved since 1991. See [D.E. 119] 220; Taylor Rep. at 9–10.

Taylor also analyzed data on racial gaps in student test scores. See [D.E. 119] 220; Taylor Rep. at 10–11. As part of his comparative approach, Taylor did not look simply to see whether any gaps in attainment existed between white and black North Carolinians, but rather how attainment rates in North Carolina compare to those across the United States. See [D.E. 119] 221. Using 2022 data from the National Assessment of Educational Progress's "Nation's Report Card," which publishes proficiency scores in math and reading for grades 4 and 8, Taylor observed that North Carolina's white and black students are at the national average for their demographic groups. See [D.E. 119] 220–21; Taylor Rep. at 10. Although a gap existed between white and black student performance, the racial gaps in North Carolina were less than in the United States as a whole. See [D.E. 119] 221; Taylor Rep. at 10.

Analyzing the racial gap in test scores in the eleven counties, Taylor compared test scores in the eleven counties against the eleven largest counties in North Carolina. See [D.E. 119] 222–23; Taylor Rep. at 11. Taylor found that the racial gap average for the eleven counties was a gap of 0.63 points for reading and 0.5 points for math, while it was a gap of 0.79 points for reading and 0.93 points for math in the eleven largest counties in North Carolina. See [D.E. 119] 222; Taylor Rep. at 11.

Burch also reported on racial gaps between white and black student test scores in the eleven counties, but she used data from the University of Wisconsin Population Health Institute that was four years older than the testing data upon which Taylor primarily relied. See Burch Rep. at 10–11; [D.E. 119] 221–22. Because Burch used data from 2018, her report and data could not consider how the COVID-19 pandemic may have affected test scores, but she speculated at trial about its

impact. See [D.E. 119] 222. Conversely, Taylor did not speculate because his data from 2022 did account for potential impact on scores due to the COVID-19 pandemic. See id.

Additionally, Taylor analyzed the same University of Wisconsin Population Health Institute test score data that Burch reviewed. Taylor found that a more comprehensive review of the same data set revealed that, while a racial gap existed in all eleven counties, the gap for third graders in the counties was relatively small compared to the gaps noted in other national and statewide data sets. See [D.E. 120] 6–8; Taylor Rep. at 11.

Taylor also analyzed data on high school graduation rates by race. See [D.E. 119] 223; Taylor Rep. at 10–11. Using data from the National Center for Education Statistics from the 2021-22 school year, Taylor found that the adjusted cohort graduation rate ("ACGR") between white and black high school students was narrower in North Carolina than the rest of the United States. See [D.E. 119] 223; Taylor Rep. at 11. Specifically, in North Carolina the ACGR difference between whites and blacks was seven percentage points, compared to nine percentage points nationally. See [D.E. 119] 223; Taylor Rep. at 11. Since the white graduation rate was the same in North Carolina as the rest of the nation at 90%, North Carolina's smaller racial gap in graduation rates was attributable to the black graduation rate in North Carolina being 2% higher at 83% than the national black graduation rate of 81%. See [D.E. 119] 224; Taylor Rep. at 11.

Burch analyzed graduation rates using data reflecting the percentage of white and black residents who are 25 years and older without a high school diploma in the eleven counties. See [D.E. 119] 224; Burch Rep. at 12. Unlike Taylor's direct observation of the graduation rates of North Carolina high schoolers, Burch's methodology introduced additional variables because it captured individuals who move into the State without a diploma and missed individuals who graduated in the State and then left before being surveyed. See [D.E. 119] 224–25.

85

Burch also never analyzed whether there were disparities in educational funding between majority-minority and majority-white school districts in North Carolina, even though that type of analysis is something she has done in other cases where she has served as an expert. See [D.E. 118] 70–71. Moreover, Burch admitted that there was data showing that some majority-minority school districts in North Carolina receive more education funding on a per-pupil basis than majority-white districts in North Carolina. See id. at 71.

As for higher education, North Carolina has a higher proportion of black college and graduate degree holders than black communities nationwide. See Taylor Rep. at 12. In 2009, only 18% of black North Carolinians had a college or graduate degree. See id. By 2022, 26.9% of black North Carolinians had a college or graduate degree. See id. In less than a generation, black North Carolinians went from underperforming the black national average by 0.4%, to overperforming the black national average by 0.6%. See id.; [D.E. 119] 225.

North Carolina vigorously has encouraged higher education for black students. As of 2023, the number of black students enrolled in the University of North Carolina ("UNC") system is proportionate with North Carolina's black population. See [D.E. 119] 226. Since 2018, North Carolina has reduced tuition at two historically black universities to $500 per semester. See Taylor Rep. at 12; [D.E. 119] 225–26. One of these universities, Elizabeth City State University, is in the Demonstration Area. See Taylor Rep. at 12.

Burch argues that it is inappropriate to look at the UNC system-wide data because she alleges that there are differences in "prestige" and "resources" between different schools in the system. See [D.E. 115] 122. Burch admits, however, that she did not consider the North Carolina Promise Tuition Plan in her rebuttal report's discussion of UNC enrollment data as a possible explanation for differences between black enrollment figures at different UNC universities. See

86

[D.E. 118] 68; [P.X. 117]. Burch also never studied whether students applying to the UNC system would be more likely to select a campus eligible for the Promise Tuition Plan. See [D.E. 118] 68.

Since 2009, North Carolina has seen a steady increase in the portion of black residents who have attained a college degree. See [D.E. 119] 225; Taylor Rep. at 12. According to 2020 data from the Lumina Foundation's "Stronger Nation" project, the proportion of black North Carolinians with a bachelor's degree or higher is 0.6% higher than the national average: 26.9% versus 26.3%. See [D.E. 119] 225; Taylor Rep. at 12.

The court finds Taylor's analysis of education and the fifth Senate Factor more persuasive than Burch's analysis. Moreover, Burch failed to show that past racial discrimination caused the educational disparities she identified. The court does not credit her opinion on causation. Furthermore, to the extent that black North Carolinians bear any effects of past discrimination in education, plaintiffs failed to prove that it hindered their political participation.

b.

As for employment, black North Carolinians have a lower unemployment rate than the national average for black communities nationwide. See Taylor Rep. at 12–13. In 2010, North Carolina's black unemployment rate was 17.2%. See id. at 12; [D.E. 119] 230. By 2023, North Carolina's black unemployment rate was 5.4%. See Taylor Rep. at 13; [D.E. 119] 230. Black North Carolinians went from an unemployment rate 1.3% higher than the national average in 2010, to an unemployment rate 0.4% lower than the national average in 2023. See Taylor Rep. at 12–13; [D.E. 119] 230. In the Demonstration Area, the black unemployment rate decreased four percent from 2011 to 2023. See Taylor Rep. at 13; [D.E. 119] 230–31. While slightly higher than

87

the state average, the black unemployment rate in the Demonstration Area is lower than the national average. See [D.E. 119] 230.

Taylor also analyzed data on poverty rates by race. See id.; Taylor Rep. at 13. Using data from the North Carolina OSBM, Taylor observed that the percentage of black residents in poverty in the eleven counties came down nearly four percentage points, going from 29.6% in 2010 to 25.7% in 2022, a greater improvement than what was observed for the state as a whole. See [D.E. 119] 230–31; Taylor Rep. at 13.

Burch looked at various economic statistics in North Carolina, starting with black median income. Burch cited statistics showing that average black median household income is lower in the eleven counties she focused on than the statewide average. See [D.E. 118] 11–13. Burch admitted, however, that white median household income is also lower in those counties than the statewide average. See Burch Rep. at 15–16; [D.E. 118] 71–72.

Burch also discussed homeownership statistics, arguing that racial disparities in homeownership can reduce voter registration and turnout because of the burden of maintaining one's voter registration when one moves. See [D.E. 118] 72. Burch, however, did not study the ways in which North Carolinians can register to vote. See id. For example, Burch did not consider that North Carolina allows 18 days of same day registration. See id. at 72–73. Burch also did not consider that North Carolina allows voters to update their registration through the Division of Motor Vehicles. See id. at 73. Burch also did not study the length of rental periods in northeast North Carolina and was unaware of the frequency with which voters move. See id. at 73–74.

Burch also mentioned discriminatory lending practices. See id. at 74. Burch, however, did not find any recent examples of discriminatory redlining or other mortgage lending practices in the eleven counties she studied. See id. Moreover, the one example of allegedly discriminatory

88

mortgage lending practices she did find in North Carolina involved a single lender, and Burch agreed that lender had only "a small part of the mortgage market in the state." Id.

The court finds Taylor's analysis of employment, poverty, and economic statistics and the fifth Senate Factor more persuasive than Burch's analysis. Moreover, Burch failed to show that past racial discrimination caused the disparities she identified. The court does not credit her opinion on causation. Furthermore, to the extent that black North Carolinians bear any effects of past discrimination in these areas, plaintiffs have failed to prove it hindered their political participation.

c.

As for health, Burch cites a litany of social statistics. See Burch Rep. at 19–20. Considering life expectancy metrics, Burch emphasizes the existence of a life expectancy gap between white and black populations in North Carolina's Black Belt. See id. at 19–20. But the life expectancy gap is not a unique phenomenon affecting North Carolina's Black Belt. See Taylor Rep. at 14. Notably, black communities in North Carolina generally, and the Black Belt specifically, have longer life expectancies than black communities nationwide. See id. In 2020, the average black life expectancy nationwide was 71.5 years. See id. Black North Carolinians had an average life expectancy of 73.4 years. See id. From 1990 to 2020, the life expectancy for black North Carolinians rose by 3.5 years—a 1.1 years' improvement on the black national average. See id.

Black North Carolinians are also closing the life expectancy gap faster than the national average. See id. From 1990 to 2020, the nationwide life expectancy gap between white and black populations decreased from 6.3 to 5.9 years. See id.; [D.E. 119] 231. Over the same period, the

89

life expectancy gap between white and black North Carolinians decreased from 6.3 to 4.5 years. See Taylor Rep. at 14; [D.E. 119] 231.

Although county-specific data is more limited, the Demonstration Area has a lower life expectancy gap than the statewide average. See [D.E. 119] 231. From 2018 to 2020, the life expectancy gap for black communities in the Demonstration Area was 3.5 years compared to the statewide life expectancy gap of 4.5 years. See Taylor Rep. at 14. Despite the circumstances highlighted in Burch's report, the life expectancy for black communities in North Carolina's Black Belt is roughly on par with black communities statewide.[18]

The court finds Taylor's analysis of health and the fifth Senate Factor more persuasive than Burch's analysis. Moreover, Burch failed to show that past racial discrimination caused the health disparities she identified. The court does not credit her opinion on causation. Furthermore, to the extent that black North Carolinians bear any effects of past discrimination concerning their health, plaintiffs have not proven that it hindered their political participation.

d.

Burch appears to "presuppose[] a broken political market, where political actors are unable to bargain with similarly situated participants. This is no longer the world we live in." Luis Fuentes-Rohwer & Guy-Uriel E. Charles, The Politics of Preclearance, 12 Mich. J. Race & L. 513, 534–35 (2007). The court acknowledges that some disparities in education, employment, and health between black and white North Carolinians still exist. Burch failed to show, however, that the disparities are the "effects of discrimination." Gingles, 478 U.S. at 37. Moreover, Burch

---

[18] The data in Taylor's report notes that the statewide average life expectancy for black communities in North Carolina is 73.4 years compared to 73.1 years in plaintiffs' Demonstration Area. See Taylor Rep. at 14.

90

failed to show that these disparities hinder the ability of blacks in North Carolina to participate effectively in the political process. In fact, current data shows that Burch's highlighted disparities have little effect on black North Carolinians' political participation. The court does not credit Burch's analysis. Thus, the court finds that the fifth Senate Factor weighs against plaintiffs and favors defendants.

6.

The sixth Senate Factor concerns whether political campaigns in North Carolina have been characterized by overt or subtle racial appeals. See Gingles, 478 U.S. at 36–38; Pierce, 97 F.4th at 220; S. Rep. No. 97-417, at 28–29 (1982). As discussed, the court considers contemporary evidence to be more probative than historical evidence. See Pierce, 97 F.4th at 220; Veasey, 830 F.3d at 257.

In Critchlow's analysis of North Carolina campaigns from 2008 to 2024, Critchlow found that only five percent of candidates' campaigns for governor and Congress featured charges of racism. See Critchlow Rep. [D.X. 61] 12; [D.E. 120] 65. The court finds Critchlow's analysis and corresponding testimony more credible and persuasive than Burch's analysis and testimony. Considering the evidence presented at trial, the court also finds that contemporary North Carolina political campaigns are characterized by "bread-and-butter" issues such as the economy, taxes, and healthcare, not racial appeals. See Critchlow Rep. at 11–12; [D.E. 120] 62. The court finds that there is no "pervasive emphasis on race" in elections in North Carolina. [D.E. 120] 65–66.

The court acknowledges Burch's analysis of older campaign ads featuring racial appeals but gives Burch's analysis little weight. See Burch Rep. at 25–26. For example, Burch cites two ads former Senator Jesse Helms ran in the 1990 North Carolina Senate race. See Burch Rep. at 25–26. Those ads were aired more than 34 years ago and have no bearing on modern North

91

Carolina political campaigns and whether modern campaigns are characterized by overt or subtle racial appeals. See id. Similarly, the court finds that many of the contemporary statements that Burch characterizes as racial appeals are isolated and aberrational incidents. See Burch Rep. at 27–30. Furthermore, Burch's analysis fails to include a denominator for the number of elections held in North Carolina in the time period she examined. Thus, Burch's analysis is not credible to show whether political campaigns in North Carolina have been characterized by overt or subtle racial appeals.

Even considering the isolated racial appeals Burch cites, such appeals pale in comparison to the thousands of political campaigns in North Carolina that occurred over the period Burch analyzed. See, e.g., Critchlow Rep. at 13–14 & n.15. Moreover, the court finds that Burch is overinclusive in what she considers a subtle racial appeal. For example, Burch counts any criticism of critical race theory and any use of the terms "woke" or "sanctuary city" as subtle racial appeals. See Burch Rep. at 31–32. Burch also believes that a criticism of TikTok in a 2024 Attorney General campaign was a subtle racial appeal against Asian Americans and that a 2022 ad for Senator Budd concerning Justice Beasley's criminal law jurisprudence was a subtle racial appeal. See [D.E. 118] 39–40, 91–94.

The court does not consider such criticisms or terms to be subtle racial appeals. Rather, to the extent political candidates discuss such issues, the discussion concerns legitimate policy issues and the performance of public officials.

Critchlow persuasively critiqued how Burch identified implicit racial appeals. He noted that Burch's approach treated legitimate policy concerns, like illegal immigration or crime, as racial appeals. Burch did so even though a 2024 CBS/YouGov poll found that 62% of registered voters, including 53% of Hispanic registered voters, favored the deportation of illegal immigrants.

92

See [D.E. 120] 70; Critchlow Rep. at 16–17. Likewise, Burch treated discussion of rising crime rates as potentially "coded" racial language, even though North Carolina crime statistics showed significant increases in crime. For example, from 2013 to 2022, Critchlow reported North Carolina crime statistics showing murders were up 76.9%, rape up 81.2%, aggravated assaults up 53.5%, and motor vehicle theft up 30.6%. See [D.E. 120] 70–71; Critchlow Rep. at 17. Similarly, as for discussing affirmative action, Critchlow cited a 2019 Pew survey showing that a majority of Americans, both white and black, thought that a person's qualifications should be more important for employment than a person's racial identity. See [D.E. 120] 72; Critchlow Rep. at 19. Critchlow also credibly testified that this survey showed that affirmative action was a legitimate area of political discourse and debate. See [D.E. 120] 72.

In opposition, Burch defined a racial appeal as a communication that primes anti-minority racial fear, resentment, and bias through various audiovisual and textual cues that associate persons of color with longstanding negative racial stereotypes. See [D.E. 118] 86. Burch also asserted that racial appeals can be subtly activated, including by appealing to racial "egalitarian" ideas and do not specifically have to discuss race. Id. at 86–87.

To describe how racial appeals work, Burch testified about her opinion that the phrase "sanctuary city" can be a "code" phrase for an implicit racial appeal. See id. at 88. She testified that a "sanctuary city" was a city that might "agree not to work with federal agencies in order to report people for certain crimes" and whose employees "won't ask about immigration status." Id. at 88. Burch admitted, however, that mayors and governors in the Democratic Party first used the term "sanctuary city." See id. at 89.

Burch did not test North Carolina audiences in 2024 to determine if terms such as "sanctuary city" or "illegal immigration" would prime anti-minority attitudes in the State. See id.

93

at 89–90. Burch also admitted that she did not do her own particularized experiment on North Carolina voters' reactions to alleged racial code words because she did not have the resources to do it for this case. See id. at 90. Burch then admitted that illegal immigration was an issue of public concern in 2024 and discussing it on its own is not a racial appeal. See id. at 90–91.

The court notes another flaw in Burch's methodology. Critchlow correctly observed that it would be difficult to replicate Burch's analysis given that Burch did not explain her methodology. See [D.E. 120] 66–67. Burch sought "evidence to support a thesis but applied no reliable method to contextualize that evidence or find the full range of relevant materials, including evidence that might undercut the view she may have already decided to advance." Critchlow Rep. at 13. Likewise, Burch's analysis failed to provide any examples of racial appeals from North Carolina Senate elections or elections in northeast North Carolina.

To evaluate Burch's assertions about the use of racial appeals in North Carolina political campaigns, Critchlow developed what he describes as a more objective methodology to study that question. See [D.E. 120] 56. Specifically, Critchlow relied on a newspaper survey, which historians commonly use in conducting historical research and is a standard methodology in political research. See id. at 56–57.

Critchlow found that newspapers are the "most ready source" to systematically study charges of racial appeals or charges of racism in political campaigns. See id. at 57. After all, newspapers provide coverage of political events and charges of racism are likely to garner public attention and controversy. See id. Thus, Critchlow opined that newspaper surveys can provide a sense of what is controversial or important to the public and a rough sense of public opinion. See id.

Critchlow selected 14 newspapers in North Carolina for his survey, all of which are on a popular newspaper aggregation service known as Newspapers.com. See id. at 56; Critchlow Rep. at 7–8. Those newspapers included the Herald-Sun (Durham), News and Observer (Raleigh), Charlotte Observer, Winston-Salem Journal, Rocky Mount Telegram, Asheville Citizen-Times, News and Record, (Greensboro), Butner-Creedmoor News, Hickory Daily Record, News Herald (Morganton), Chatham News (Siler City), Salisbury Post, Statesville Record & Landmark, and Stanly News and Press (Albemarle). Critchlow Rep. at 7. Critchlow searched from 2008 to approximately June 2024 (when research for his report concluded). See [D.E. 120] 58; Critchlow Rep. at 7.

For Critchlow's survey, he identified the general election candidates for 20 contests for three offices between 2008 and 2024: North Carolina Governor, U.S. Senate, and Representative for North Carolina's First Congressional District. He selected these races as ones that would attract the most attention and, in the case of Congressional District 1, a congressional seat that overlapped the territory of Senate Districts 1 and 2. See [D.E. 120] 58–59; Critchlow Rep. at 6.

Critchlow searched news coverage of each contest, for each candidate, for stories matching the terms "racism," 'bigotry," and "issues." Critchlow Rep. at 6. He testified that he reviewed "hundreds" of articles matching search terms. See [D.E. 120] 93–94. He determined that the terms were broad enough to be inclusive of the issues he was attempting to capture, with the term "racism" returning 114 articles and "bigotry" returning 85 articles. See id. at 59. After reviewing the articles matching the search parameters, Dr. Critchlow prepared Table 2 to his report. See id. at 61; Critchlow Rep. at 11–12.

Critchlow's methodology did not "rely specifically on a definition of overt or subtle racial appeals," but rather looked at newspaper reports for accusations of racism in campaigns. See [D.E.

95

120] 60. Critchlow found this definition to be "an objective measure that went beyond any kind of subjective or scholarly debate . . . over what a racial appeal is." Id. at 60–61.

In contrast, Burch admitted that her report did not provide a statistical or systematic analysis of racial appeals in North Carolina. See [D.E. 118] 83. Burch also acknowledged that she had a "hard time envisioning what that [i.e., a statistical evaluation] would look like." Id. at 80. Moreover, when Burch searched for evidence of racial appeals, she did not use any database in particular to search for examples of racial appeals. See id. at 76–77. Rather, she used an undefined mixture of Google, various websites, and searches of social media and campaign websites for some, but not all, North Carolina candidates. See id. Burch also did not keep a list of the websites and social media she reviewed. See id. at 77. Burch also did not keep a list of the search terms that she used to discover and analyze racial appeals of North Carolina political candidates. See id. Burch also did not provide any documentation of searches she conducted that did not result in finding an alleged racial appeal or the identities of campaigns where she could not find any evidence of the campaigns making a racial appeal. See id. at 79.

Critchlow properly criticized Burch's approach as not systematic. See [D.E. 120] 66. He noted that Burch's approach was not replicable (unlike his approach, which was replicable) because Burch did not clearly identify a methodology, demonstrate how she selected or used sources, or otherwise employ a systematic approach. See id. at 66–67.

Table 2 reports the results of Critchlow's newspaper survey. He identifies, for each campaign in each of the 20 contests, what campaign issues received coverage and whether charges of racism were reported. See Critchlow Rep. at 112. He reported that of the 40 campaigns, newspapers reported charges of racism in just two: Bev Perdue's campaign for Governor in 2008, and Pat McCrory's campaign for Governor in 2012. See [D.E. 120] 62–63. That amounts to two

96

campaigns with a charge of racism out of 40 campaigns during the period of Critchlow's study. See Critchlow Rep. at 12.

In his report, Critchlow discussed the two examples he found. In 2008, Perdue (a white Democrat running for Governor) was accused of being a KKK sympathizer because of a legislative vote she took and because convenience stores she was connected with sold Confederate-themed items. Perdue disputed the charge and had black legislators vouch for her policies, record, and character. See id. at 8 & n.2. Likewise, in 2012, McCrory (a white Republican running for Governor) was criticized for an ad featuring a former Democratic Sheriff from Eastern North Carolina who supported McCrory. McCrory's campaign denied that the ad had anything to do with race, and a Charlotte Observer newspaper editorial argued that turning policy differences into charges of racism is not helpful. See id. at 8 & n.4. The North Carolina Democratic Party that year also attempted to tie McCrory (the Republican candidate) to Donald Trump (before Donald Trump ever became a candidate for any office), who had raised "birtherism" allegations involving President Obama. The charge, however, appeared to Critchlow to be guilt by association because McCrory had not mentioned Donald Trump or "birtherism." See id. Although these are examples of charges of alleged racism, they do not reflect political campaigns characterized by overt or subtle racial appeals.

On cross-examination, Critchlow acknowledged that, based on events that post-dated the end of his research for this case, he would have identified a charge of racism in Mark Robinson's campaign for Governor in 2024, bringing the total to three campaigns out of 40. [D.E. 120] 104–05. Critchlow noted that Mark Robinson (a black Republican) was "an unusual candidate" and finished well behind President Trump in the 2024 election in North Carolina, where President Trump comfortably carried North Carolina while Robinson only got 40% of the vote. See id. at

97

102–03. Nonetheless, even counting an incident from Robinson's 2024 gubernatorial campaign, Critchlow found that just three campaigns out of 40 (i.e., 7.5%) for the three offices he examined during that 16-year period contained a charge of racism. See id. at 108.

Critchlow's newspaper survey found that political campaigns in North Carolina focused on the "bread and butter issues," such as the economy, taxes, health care, and education, in an effort to attract voters. See id. at 62; Critchlow Rep. at 11. Critchlow did not find evidence, overall, in his newspaper survey of any pervasive emphasis on racism during the campaigns he studied. See [D.E. 120] 65–66.

Burch's analysis also did not show that the few racial appeals in recent North Carolina elections were a winning strategy. In fact, the evidence shows that the few candidates who made racial appeals lost. Moreover, Burch failed to take a systematic approach to her racial appeal analysis, and the court gives her racial appeal analysis little weight.

The court credits Critchlow's more persuasive analysis over Burch's analysis. Moreover, having lived in this State for the past 33 years, the court has observed thousands of political campaigns. Political campaigns in North Carolina over that time period have not been characterized by overt or subtle racial appeals. The sixth Senate Factor weighs against plaintiffs and strongly favors defendants.

7.

The seventh Senate Factor concerns the extent to which members of plaintiffs' minority group have been elected to public office in the jurisdiction. See Gingles, 478 U.S. at 36–38; Pierce, 97 F.4th at 220; S. Rep. No. 97-417, at 28–29 (1982). This is the only Senate Factor written into the text of Section 2. See 52 U.S.C. § 10301(b).

> The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered:

98

> Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Id. (emphasis in original).

Section 2's proportionality proviso "confirms what is otherwise clear from the text of the statute, namely, that the ultimate right of [Section] 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." De Grandy, 512 U.S. at 1014 n.11. Section 2 does not immunize black voters in North Carolina "from the obligation to pull, haul, and trade to find common political ground." Id. at 1020. "Forcing proportional representation is unlawful and inconsistent with [the Supreme] Court's approach to implementing [Section] 2." Milligan, 599 U.S. at 28.

"[C]onsistent and sustained success by candidates preferred by minority voters" is presumptively incompatible with a successful vote dilution claim under Section 2. Gingles, 478 U.S. at 102 (O'Connor, J., concurring); see id. ("I agree with Justice Brennan that consistent and sustained success by candidates preferred by minority voters is presumptively inconsistent with the existence of a [Section] 2 violation."); Jenkins, 4 F.3d at 131 ("In Gingles, a majority of the Supreme Court held that persistent proportional representation by minority-preferred candidates was presumptively inconsistent with proving a [Section] 2 violation."); cf. Solomon v. Liberty Cnty. Comm'rs, 221 F.3d 1218, 1228 (11th Cir. 2000) (en banc).

In analyzing the seventh Senate Factor, the court may consider "the successful election of black candidates statewide and not merely in the challenged districts." Pierce, 97 F.4th at 221. Of course, the election of just "a few minority candidates" does not provide safe harbor from a vote dilution claim. S. Rep. No. 97-417, at 29 n.115 (1982). At the same time, "[f]orcing proportional representation is unlawful and inconsistent with . . . implementing Section 2." Pierce, 713 F. Supp. 3d at 235 (cleaned up); see Milligan, 599 U.S. at 28; Covington, 316 F.R.D. at 133 n.13. Thus,

instead of focusing on proportionality, the court examines whether blacks have not been "elected to office over an extended period of time." Pierce, 713 F. Supp. 3d at 235 (quotation omitted); see S. Rep. No. 97-417, at 28 n.115.

During the preliminary injunction proceeding, Burch conceded that in 2023, 21.6% (26 out of 120) of House members and 18% (9 out of 50) of Senate members were black and that these numbers were close to parity with the black share of North Carolina's voting age population and population. See [D.E. 17-3] 21–23. Nonetheless, Burch opined that "[o]verall, Black North Carolinians are slightly underrepresented in some offices relative to their share of the population with respect to Senate Factor 7." Burch Rep. at 32.

In 2024, North Carolina voters elected 28 black representatives out of 120 (i.e., 23.3%) and 10 black senators out of 50 (i.e., 20%) to the 2025–26 General Assembly. See [D.X. 72, 73]; D.E. 119] 234. The African-American voting age population is 21.37%, and its African-American population is 22%. Thus, African Americans hold 21.7% of the seats in North Carolina's General Assembly.

Only four of the 28 House districts that elected a black representative were majority black (i.e., HD 23, HD 27, HD 58, and HD 107). See [D.E. 118] 99–10. House District 23 is in Bertie, Edgecombe, and Martin Counties. House District 27 is in Halifax, Northampton, and Warren Counties. House District 58 is in Guilford County. House District 107 is in Mecklenburg County. Thus, out of the 28 House districts in North Carolina that elected black representatives, 85% (i.e., 24 out of 28) were elected from districts that were not majority-black. Furthermore, because race

was not in the computer when the General Assembly drew the 28 districts that did elect black

representatives, race was not a factor in drawing the districts.[19]

---

[19] To provide context to the composition of the General Assembly after the 2024 election, consider that in 1969, North Carolina had one African American in the House in the General Assembly. See Fed. R. Evid. 201; North Carolina Legislative Library, North Carolina African-American Legislators 1969–2025, https://sites.ncleg.gov/library/african-american-legislative-resources/ (last visited Sept. 29, 2025) [hereinafter "African-American Legislators"].

    In 1971, North Carolina had three African Americans in the House. In 1973, it again had three African Americans in the House. In 1975, it had two African Americans in the Senate and four African Americans in the House. In 1977, it had three African Americans in the Senate and six African Americans in the House. In 1979, it had two African Americans in the Senate and four African Americans in the House. Id.

    In 1981, North Carolina had one African American in the Senate and three African Americans in the House. In 1983, it had one African American in the Senate and 11 African Americans in the House. In 1985, it had three African Americans in the Senate and 13 African Americans in the House. In 1987, it had two African Americans in the Senate and 13 African Americans in the House. In 1989, it had five African Americans in the Senate and 14 African Americans in the House. Id.

    In 1991, North Carolina had five African Americans in the Senate and 14 African Americans in the House. In 1993, it had nine African Americans in the Senate and 20 African Americans in the House. In 1995, it had seven African Americans in the Senate and 17 African Americans in the House. In 1997, it had seven African Americans in the Senate and 17 African Americans in the House. In 1999, it had seven African Americans in the Senate and 19 African Americans in the House. Id.

    In 2001, North Carolina had seven African Americans in the Senate and 18 African Americans in the House. In 2002, it had eight African Americans in the Senate and 18 African Americans in the House. In 2003, it had six African Americans in the Senate and 18 African Americans in the House. In 2005, it had seven African Americans in the Senate and 22 African Americans in the House. In 2007, it had ten African Americans in the Senate and 24 African Americans in the House. In 2009, it had ten African Americans in the Senate and 23 African Americans in the House. Id.

    In 2011, North Carolina had seven African Americans in the Senate and 19 African Americans in the House. In 2013, it had 11 African Americans in the Senate and 23 African Americans in the House. In 2015, it had 12 African Americans in the Senate and 23 African Americans in the House. In 2017, it had 12 African Americans in the Senate and 26 African Americans in the House. In 2019, it had 12 African Americans in the Senate and 27 African Americans in the House. Id.

    In 2021, North Carolina had 12 African Americans in the Senate and 24 African Americans in the House. In 2023, it had nine African Americans in the Senate and 26 African Americans in the House. Id.

    For the specific members elected between 2014 and 2022 and a breakdown by political party, race, and sex, see Joint Exhibits 42–51. For similar information from 1992 to 2002, see

101

Black members of the General Assembly also hold top leadership positions in their respective chambers. Representative Reives, a black representative, is the House Democratic Leader. See [D.E. 116] 69, 148. From 2013 to 2024, Senator Blue, a black senator, served as the Senate Democratic Leader. See id. From 1991 to 1994, Senator Blue served as the Speaker of the House. Senator Sydney Batch, a black senator, is the current Senate Democratic Leader. See id. at 98. All are from districts with much less than 50% BVAP.

In opposition, Burch contends that black electoral success in the House in 2024 was due to some majority-black districts (i.e., four) or majority-minority districts (i.e., 18). See [D.E. 118] 57. Racial composition of the district, however, is not part of Senate Factor seven. Rather, the focus is on whether black candidates were elected to the body. Thus, the court does not credit Burch's opinion.

Burch's analysis contained another flaw deeply undermining the credibility of her analysis. She lumped together majority-minority districts (i.e., districts where a majority of the voting-age population are of races other than white) and majority-black districts (districts with a majority-black voting age population). Such districts are not the same, and the VRA can only require the remedy of a majority-black district. See Strickland, 556 U.S. at 23 ("[Section] 2 does not require crossover districts"); Petteway v. Galveston Cnty., 111 F.4th 596, 599 (5th Cir. 2024) (en banc). Notably, as mentioned, just four of the 28 House districts that elected a black representative in 2024 were majority-black districts. Thus, in North Carolina, in 24 out of the 28 districts that elected black representatives, 85% of these districts were not majority black. That statistic supports defendants and undermines plaintiffs.

_____

Joint Exhibits 105–14. For information on Senate plans used since 2003, see Joint Exhibits 52–72. For information on some earlier House plans, see Joint Exhibits 99–104.

102

Black candidates also have found electoral success in North Carolina's Black Belt and Demonstration Area. As discussed, for over 30 years, Black Belt voters have elected black candidates to Congress, including Frank Ballance, Eva Clayton, G.K. Butterfield, and Don Davis. See [D.E. 105] ¶¶ 94–128; [D.E. 119] 234. As discussed, black Congressional candidates (such as Congressman Don Davis and Congressman G.K. Butterfield) consistently secure wide margins of victory, even without a majority BVAP district. See [D.E. 105] ¶¶ 94–111. As discussed, in the 2024 election, voters continued this trend by reelecting Congressman Don Davis, a black Democrat, from a district that is not majority-black or majority-minority. See id.; [D.E. 116] 16–32.

Since the 1980s, voters in plaintiffs' Demonstration Area and in the Black Belt also have regularly elected black candidates to the General Assembly. See Fed. R. Evid. 201; North Carolina Legislative Library, North Carolina African-American Legislators 1969–2025, https://sites.ncleg.gov/library/african-american-legislative-resources (last visited Sept. 29, 2025) [hereinafter "African-American Legislators"]. Over the past several decades, Black Belt voters elected Senators Frank W. Ballance, Jr., Robert L. Holloman, Edward Jones, Erica Smith-Ingram, Angela R. Bryant, Milton F. Fitch, Jr., Ernestine Bazemore, and Kandie D. Smith. See [D.E. 105] ¶¶ 118–28. As for the House, voters in the Black Belt and Demonstration Area have consistently sent black representatives to Raleigh. See African-American Legislators 2–24. Notably, voters in Halifax, Warren, and Northampton counties elected Representative Pierce (the lead plaintiff in this case) to the House in 2024 during this litigation. See [D.E. 116] 45–46.

As for local offices, black county commissioners held nearly two-thirds of the county commission seats in the Black Belt before the 2024 election (i.e., 40 of 62, or 65%). See Taylor

Rep. at 17.[20]    In total, just under 200 black elected officials held office in the Black Belt before

the 2024 election.  See Taylor Rep. at 17.  Notably, starting in 1996, voters in Martin County

elected plaintiff Matthews to the Martin County School Board and continued to do so for five

consecutive terms.  See [D.E. 116] 59.  Likewise, as mentioned, the voters in House District 27

elected plaintiff Pierce to serve as Representative Pierce in 2024.  The court finds that black

candidates have found substantial electoral success in North Carolina generally and in the Black

Belt and Demonstration Area specifically.

While exogenous election results are less probative, the court also finds that black

candidates find electoral success across all three branches of government in North Carolina.

"[N]umerous black candidates consistently have won election to statewide appellate judgeships."

Pierce, 713 F. Supp. 3d at 236.  Seven black jurists have served on the Supreme Court of North

Carolina, including current Justice Anita Earls.  See Taylor Rep. at 16–17.  In 2023, Governor

Cooper recognized the achievements of approximately 50 black judges, prosecutors, and other

---

[20]  After the 2024 election, black county commissioners continue to maintain a substantial number of seats.  See, e.g., Fed. R. Evid. 201; Bertie County Commissioners, http://www.co.bertie.nc.us/commissioners/commissioners.html (last visited Sept. 29, 2025); Chowan County Board of Commissioners,  https://www.chowancounty-nc.org/?SEC=A0602267-5599-4BE3-9101-D1120C305EA9 (last visited Sept. 29, 2025); Board of Commissioners, Edgecombe Cnty., https://www.edgecombecountync.gov/residents/board_of_commissioners.php (last visited Sept. 29, 2025); Board of Commissioners, Gates Cnty., https://gatescountync.gov/commissioners (last visited  Sept.  29,  2025);  Board  of  Commissioners,  Halifax  Cnty., https://www.halifaxnc.com/239/Board-of-Commissioners (last visited Sept. 29, 2025); County Commissioners,  Hertford  Cnty.,  https://www.hertfordcountync.gov/government/county_commissioners/index.php (last visited Sept. 29, 2025); County Commissioners, Martin Cnty.,  https://www.martincountync.gov/government/county_commissioners/index.php  (last visited  Sept.  29,  2025);  Board  of  Commissioners,  Northampton  Cnty., https://www.northamptonnc.com/189/Board-of-Commissioners  (last  visited  Sept.  29,  2025); Board  Members,  Vance  Cnty.,  https://www.vancecounty.org/departments/board-of-commissioners/ (last visited Sept. 29, 2025); County Commissioners, Warren Cnty. https://www.warrencountync.com/463/County-Commissioners (last visited Sept. 29, 2025); Commissioners, Washington Cnty., https://washconc.org/commissioners/ (last visited Sept. 29, 2025).

elected officials, breaking the stereotype of "all white" justice in the South. See Critchlow Rep. at 24–26. Moreover, on November 3, 2020, North Carolina elected a black lieutenant governor (i.e., Republican Mark Robinson). See Taylor Rep. at 16–17. In November 2024, North Carolina elected a black school superintendent (i.e., Democrat Maurice Greene). Furthermore, several large North Carolina cities, including Fayetteville, Durham, and Charlotte, have black mayors. See [D.E. 120] 76; Critchlow Rep. at 23. Likewise, voters throughout North Carolina have elected countless black sheriffs, including those currently serving in Buncombe County, Caswell County, Granville County, Vance County, Warren County, Halifax County, Bertie County, Northampton County, Hertford County, Pitt County, Edgecombe County, Wilson County, Wake County, Durham County, Guilford County, Forsyth County, and Mecklenburg County. See Fed. R. Evid. 201.

Critchlow opined that North Carolina has taken great pride in the racial progress that African Americans have made politically and economically in this state. See [D.E. 120] 76. He found that the election of meaningful numbers of black elected officials, at both local and higher offices, is evidence "that there's a political force being mobilized by the Black community" to achieve electoral success. See id.

Throughout North Carolina, voters elect black candidates up and down the ballot and have for quite some time. Crossover voting occurs throughout North Carolina up and down the ballot. The court finds that the seventh Senate Factor weighs strongly against plaintiffs and strongly favors defendants.

8.

The eighth Senate Factor concerns whether there is a significant lack of responsiveness by the state's elected officials to the "particularized needs" of plaintiffs' minority group. See Gingles,

105

478 U.S. at 36–38; Pierce, 97 F.4th at 219; S. Rep. No. 97-417, at 28–29 (1982). When considering the eighth Senate Factor, courts weigh "responsiveness" and "unresponsiveness" to plaintiffs' minority group. NAACP v. City of Niagara Falls, 65 F.3d 1002, 1023 (2d Cir. 1995); Pierce, 713 F. Supp. 3d at 236.

Political responsiveness can be measured in various ways. For example, political scientists can measure the responsiveness of state officials based on the statistical correlation between public opinion and policy outputs in each state. See Taylor Rep. at 21–22. Examining political science literature and published datasets, Taylor ranked the responsiveness of state officials from 1987 to 2019. See id. Taylor's state rankings show that North Carolina officials are generally average concerning their responsiveness to social and economic issues.[21] Specifically, Taylor concluded that North Carolina ranked 28th on economic issue responsiveness from 1987 to 2019. See id. at 21. Taylor also concluded that North Carolina ranked 25th on social issue responsiveness from 2011 to 2019. See id. at 22. Taylor, however, conceded that his rankings measure North Carolina officials' responsiveness to the whole state, not the Black Belt counties specifically. See [D.E. 120] 34–35. The court accepts this limitation on Taylor's analysis and weighs it accordingly. Even so, the court credits Taylor's analysis, which demonstrates that North Carolina politicians are responsive to the particularized social and economic needs of plaintiffs' minority group. See id. at 35–36.

Another measure of political responsiveness is the amount of funds appropriated to a certain area. See Taylor Rep. at 22. For the 2019 federal fiscal year, the counties in North Carolina's Black Belt, on average, receive more per-capita federal funds than the majority of North

---

[21] Taylor concluded that North Carolina ranked 28th on economic policy responsiveness from 1987 to 2019. See Taylor Rep. at 21. Taylor concluded that North Carolina ranked 25th on social policy responsiveness from 2011 to 2019. See id. at 22.

106

Carolina's other counties. See Taylor Rep. at 22; [D.E. 119] 242. Specifically, Taylor analyzed federal government appropriations—including procurement grants and direct payment to individuals—as reported on a per-county basis in the USASpending.gov database. See [D.E. 119] 241–42; Taylor Rep. at 22. In 2019, the average position in North Carolina of the eleven Black Belt counties for per capita federal expenditures was in the top half for the state, at 33 out of 100 counties. [D.E. 119] 242; Taylor Rep. at 22. For the 2024 North Carolina fiscal year, the Black Belt counties, on average, also received more per-capita state education funds than the majority of North Carolina's other counties. See Taylor Rep. at 22–23; [D.E. 119] 243. When ranked by per-capita state education spending, Northampton, Warren, Washington, Gates, Bertie, Martin, Hertford, and Chowan Counties are in the top third of North Carolina's 100 counties. See Taylor Rep. at 23 n.50.

In opposition, plaintiffs argue this funding is insufficient. See [D.E. 126] 247. Of course, everyone wants more funding. That is not, however, the issue. The issue is whether there is a significant lack of responsiveness to the particularized needs of black communities in the Black Belt. Considering North Carolina's education spending and the funds North Carolina has secured from the federal government, the funding evidence does not reflect a significant lack of responsiveness to black communities in the Black Belt.

In post-trial briefing, plaintiffs cite Burch's report and argue North Carolina allegedly is not responsive to black communities. See [D.E. 126] 247–50. At plaintiffs' direction, however, Burch expressly limited her report and analysis to the fifth, sixth, and seventh Senate Factors. See Burch Rep. at 2. Plaintiffs cannot bootstrap Burch's opinions and conclusions onto a Senate Factor they did not ask her to analyze and that she did not analyze. Thus, the court does not credit Burch's report to the extent the plaintiffs seek to use it concerning the eighth Senate Factor.

Plaintiffs also cite North Carolina's decision to "wait[] ten years to approve Medicaid expansion" and "shutter[] the Office of Minority Health." [D.E. 126] 248. At trial, however, Representative Reives testified that the Office of Minority Health "wasn't a big issue" and noted that North Carolina still has a "Health Disparities Office." [D.E. 116] 147. As for Medicaid, North Carolina approved Medicaid expansion. See id. at 55. Medicaid expansion itself shows responsiveness to the particularized needs of black communities.

Plaintiffs also argue that recent federal litigation over voter identification laws and redistricting demonstrate indifference or hostility to black communities in North Carolina. See [D.E. 126] 248–49. In support, plaintiffs cite testimony from their lay witnesses. See id. The court, however, finds the connections and inferences drawn by the lay witnesses on this subject to be strained and driven by their own partisan political views. For example, the same day S.B. 758 was filed, Senator Blue and Representative Reives stated that they were "reviewing the maps in real time" but "will no doubt find [S.B. 758's maps] to be partisan gerrymanders that violate the rights of minority voters in North Carolina." [J.X. 15] 1. Senator Blue and Representative Reives testified consistently with the preordained conclusion that they reached mere hours after their legislative colleagues filed S.B. 758. See, e.g., [D.E. 116] 112–22.

Representative Reives has been elected five times to the House. He currently holds a seat in Chatham County and Randolph County that has a BVAP under 12%. Representative Reives undermined his own credibility at trial by downplaying the success of a black elected official in northeast North Carolina. See id. at 148–49. Specifically, Representative Reives was asked about Representative Dante Pittman from House District 24 in Nash and Wilson Counties. Representative Pittman defeated a black Republican incumbent in 2024 in a House district that is not majority black. See id. at 149–50. Representative Reives discounted Representative Pittman,

108

his family, and his electoral success by stating that Representative Pittman was "I guess by legal definition" black, but "he is half white and half black and he was raised by a white family." Id. at 151. Representative Reives then paused. See id. He seemed to realize how insulting his testimony was about Representative Pittman, his family, and his electoral success. Representative Reives then stated that "we would identify [Representative Pittman] however he identifies." Id.

The court does not credit the testimony of plaintiffs' lay witnesses on Senate Factor eight. The countervailing evidence of responsiveness under Senate Factor eight swamps the non-credible testimony of plaintiffs' lay witnesses and the other evidence plaintiffs cite.

Defendants presented other persuasive evidence on Senate Factor eight. As part of Taylor's analysis of whether the political process is equally open to participation of the minority group, Taylor used data from the Cost of Voting Index ("COVI"). See [D.E 119] 236; Taylor Rep. at 18. COVI ranks states based on a composite score of performance in nine elements of accessible voting: (1) registration deadlines, (2) registration restrictions, (3) preregistration laws, (4) voting inconveniences, (5) voter ID laws, (6) poll hours, (7) registration drive restrictions, (8) automatic voter registration, and (9) early voting. See [D.E. 119] 236; Taylor Rep. at 18 n.38. In 2022, North Carolina ranked 24th on the Index. See [D.E. 119] 236; Taylor Rep. at 18.

In the 2022 general election, Taylor found that the eleven Black Belt counties received a disproportionately higher number of polling places considering their voting-age population ("VAP"). Of the 2,655 polling places located across North Carolina in the 2022 general election, 131 or 4.93% of polling places were in the eleven Black Belt counties, even though these counties account for only 2.68% of the state's VAP. See [D.E. 119] 238; Taylor Rep. at 19.

In analyzing responsiveness, Taylor also considered voter registration and turnout by race. See [D.E. 119] 236–37; Taylor Rep. at 18–20. Using U.S. Census data as reported by the Kaiser

Family Foundation, 2022 voter registration statistics showed a 70.9% white registration rate nationally, 63.4% white registration in North Carolina, 64.1% black registration nationally, and 58.3% black registration in North Carolina. See [D.E. 119] 236–37; Taylor Rep. at 18–19. Based on this data, Taylor found that, in 2022, the registration rate for white North Carolinians was 89.4% of the national figure, while the rate for black North Carolinians was 91% of the national figure. See [D.E. 119] 237; Taylor Rep. at 18–19. Essentially, Taylor found not only that the black registration rate in North Carolina was higher than the black rate nationally, but it was also proportionally higher than the comparable white figures. See [D.E. 119] 236–37; Taylor Rep. at 18–19. These statistics evince the responsiveness of North Carolina elected officials to the particularized needs of black communities.

The Kaiser Family Foundation also published statistics on voter turnout in 2022, showing a 54.7% turnout rate for white voters nationally, a 49.3% turnout rate for white North Carolina voters, a 45.1% turnout rate for Black voters nationally, and a 41.2% turnout rate for black North Carolina voters. See Taylor Rep. at 19. As with voter registration, Taylor observed that black voter turnout was proportionally higher than white voter turnout in 2022, with the white voter turnout rate being 90.1% of the national figure, and the black voter turnout rate being 91.4% of the national figure. See [D.E. 119] 237; Taylor Rep. at 19.

The court finds that North Carolina responds to the particularized needs of black communities in general and black communities in the Black Belt and Demonstration Area in particular. Thus, the eighth Senate Factor weighs against plaintiffs and strongly favors defendants.

9.

The ninth Senate Factor concerns whether the state's policy underlying its use of the challenged voting procedure is tenuous. See Gingles, 478 U.S. at 36–38; Pierce, 97 F.4th at 219;

110

S. Rep. No. 97-417, at 28–29 (1982). Courts look to the "weight, as well as tenuousness, of the state's interest" behind its districting decisions. League of United Latin Am. Citizens, Council No. 4434 v. Clements, 999 F.2d 831, 871 (5th Cir. 1993) (en banc); see Hous. Lawyers' Ass'n v. Att'y Gen. of Tex., 501 U.S. 419, 426–27 (1991); cf. McCrory, 831 F.3d at 235. An underlying policy cannot be a "pretext masking discriminatory intent." Clements, 999 F.2d at 870. Courts must respect a State's districting decisions that do not otherwise "contravene federal requirements." Quilter, 507 U.S. at 156; see Alexander, 602 U.S. at 6–12.

The General Assembly's adherence to North Carolina's WCP principles is not "tenuous" under Senate Factor nine. Gingles, 478 U.S. at 37. The WCP principles represent a sovereign policy from the beginning of North Carolina's history. The General Assembly implements the policy through objective, neutral, and non-arbitrary means. See, e.g., Stephenson I, 355 N.C. at 363–71, 562 S.E.2d at 384–89. North Carolina's interest in House and Senate districts that adhere to county lines to the maximum extent possible under Stephenson I and II and their progeny "lies at the heart of representative government and thus must be treated with great respect." Fusilier v. Landry, 963 F.3d 447, 460 (5th Cir. 2020). Likewise, North Carolina's interest in complying with federal constitutional principles is not tenuous. See Pierce, 97 F.4th at 221 n.10 ("Equally baseless is [p]laintiffs' assertion, under the ninth factor, that North Carolina's interest in complying with federal constitutional prohibitions against racial gerrymandering and the state constitutional prohibitions against splitting counties are illegitimate considerations.").

As Senator Hise credibly explained at trial, the General Assembly did not consider race when drawing the 2023 Senate map. See [D.E. 118] 114–15. The General Assembly considered factors such as population size, county lines and county groupings under Stephenson I and II, compactness, contiguity, and the boundaries of political subdivisions. See [J.X. 4] 1. The General

Assembly also took political considerations and incumbent residency into account. See id.; [D.E. 118] 115. These are legitimate districting considerations. See, e.g., Rucho v. Common Cause, 588 U.S. 684, 685 (2019); Easley, 532 U.S. at 245, 258. For Senate Districts 1 and 2 specifically, the General Assembly considered several other factors such as preserving communities of interest. See [D.E. 118] 116. Senator Hise credibly explained that Senate District 1 kept four of the five "fingerling" counties together. Id. He also credibly explained that grouping the "coastal region" together was another consideration and that media market coverage was yet another consideration. Id. Moreover, Senate District 1 is primarily covered by the Norfolk, Virginia, media market. See id. Senate District 2 is primarily covered by the Greenville, North Carolina, media market. See id.

The court credits Senator Hise's testimony. Moreover, the court finds that the General Assembly's districting criteria, desire to comply with Stephenson I and II, and desire to comply with federal constitutional prohibitions against racial gerrymandering reflect legitimate and weighty districting considerations. Thus, the ninth Senate Factor weighs against plaintiffs and strongly favors defendants.

10.

The Senate Factors are a non-exhaustive list of considerations. See Gingles, 478 U.S. at 45–46; Pierce, 97 F.4th at 219; Covington, 316 F.R.D. at 125. The court may address other factors under Section 2's totality of the circumstances test. See Gingles, 478 U.S. at 45–46; Pierce, 97 F.4th at 219; Covington, 316 F.R.D. at 125. For example, courts may consider "whether partisanship, rather than race, drove polarization." Pierce, 97 F.4th at 222; see Charleston Cnty., 365 F.3d 341, 347–48; Lewis, 99 F.3d at 615–16 & n.12; cf. Alexander, 602 U.S. at 6 (noting

112

importance of disentangling "race and politics" in assessing legality of redistricting efforts particularly where "race and partisan preference are highly correlated").

The court accepted Alford as an expert in voter cohesion and polarization, as well as voting behavior and redistricting. See [D.E. 119] 34. Alford is a tenured professor at Rice University. Id. at 32. Alford earned a Bachelor of Science in Political Science from the University of Houston, a Master's of Public Administration from the University of Houston, and a Ph.D. from the University of Iowa in Political Science with a focus in American elections and voting behavior, public policy, and political science methodology. Id.

Alford has taught about the Voting Rights Act, redistricting, and social science methodology, including statistical analyses. See id. at 32–33. He has served as an expert witness in dozens of redistricting cases. See id. at 33.

Alford concluded that Collingwood's racially polarized voting analysis "clearly shows partisan polarized voting" but does not show "the polarization is related to race." Id. at 34, 57; see [D.X. 59] 2. Alford credibly explained that party affiliation best explains divergent voting preferences of black and white voters in North Carolina elections. See [D.E. 119] 58–59; [D.X. 59] 19. Black voters overwhelmingly support Democratic candidates, and white voters predominately support Republican candidates. See [D.E. 119] 57; [D.X. 59] 18.

As Alford credibly explained, black voters in North Carolina do not support black candidates because of race. They are no more likely to support a black Democratic candidate than they are to support a white Democratic candidate, and they are no less likely to oppose a black Republican than a white Republican. See [D.E. 119] 57–58; [D.X. 59] 18–19. Moreover, a majority of white voters in North Carolina do not regularly oppose black candidates because of race and are no more likely to oppose a black Democratic candidate than they are to oppose a white

113

Democratic candidate. Furthermore, a majority of white voters in North Carolina are no less likely to support a black Republican candidate than they are to support a white Republican candidate. See [D.E. 119] 58; [D.X. 59] 19.

Alford also persuasively explained that there is "substantial white crossover voting" in North Carolina that allows districts to perform for Democratic candidates below 50% BVAP. See [D.E. 119] 34–35; see also [D.X. 59] 2; [D.E. 119] 56 ("All of the evidence shows clearly that districts below 50 percent . . . clearly perform for Black-preferred candidates.").

Alford relied on the data and results that Collingwood provided. See [D.E. 119] 35; see also [D.X. 59] 3. For example, Alford's analysis of three U.S. Senate Elections in 2016, 2020, and 2022 shows a polarized response to party affiliation, but not to the race of the candidate. See [D.X. 59] 6. Black voters were highly supportive of the Democratic candidate and white voters were supportive of the Republican candidate in all three contests. See [D.X. 59] 6; [D.E. 119] 39. That is true in the two contests where both candidates were white and in the one contest where there was a black candidate and a white candidate. See [D.X. 59] 6; [D.E. 119] 39.

In Senate District 1, white voters were slightly more supportive of the black Democrat Beasley in 2022 (at 20%) than the average of the support for the two white Democratic candidates in 2016 and 2020 (at 19%). See [D.E. 119] 40; [D.X. 59] 6. In Senate District 2, white voters were equally supportive of the black Democratic candidate as they were of the average of the white Democratic candidates at 17% of the vote. See [D.E. 119] 40; [D.X. 59] 6. In these and other elections, Senate Districts 1 and 2 have consistently higher levels of white crossover voting than in the Demonstration Area. See [D.E. 119] 40; [D.X. 59] 6.

Alford persuasively explained that the results show the race of the candidate in North Carolina does not significantly impact voter choices. Black voters consistently support

114

Democratic candidates, and white voters consistently support Republican candidates, regardless of the race of the candidate. See [D.E. 119] 41–42; [D.X. 59] 6. If voters were responding to the race of the candidates, one would expect black voters to give less support to a white Democrat than a black Democrat, or that white voters would be more willing to cross over to support a white Democrat than a black Democrat. See [D.E. 119] 41–42; [D.X. 59] 6. But in partisan contests in North Carolina between white candidates, black voters support Democratic candidates, and white voters support Republican candidates at roughly the same levels as the partisan contests between white and black candidates. See [D.X. 59] 6.

Alford's persuasive analysis of seven North Carolina Supreme Court races between 2016 and 2020 showed the same results of roughly equal levels of white crossover voting for Democratic candidates in white versus white elections as in black versus white elections. See [D.E. 119] 44; [D.X. 59] 7–8. In the six partisan-affiliated elections, black voters were highly supportive of the Democratic candidate, and white voters were supportive of the Republican candidate, consistent with a polarized response based on party affiliation, and not race. See [D.X. 59] 7. Four of the partisan elections featured two white candidates, while the other two involved a black candidate versus a white candidate. See id.

In Senate District 1, the average white crossover voting for the Black Democratic Supreme Court candidate was slightly higher (at 23%) in the black versus white races than it was for the white Democratic candidate (at 21%) in the white versus white races. See [D.E. 119] 43; [D.X. 59] 7. The same was true in Senate District 2. The average white crossover voting for the black Democratic candidate in the black versus white races was higher (at 19%) than for the white Democratic candidate (at 17%) in the white versus white races. See [D.E. 119] 43; [D.X. 59] 7.

115

Alford's analysis of the 2016 North Carolina Supreme Court race, which is the most recent judicial election that did not have a partisan designation on the ballot, was particularly persuasive. See [D.E. 119] 44; [D.X 59] 8. Without the partisan indication on the ballot, black support for the black candidate (Morgan) was significantly lower than black support for either the white or black Democratic candidates in the partisan elections analyzed. See [D.E. 119] 45; [D.X. 59] 8. White support for the white candidate (Edmunds) was also much lower than for Republican candidates, and there were very high levels of white crossover voting for the black candidate. See [D.E. 119] 45; [D.X. 59] 8. The white vote was "completely non-cohesive," and Morgan defeated Edmonds. See [D.E. 119] 46; [D.X. 59] 8 ("[I]t is clear that White voters were not voting cohesively to defeat the Black candidate of choice, and in fact Morgan defeated Edmonds statewide and in each of other areas included here."). In fact, a majority of white voters (52%) in Senate District 1 voted for the black candidate Morgan, as did 43% of voters in Senate District 2. See [D.E. 119] 46; [D.X. 59] 8.

These results show that the race of the candidate has no impact beyond the impact of party, particularly for white voters. See [D.E. 119] 46–47; [D.X. 59] 8. If party was not driving voting behavior, then the results of this 2016 Supreme Court race should be the same as those in partisan contests. See [D.E. 119] 49. But if party is the "really important factor" and it is removed from the ballot, different voting behavior would result, and that is what occurred in the 2016 Supreme Court race. Id. at 45. The court finds that this highly probative 2016 Supreme Court election vividly illustrates that divergence in candidate preference by race is a partisan phenomenon, not a racial phenomenon.

In opposition, Collingwood acknowledged the high level of crossover voting in the non-partisan 2016 Supreme Court election. See [D.E. 115] 26–27. Collingwood grasped for some

116

racial identity with the candidate names (i.e., Michael Morgan and Robert Edmunds), but he opined that "[t]he two candidate surnames are not especially racially distinctive from one another - both Black and white folks might realistically have either of those names." [P.X. 128] 4; see [D.E. 117] 134; [D.E. 115] 28, 32. Collingwood then agreed that it was possible that voters either did not know or simply did not care about the race of the black candidate, Morgan. See [D.E. 115] 32–34. Instead, many voters were likely voting based on "policy positions" and "policy issues." Id. at 33–34.

Plaintiffs dismiss the 2016 Supreme Court election as a "single election." See [D.E. 119] 89. That 2016 election Supreme Court, however, presented a racial choice but not a partisan choice and thereby permitted these factors to be "isolated and measured." Charleston Cnty., 365 F.3d at 352. This evidence is highly probative.

The court credits Alford's analysis of the 2016 Supreme Court race over Collingwood's analysis of that race. Alford's analysis was more persuasive.

Alford also persuasively analyzed 17 North Carolina Court of Appeals races between 2016 and 2022. That analysis shows the same result of polarization based on party, not on the race of the candidate. See [D.X. 59] 8–11; [D.E. 119] 47. Specifically, the average white crossover voting in Senate District 1 for the Democratic candidate was identical (at 22%) in the ten white versus white contests as in the six black versus white contests. [D.X. 59] 10. In Senate District 2, the average white crossover voting was roughly the same (at 19% in the white versus white contests as in the black versus white contests in Senate District 2 (at 18%). Id. In the one contest where both candidates were black, "the role of the candidate's party remains clear." Id. at 10–11. Black voters supported the Democrat and white voters supported the Republican at levels consistent with

117

contests in which the Republican candidate was white.  See id. at 10–11; [D.E. 119] 47.  Again, the court credits Alford's more persuasive analysis over Collingwood's analysis.

Alford also persuasively explained that the elections for all offices in 2016, 2018, 2020, and 2022 showed polarized voting by party, but no indication of differences in voter behavior based on the race of the candidates.  See [D.X. 59] 11; [D.E. 119] 49–50.  White crossover voting was slightly lower in the 2016 contests, but that slight difference does not appear in the 2018, 2020, or 2022 contests.  See [D.X. 59] 11–14; [D.E. 115] 50–51.

Collingwood did not find any errors in how Alford presented his analysis.  See [D.E. 115] 76.  Collingwood also did not analyze or offer any opinions about whether voting patterns were due to a voter's racial or partisan affiliation.  See id. at 21–22.  Moreover, Collingwood agreed that the preferred candidate of black voters tends to be the Democratic candidate.  See id. at 20.  Collingwood also does not know what percentage of voters in the Demonstration Area are Democrats, but he agreed it is "realistic" that, if the population of Republicans in the Demonstration Area grew relative to Democratic population, crossover voting would decrease.  See id. at 20–21.  Collingwood did not study how often Democrats voted for Republicans or vice versa.  See id. at 178.

Alford's analysis of the 2024 elections confirms a strong polarized response to candidate party affiliation rather than the race of the candidate.  See [D.X. 75] 2–3.  On average, white voters support black Democratic candidates at the same levels as white Democratic candidates.  In Senate District 1, white voters provide an average of 24.1% crossover support to white Democratic candidates and an essentially identical 24.2% crossover to black Democratic candidates.  Id. at 3, 5, Tbl. 1.  Similarly, white voters in Senate District 2 provide an average of 21% crossover support to white Democratic candidates and 20.5% to black Democratic candidates.  Id. at 3, 5, Tbl. 1.

White voters in the Demonstration Area supported white Democratic candidates at 14.6% and black Democratic candidates at 14%. See id. at 3, 5, Tbl. 1. The same is true statewide. White voters supported white Democratic candidates at 31.5% and black Democratic candidates at 31.4%. See id.

If North Carolina voters were responding to the race of the candidates, black voters would be expected to provide significantly more support to black candidates compared to white candidates, and white voters would show increased opposition to black candidates. Alford's persuasive analysis, however, shows that black voters are no more supportive of the black Democrat than they are of white Democrat candidates, and white voters are not more likely to oppose a black Democrat than a white Democrat. See [D.X. 75] 3–4.

Collingwood attempts to draw various conclusions about the differences in levels of crossover voting based on the race of the candidate in the 2024 elections. See [P.X. 279] 1, 8–14; see also [P.X. 280] 3–4. Collingwood opines that on average, white voters in Senate Districts 1 and 2, and the Demonstration Area are less supportive of black Democratic candidates than white Democratic candidates. See [P.X. 279] 1, 8–9, 11, 14. These differences, however, are slight—about 1.5% statewide, about 0.3% in Senate District 1, 1.84% in Senate District 2, and less than 1% in the Demonstration Area. See id. at 1, 8–9, 11, 14.

Collingwood's analysis is not persuasive. These differences are largely the result of the "unusual 2024 Gubernatorial contest" between Josh Stein (a white Democrat) and Mark Robinson (a black Republican) that Collingwood averages with the eight white versus white candidate contests. See [D.X. 76] 6. The 2024 Gubernatorial contest was not a white versus white candidate contest, and the differences all but disappear when that race is removed from that average. See id. For example, the average difference of white voter support for black candidates compared to white

119

candidates is 0.4% statewide, 0 in Senate District 1, 0.9% in Senate District 2, and 0.2% in the Demonstration Area.  See id.; see also id. at 4, Tbl. 1.

Alford persuasively found that the impact of the candidate of the party is polarizing.  The gap between black voter support for the Democratic candidate and white voter support for the Democratic candidate is about 70 to 80% across the relevant geographies.  See id. at 6–7, Tbl. 3.  In contrast, the impact of the race of the candidate is near zero.  See id. at 7, Tbl. 4.

Collingwood also opines that on average in Senate District 1, Senate District 2, and the Demonstration Area, white voters crossover at higher rates for white Democrats when the Republican candidate is black.  See [P.X. 279] 9, 11–12, 14.  These conclusions, however, are based on just one contest: the 2024 Governor's race between black Republican Mark Robinson and white Democrat Josh Stein.  Collingwood had previously cautioned against relying on a finding based on only one or two black candidates.  See Collingwood Rep. at 3–5.

Despite these cautions, and despite not previously analyzing the role of the race of the candidate, Collingwood's opinions about the levels of white support for black Republican candidates exclusively relies on this single aberrational contest for governor in 2024.  Collingwood emphasizes that Robinson received less white support in 2024 when running against a white Democrat (Josh Stein) than when he ran against a black Democrat (Yvonne Holley) in 2020, and that Stein received more support from white voters when running against a black Republican (Robinson) in 2024 than when running for Attorney General against a white Republican (Jim O'Neill) in 2020.  See [P.X. 279] 9, 11, 14.

Collingwood (who lives and works in New Mexico) failed to account properly for the unique events that occurred during the 2024 campaign for governor in North Carolina: the highly publicized sexual misconduct allegations and comportment allegations that emerged against

120

Robinson a few months before the general election, and the resulting implosion of Robinson's campaign. See [D.X. 76] 10–11. After the allegations received wide publicity throughout North Carolina and Robinson declined to withdraw from the race, polling showed there was a "dramatic shift away from Robinson," with Stein up by 17 points by late September and up 15 points in October 2024. Id. at 11–12. These events were not obscure. Rather, they were a "highly visible news story covered and commented on extensively even in the national media." Id. at 12. Alford persuasively opined that this contest and the "highly publicized downturn" of Robinson's campaign were a "special circumstance," which makes it "less useful" when evaluating voting patterns. Id.

The court agrees with Alford. North Carolina voters knew that Robinson was black and Stein was white before August 2024 because both had already served, campaigned, and received extensive media attention in statewide elected roles. See id. Stein served as Attorney General from 2021 to 2024. Robinson served as Lieutenant Governor from 2021 to 2024. Collingwood's opinion that many white North Carolina voters voted based on the race of the candidates in the 2024 election for governor is preposterous.

The 2024 gubernatorial contest between Robinson and Stein does not show that voting in North Carolina is polarized by race. Collingwood's analysis does not help to prove that point, and the court does not credit Collingwood's analysis of that 2024 election at all. Furthermore, the court discounts that 2024 election as probative of anything due to the unique and widely publicized implosion of Robinson's campaign. See, e.g., Ruiz v. City of Santa Maria, 160 F.3d 543, 557 (9th Cir. 1998); Mo. State Conf. of NAACP v. Ferguson-Florissant Sch. Dist., 201 F. Supp. 3d 1006, 1054 (E.D. Mo. 2016); Black Pol. Task Force v. Galvin, 300 F.Supp. 2d 291, 305 (D. Mass. 2004).

121

In contrast to the 2024 race for governor, Robinson's 2020 campaign against Yvonne Holley, a black Democrat, for lieutenant governor is probative. See [D.X. 59] 14. Approximately 97% of black voters supported Holley, while only 3% of black voters supported Robinson. See id. In Senate Districts 1 and 2, approximately 99% of black voters supported Holley, while only 1% supported Robinson. See id. If race was truly motivating voters, black voters would have spread their vote more evenly between the two candidates. As for the governor's race, in 2020, Dan Forest, a white Republican, ran against Roy Cooper, a white Democrat. See id. Approximately 98% of black voters supported Cooper, while only 1% of black voters supported Forest. See id. In Senate Districts 1 and 2, approximately 99% of black voters supported Cooper, while only 1% of black voters supported Forest. See id. These two elections exemplify a clear trend present across virtually every recent election in North Carolina. See id. at 6–15. Polarization on the basis of the party of a candidate, not polarization on the basis of race, is the explanation.

As Alford credibly explained, voting in North Carolina clearly reflects polarization on the basis of the party of candidates, but not polarization on the basis of race. See [D.E. 119] 57. White North Carolinians predominately vote for Republican candidates and black North Carolinians overwhelmingly vote for Democratic candidates. See id. If North Carolinians were predominantly motivated by race when voting, voters would swing whenever a candidate did not match voters' alleged racial preferences. But when controlling for race, recent elections show partisan preferences, rather than racial preferences, motivate voters.

"[A] model that accounts for the candidate's race can provide probative evidence about causation," Pierce, 97 F.4th at 223, because it enables "the effects of partisanship and race or voting [to be] isolated and measured." Charleston Cnty., 365 F.3d at 352. Alford persuasively

122

examined such elections that provide scenarios to isolate race and politics, and the court credits his persuasive analysis.

The evidence shows North Carolina (including northeast North Carolina) as a place "where racial animosity is absent although the interest of racial groups diverge" and that politics—not race—explain the voting patterns. See Gingles, 478 U.S. at 100 (O'Connor, J., concurring); see Charleston Cnty., 365 F.3d at 367; Lewis, 99 F.3d at 615 n.12. When Congress amended Section 2 in 1982, Congress did not equate partisan political preferences with racial vote dilution. As Justice White observed in Gingles, Section 2 does not entitle a minority group to judicial enforcement of that group's position in "interest group politics" but instead provides "a rule hedging against racial discrimination." Gingles, 478 U.S. at 83 (White J., concurring). Moreover, as the Supreme Court observed in De Grandy, "[m]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground." 512 U.S. at 1020.

The court credits the persuasive analysis of Alford and discredits the unpersuasive analysis of Collingwood. The court finds that party preference rather than racial preference drives voting in North Carolina. Thus, the court finds that this factor weighs heavily against plaintiffs and heavily favors defendants.

### 11.

It is not 1965 or 1982 in North Carolina. It is 2025. Due in part to societal progress on race and due in part to the VRA, North Carolina is a very different state politically and socially than it was in 1965 or 1982. Cf. Nw. Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 202 (2009). Black voters in northeast North Carolina and throughout North Carolina have elected candidates of their choice (both white and black) with remarkable frequency and success for decades. Black elected officials in North Carolina are at or near-parity with their share of the

123

statewide population. North Carolina's African-American voting age population is approximately 21.37% of the State and its total population is 22% of the State. The North Carolina House has 23.3% African-American Representatives (28 out of 120). The North Carolina Senate has 20% African-American Senators (10 out of 50). Thus, African-American legislators hold 21.7% of the seats in the North Carolina General Assembly. These legislative election results arose without race in the computer or the odious practice of grouping voters by race. Moreover, the Democratic leaders in the House and in the Senate are black.

Throughout North Carolina, black voters regularly join with their white counterparts to support common causes and candidates in local elections, state elections, and federal elections. Plaintiffs ignore the progress that North Carolina has made over the past 60 years and seek to use Section 2 to sort voters by race in order to squeeze one more Democratic Senate district into the map. Congress did not amend Section 2 in 1982 for that purpose. Cf. Alexander, 602 U.S. at 11 (federal courts "must be wary of plaintiffs who seek to transform federal courts into weapons of political warfare that will deliver victories that eluded them in the political arena" (cleaned up)); Gingles, 478 U.S. at 83 (White, J., concurring).

A statewide Section 2 proportionality inquiry helps to illustrate this point. Section 2 does not require proportional representation. See 52 U.S.C. § 10301(b); Milligan, 599 U.S. at 13–14, 26–28; id. at 43–44 (Kavanaugh, J., concurring); id. at 45–46 (Thomas, J., dissenting); id. at 102 (Alito, J., dissenting). Nonetheless, if an enacted map results in statewide proportionality, such proportionality, though not a safe harbor, "is a relevant fact in the totality of circumstances." De Grandy, 512 U.S. at 1000; see id. at 1017–19; LULAC, 548 U.S. at 436–37.

A statewide Section 2 proportionality inquiry compares "the percentage of total districts that are [minority] opportunity districts with the [minority] share of the" population. LULAC, 548

124

U.S. at 436. Proving the three <u>Gingles</u> preconditions "without more, does not make the result vote dilution when the minority group enjoys substantial proportionality." <u>De Grandy,</u> 512 U.S. at 1015-16. "One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast." <u>Id.</u> at 1017. Thus, in <u>De Grandy,</u> the Supreme Court held that vote dilution ordinarily will not exist when minority voters in the relevant "area would enjoy substantial proportionality." <u>Id.</u> at 1014; <u>see</u> <u>Fairley v. Hattiesburg,</u> 662 F. App'x 291, 300–01 (5th Cir. 2016) (unpublished); <u>Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist., No. 1,</u> 56 F.3d 904, 912 (8th Cir. 1995). In fact, in <u>De Grandy,</u> the Supreme Court found the substantial proportionality of Hispanic opportunity district to Hispanic voting-age population to be so important that it reversed a three-judge court finding on Section 2 liability on that basis. <u>See</u> 512 U.S. at 1014–15.

As in <u>De Grandy,</u> the substantial proportionality of black opportunity Senate districts in North Carolina relative to the state's BVAP of 21.37% militates against Section 2 liability. "[A]ny Democratic district in North Carolina no matter what its black composition will elect the preferred candidate of black voters." [D.E. 119] 51–52. Thus, the court can consider the state's numerous Democratic leaning Senate districts in assessing the number of "opportunity districts." <u>LULAC,</u> 548 U.S. at 436; <u>see</u> <u>De Grandy,</u> 512 U.S. at 1014–16.

Even if the court only focuses on Senate districts with BVAP exceeding 25%, such districts elected 12 Democratic senators in 2024 (SD 5, SD 14, SD 19, SD 20, SD 22, SD 27, SD 28, SD 32, SD 38, SD 39, SD 41), which is 24% of the state Senate. <u>See</u> [J.X. 6] 13–14; <u>11/5/24 Official General Election Results – Statewide,</u> N.C. State Bd. of Elections, https://er.ncsbe.gov/?election_dt=11/05/2024&county_id=0&office=NCS&contest=0 (last visited Sept. 29, 2025). Two other Senate districts with more than 20% BVAP elected Democratic

125

senators (SD 15 and SD 18). Furthermore, as mentioned, voters elected 10 black Senators in 2024, which is 20% of the Senate. See [D.E. 116] 98–99. Those Senators represent SD5, SD14, SD17, SD19, SD20, SD28, SD32, SD39, SD40, and SD41. Black voters have opportunity districts exceeding the state's BVAP of 21.37%.

Here, plaintiffs seek to use Section 2 not to address vote dilution but to obtain "the maximum possible" political power. De Grandy, 512 U.S. at 1017. The current redistricting plan in the Senate protects black voters from "political famine." Id. Section 2 does not entitle plaintiffs to a "political feast." Id. This point is particularly true in light of the trial record, Covington, and the abundance of black opportunity districts in the enacted redistricting plan. See, e.g., LULAC, 548 U.S. at 436; De Grandy, 512 U.S. at 1017.

The court has considered the trial testimony, expert reports, and all admitted evidence. Under the totality of the circumstances, the court finds that plaintiffs have failed to prove their Section 2 claim. See 52 U.S.C. § 10301(b); Milligan, 599 U.S. at 18; Perez, 585 U.S. at 614; De Grandy, 512 U.S. at 1011–12; Gingles, 478 U.S. at 45–46; Covington, 316 F.R.D. at 125.

## VI.

In sum, having considered the entire record and governing law and having made credibility findings concerning each witness who testified, the court FINDS that plaintiffs have failed to prove their Section 2 claim against defendants. Thus, judgment SHALL BE ENTERED in favor of defendants and against plaintiffs. Defendant may seek costs in accordance with the Federal Rules of Civil Procedure and this court's local rules.

SO ORDERED. This _30_ day of September, 2025.

JAMES C. DEVER III
United States District Judge

126