No. 25-2180

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

RODNEY D. PIERCE and MOSES MATTHEWS,

*Plaintiffs-Appellants,*

v.

THE NORTH CAROLINA STATE BOARD OF ELECTIONS, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court for
the Eastern District of North Carolina
The Honorable James C. Dever III (No. 4:23-cv-193-D-RN)

**Response Brief of Legislative Defendants-Appellees**

| | |
|---|---|
| Phillip J. Strach | Richard B. Raile |
| Alyssa M. Riggins | Katherine L. McKnight |
| Cassie A. Holt | Trevor M. Stanley |
| Jordan A. Koonts | Allen J. Dickerson |
| NELSON MULLINS RILEY & | BAKER & HOSTETLER LLP |
| SCARBOROUGH LLP | 1050 Connecticut Ave. N.W. |
| 301 Hillsborough Street | Washington, DC 20036 |
| Raleigh, North Carolina 27603 | (202) 861-1711 |
| (919) 329-3800 | rraile@bakerlaw.com |
| phil.strach@nelsonmullins.com | |

(additional counsel listed on inside cover)

Patrick T. Lewis
BAKER & HOSTETLER LLP
Key Tower
127 Public Square
Cleveland, Ohio 44114
(216) 861-7096
plewis@bakerlaw.com

Erika Dackin Prouty
BAKER & HOSTETLER LLP
200 Civic Center Drive, Ste. 1200
Columbus, OH 43215
(614) 462-4710
eprouty@bakerlaw.com

**TABLE OF CONTENTS**

Preliminary Statement..............................................................................1

Statement of Jurisdiction .........................................................................2

Statement of the Issue .............................................................................2

Statement of the Case..............................................................................2

Summary of the Argument .......................................................................9

Standards of Review ..............................................................................10

Argument ...............................................................................................10

    I.    The District Court Correctly Rejected Plaintiffs' Claim
         Under the Totality of Circumstances ..................................... 13

        A. The District Court Is Not Alleged to Have Erred in Finding
           Substantial Proportionality, a Dispositive Factor...................... 13

        B. The District Court Correctly Found Polarization Muted at
           Most and Reflective of Partisanship, Not Race........................ 16

        C. The District Court Correctly Found Substantial Success
           of Black Candidates ................................................................ 21

        D. The District Court Correctly Found Elections Are Not
           Marred by Racial Appeals ....................................................... 24

        E. The District Court Correctly Found No Voting Practices
           That Exacerbate Discriminatory Effects .................................. 28

        F. The District Court Correctly Found No Recent Evidence
           of Voting-Related Racial Discrimination.................................. 30

        G. The District Court Correctly Held That the State's
           Policies Are Not Tenuous ....................................................... 32

        H. The District Court Correctly Found the General Assembly
           Responsive to the Needs of Black Voters................................. 34

I. The District Court Correctly Held That Effects of Past Discrimination Are Not Shown to Hinder Political Participation ................................................................ 35

II.    Plaintiffs Failed to Establish The First and Third *Gingles* Preconditions ................................................................ 39

A. The First Precondition Was Not Satisfied ............................... 39

1.  Three Demonstration Districts Failed the Numerosity Element ................................................................ 41

2.  The Demonstration Districts Are Not Reasonably Configured ................................................................ 45

3.  Demonstration E Was Properly Excluded ......................... 53

B. The Third Precondition Was Not Satisfied ............................. 54

Conclusion ................................................................ 63

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez,*
   585 U.S. 579 (2018) ................................................................*passim*

*Abrams v. Johnson,*
   521 U.S. 74 (1997) ....................................................... 55, 58, 59

*Alexander v. S.C. State Conf. of the NAACP,*
   602 U.S. 1 (2024) ............................................. 17, 18, 20, 33, 57

*Allen v. Milligan,*
   599 U.S. 1 (2023) ....................................................................*passim*

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger,*
   700 F. Supp. 3d 1136 (N.D. Ga. 2023)..................................... 25

*Anderson v. City of Bessemer City,*
   470 U.S. 564 (1985) .................................................................. 62

*Barnett v. City of Chicago,*
   141 F.3d 699 (7th Cir. 1998)................................................... 44

*Bartlett v. Strickland,*
   556 U.S. 1 (2009) ................................................................*passim*

*Belville v. Ford Motor Co.,*
   919 F.3d 224 (4th Cir. 2019) ................................................... 50

*Benavidez v. Irving Indep. Sch. Dist., Tex.,*
   690 F. Supp. 2d 451 (N.D. Tex. 2010)..................................... 43

*Berger v. N.C. State Conf. of the NAACP,*
   597 U.S. 179 (2022) ................................................................... 7

*Bethune-Hill v. Va. State Bd. of Elections,*
   580 U.S. 178 (2017) .................................................................. 53

*Brnovich v. DNC,*
   594 U.S. 647 (2021) ..................................................... 11, 17, 38

*Brock v. Merrell Dow Pharm., Inc.*,
 874 F.2d 307 (5th Cir. 1989)................................................................ 50

*Carlson v. Boston Sci. Corp.*,
 856 F.3d 320 (4th Cir. 2017).............................................................. 23

*Chavez-Deremer v. Med. Staffing of Am., LLC*,
 147 F.4th 371 (4th Cir. 2025).............................................................. 46

*City of Boerne v. Flores*,
 521 U.S. 507 (1997) ....................................................................... 12

*City of Mobile v. Bolden*,
 446 U.S. 55 (1980) ........................................................................ 11

*City of Rome v. United States*,
 446 U.S. 156 (1980) ............................................................. 13, 15, 31

*Clark v. Sweeney*,
 607 U.S. 7 (2025) ......................................................................... 15

*Cmty. Success Initiative v. Moore*,
 384 N.C. 194 (2023)....................................................................... 29

*Cooper v. Harris*,
 581 U.S. 285 (2017) ...................................................................*passim*

*Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016)
 (three-judge court), *aff'd*, 581 U.S. 1015 (2017) ................... 5, 32, 48, 56, 58

*Democracy N.C. v. De Luca*,
 No. 1:23-cv-878, 2026 WL 836812 (M.D.N.C. Mar. 26, 2026)................. 38

*Dickson v. Rucho*,
 766 S.E.2d 238 (N.C. 2014), *vacated on other grounds*, 575 U.S. 959 (2015)... 4

*Dixon v. Hassler*,
 412 F. Supp. 1036, 1040 (W.D. Tenn.), *aff'd sub nom.*
 *Republican Party of Shelby Cnty., v. Dixon*, 429 U.S. 934 (1976)................... 43

*Fairley v. Hattiesburg Mississippi*,
 662 F. App'x 291 (5th Cir. 2016) ......................................................... 14

iv

*Fusilier v. Landry*,
   963 F.3d 447 (5th Cir. 2020).................................................................... 33

*Gill v. Whitford*,
   585 U.S. 48 (2018) .............................................................................. 2

*G.M. by E.P. v. Barnes*,
   114 F.4th 323 (4th Cir. 2024)...........................................................15, 62

*Growe v. Emison*,
   507 U.S. 25 (1993) ...........................................................................36, 39

*Harper v. Hall*,
   886 S.E.2d 393 (N.C. 2023) ............................................................... 6

*Johnson v. De Grandy*,
   512 U.S. 997 (1994) .....................................12, 14, 15, 39, 40, 49

*Johnson v. DeSoto Cnty. Bd. of Comm'rs*,
   204 F.3d 1335 (11th Cir. 2000) ......................................................... 42

*League of United Latin Am. Citizens v. Perry*,
   548 U.S. 399 (2006) .....................................14, 39, 40, 44, 45, 49

*Levy v. Lexington Cnty., S.C.*,
   589 F.3d 708 (4th Cir. 2009)............................................................. 10

*Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist., No. 1*,
   56 F.3d 904 (8th Cir. 1995).........................................................14, 15

*Louisiana v. Callais*,
   No. 24-109 (U.S.)............................................................................. 3

*Lowe v. Walbro, LLC*,
   147 F.4th 601 (6th Cir. 2025)........................................................... 61

*LULAC, Council No. 4434 v. Clements*,
   999 F.2d 831 (5th Cir. 1993)........................................................18, 25

*McKiver v. Murphy-Brown LLC*,
   No. 7:14-cv-180, 2018 WL 1832964 (E.D.N.C. Apr. 17, 2018) .................. 54

*McNeil v. Springfield Park Dist.*,
   851 F.2d 937 (7th Cir. 1988)............................................................... 42

*Miss. State Conf. of NAACP v. State Bd. of Election Commissioners*,
   739 F. Supp. 3d 383 (S.D. Miss. 2024) ....................................................... 23

*Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*,
   894 F.3d 924 (8th Cir. 2018)............................................................42, 43

*NAACP, Inc. v. City of Niagara Falls*,
   65 F.3d 1002 (2d Cir. 1995)............................................................21, 35

*Nagle v. Alspach*,
   8 F.3d 141 (3d Cir. 1993)................................................................. 15

*N.C. A. Philip Randolph Inst. v. N.C. Bd. of Elections*,
   155 F.4th 298 (4th Cir. 2025)............................................................ 31

*N.C. State Conf. of NAACP v. Hirsch*,
   No. 1:18-cv-01034, slip op. (M.D.N.C. Mar. 26, 2026) ........................... 29

*N.C. State Conf. of NAACP v. Hirsch*,
   720 F. Supp. 3d 406 (M.D.N.C. 2024) ..................................................... 29

*N.C. State Conf. of NAACP v. Raymond*,
   981 F.3d 295 (4th Cir. 2020)............................................................29, 31

*Negron v. City of Miami Beach*,
   113 F.3d 1563 (11th Cir. 1997) .................................................... 40, 44, 48

*North Carolina v. Covington*,
   581 U.S. 1015 (2017)....................................................................... 5

*Patino v. City of Pasadena*,
   230 F. Supp. 3d 667 (S.D. Tex. 2017) ..................................................... 44

*Pender County v. Bartlett*,
   649 S.E.2d 364 (N.C. 2007)............................................................41, 52

*Perry v. United States*,
   755 F.2d 888 (11th Cir. 1985) ............................................................. 50

vi

*Petteway v. Galveston County,*
   111 F.4th 596 (5th Cir. 2024)................................................................. 23

*Pierce v. N.C. Bd. of Elections,*
   97 F.4th 194 (4th Cir. 2024)............................................................*passim*

*Pierce v. N.C. State Bd. of Elections,*
   713 F. Supp. 3d 195 (E.D.N.C. 2024) ..................................................... 7

*Pope v. County of Albany,*
   No. 1:11-cv-0736, 2014 WL 316703 (N.D.N.Y. Jan. 28, 2014) ................ 43

*Pullman-Standard v. Swint,*
   456 U.S. 273 (1982) ............................................................................. 63

*Nixon v. Kent County,*
   76 F.3d 1381 (6th Cir. 1996)................................................................. 23

*Reno v. Bossier Parish Sch. Bd.,*
   520 U.S. 471 (1997) ............................................................................. 11

*Richardson v. Clarke,*
   52 F.4th 614 (4th Cir. 2022).................................................................. 15

*Rios-Andino v. Orange County,*
   51 F. Supp. 3d 1215 (M.D. Fla. 2014).................................................... 43

*S. States Rack And Fixture, Inc. v. Sherwin-Williams Co.,*
   318 F.3d 592 (4th Cir. 2003)............................................................10, 54

*Shapiro v. McManus,*
   577 U.S. 39 (2015) ................................................................................. 8

*Shaw v. Hunt,*
   517 U.S. 899 (1996) ...........................................................................3, 12

*Shaw v. Reno,*
   509 U.S. 630 (1993) ............................................................................... 3

*Shelby County v. Holder,*
   570 U.S. 529 (2013) ............................................................................. 31

vii

*Singleton v. Merrill*,
  582 F. Supp. 3d 924 (N.D. Ala. 2022) ....................................................... 23

*Standley v. Edmonds-Leach*,
  783 F.3d 1276 (D.C. Cir. 2015) ................................................................. 61

*Stephenson v. Bartlett*,
  562 S.E.2d 377 (N.C. 2002) ................................................. 4, 32, 47, 50, 51

*Stephenson v. Bartlett*,
  582 S.E.2d 247 (N.C. 2003) ......................................................................... 4

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*,
  576 U.S. 519 (2015) ............................................................................. 13, 15

*Thornburg v. Gingles*,
  478 U.S. 30 (1986) ............................................................................*passim*

*TikTok Inc. v. Garland*,
  604 U.S. 56 (2025) ..................................................................................... 26

*Underwood v. Bank of Am. Corp.*,
  996 F.3d 1038 (10th Cir. 2021) ................................................................. 63

*United States v. 269 Acres, More or Less, Located in Beaufort Cnty.*,
  995 F.3d 152 (4th Cir. 2021) ........................................................ 25, 36, 62

*United States v. Charleston County*,
  365 F.3d 341 (4th Cir. 2004) ........................................................ 10, 17, 18

*United States ex rel. Brown v. Celgene Corp.*,
  No. 10-cv-3165, 2016 WL 6542730 (C.D. Cal. June 29, 2016) .................. 54

*Utah v. Evans*,
  536 U.S. 452 (2002) ................................................................................... 43

*Valdespino v. Alamo Heights Indep. Sch. Dist.*,
  168 F.3d 848 (5th Cir. 1999) ..................................................................... 42

*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) ..................................................................... 30

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ............................................................... 31

*Voinovich v. Quilter*,
   507 U.S. 146 (1993) ............................................................... 55

*Williams v. Hall*,
   810 F. Supp. 3d 637 (M.D.N.C. 2025). .............................................*passim*

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
   979 F.3d 1282 (11th Cir. 2020) ............................................... 10

**Statutes and Rules**

22 U.S.C. § 2284(a) .................................................................... 7

28 U.S.C. § 1253 ........................................................................ 8

28 U.S.C. § 1291 ........................................................................ 2

28 U.S.C. § 1331 ........................................................................ 2

52 U.S.C. § 10301(b) ....................................................... 10, 12, 13

Fed. R. Evid. 602 ..................................................................... 30

Fed. R. Evid. 702(c) ......................................................... 26, 42, 61

N.C. Const. art. II .................................................................... 4

N.C. Gen. Stat. § 1-72.2 ............................................................ 7

S. Rep. No. 97-417 ........................................................... 16, 21, 38

U.S. Const. amend. XV ............................................................. 11

Voting Rights Act Section 2 ....................................................*passim*

**Other Authorities**

Grofman, Handley et al., *Drawing Effective Minority Districts: A
   Conceptual Framework and Some Empirical Evidence*,
   79 N.C. L. Rev. 1383 (2001) .................................................. 60

## PRELIMINARY STATEMENT

In the past 30 years, every court to adjudicate a race-related redistricting case in northeastern North Carolina held that majority-Black districts are unnecessary and, when purposefully created, impermissible. These districts can upend the county groupings required by the North Carolina Constitution and trigger strict scrutiny under the U.S. Constitution. Not one North Carolina district in decades has satisfied that standard. Dozens have failed.

Plaintiffs (the two voters who brought this suit) came to court in 2023 with the improbable view that Section 2 of the Voting Rights Act (VRA) requires the General Assembly to depart from the State's county-grouping formula to create a race-based majority-Black district in North Carolina's "Black Belt." The decision below is one of four federal rulings this decade to reject this contention. The district court already found Plaintiffs' claim unlikely to succeed at the preliminary injunction stage, and this Court affirmed that holding. On remand, Plaintiffs' claim failed as predicted. As discussed below, the district court carefully parsed the record in 125 pages that reveal a broader theme: Plaintiffs are attempting to force a case that simply is not there. Across inquiries, the trial judge perceived that Plaintiffs' experts selected parameters and figures arbitrarily to suit predetermined ends, that demographics do not support a *second* opportunity district in the region, and that white bloc voting is too muted to be legally significant. Subsequently, another federal district court—composed of three judges—rejected a Section 2 claim challenging the same districts. Four judges cannot have clearly erred. This Court should affirm.

1

## STATEMENT OF JURISDICTION

Plaintiffs are correct that jurisdiction was proper below under 28 U.S.C. § 1331, that jurisdiction is proper here under 28 U.S.C. § 1291, and that their notice of appeal was timely. Br. 3. Plaintiffs are incorrect to claim standing to challenge Senate District (SD) 1, where neither of them resides. Injury-in-fact "arises from the particular composition of the voter's own district," not neighboring districts. *Gill v. Whitford*, 585 U.S. 48, 67 (2018); JA1598-1600. Nor is the point "academic." Br. 3. Plaintiffs are not entitled to an order enjoining elections in a district that is outside the district court's jurisdiction.

## STATEMENT OF THE ISSUE

Whether the district court clearly erred in every finding essential to its determination that Plaintiffs failed to show unequal Black opportunity in SD2.

## STATEMENT OF THE CASE

1. "Redistricting is never easy." *Abbott v. Perez*, 585 U.S. 579, 585 (2018). States are subject to "complex and delicately balanced requirements regarding the consideration of race" under federal law, as well as "special state-law districting rules." *Id.* The rules governing the North Carolina General Assembly are uniquely complex.

Like all state actors, the General Assembly is subject to the Fourteenth Amendment, which "prevents a State, in the absence of 'sufficient justification,' from 'separating its citizens into different voting districts on the basis of race.'" *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (citation omitted). But the VRA "pulls

2

in the opposite direction: It often insists that districts be created precisely because of race." *Abbott*, 585 U.S. at 586. These "competing hazards of liability," *id.* at 587 (citation omitted), result from the Supreme Court's interpretation of Section 2, which compels the configuration of majority-Black districts in limited circumstances. *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986). The conflict has become so stark that the Supreme Court is currently reexamining when, if ever, a government actor may intentionally create (or be compelled to create) a majority-Black district. *See Louisiana v. Callais*, No. 24-109 (U.S.) (reargument Oct. 15, 2025). This case may require additional briefing or remand once the opinion issues in *Callais*.

2.    The General Assembly's attempts "to navigate those hazards" have met "mixed success." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 204 (4th Cir. 2024). Its "efforts provide[] helpful context for understanding the current case." *Id.*

The Supreme Court first recognized the racial-gerrymandering claim more than 30 years ago in a challenge to North Carolina's congressional district (CD) 1 and CD12, *Shaw v. Reno*, 509 U.S. 630 (1993) (*Shaw I*), the latter of which was eventually enjoined, *Shaw v. Hunt*, 517 U.S. 899, 906 (1996) (*Shaw II*). Two decades later, the Supreme Court again encountered CD1 and CD12 and invalidated both.[1] It concluded that race predominated in CD1 because the General Assembly moved a significant number of voters to "purposefully" make

---

[1] CD1, enacted in 2001, was not a majority-Black district, and elected a Black Democrat from 2002-2010, and was never challenged in Court. JA357-358.

3

it a majority-Black district. *Cooper*, 581 U.S. at 299. CD1 failed strict scrutiny because Black candidates of choice could prevail in a district below a 50% Black voting-age population (BVAP) majority, called a "crossover" district, which indicated there was no "effective white bloc-voting" as required by the third *Gingles* precondition. *Id.* at 304; *see infra* Argument § II.B. CD1 occupied "multiple northeast counties at issue here." JA1590.

Legislative redistricting has proven equally difficult in North Carolina. The General Assembly is subject to the North Carolina Constitution's Whole County Provision (WCP), which prohibits counties from being divided by legislative districts. N.C. Const. art. II, §§ 3, 5. Although federal law partially preempts the WCP, the North Carolina Supreme Court harmonized these competing dictates by reading it to forbid county divisions "for reasons unrelated to compliance with federal law." *Stephenson v. Bartlett*, 562 S.E.2d 377, 389 (N.C. 2002) (*Stephenson I*). The court directed that "legislative districts required by the VRA" be "formed prior to creation of non-VRA districts," that total-population deviations satisfy the federal equal-population rule, and that county groupings consisting of "non-VRA population pool[s]" be identified consistent within those confines to ensure county lines are followed as far as federal law permits. *Id.* at 396-97; *see also Stephenson v. Bartlett*, 582 S.E.2d 247, 248 (N.C. 2003) (*Stephenson II*); *Dickson v. Rucho*, 766 S.E.2d 238, 258 (N.C. 2014), *vacated on other grounds*, 575 U.S. 959 (2015); JA1603-1609.

In *Bartlett v. Strickland*, 556 U.S. 1 (2009), the General Assembly departed from the WCP to create a crossover district with "an African-American voting-

4

age population of 39.36 percent." *Id.* at 8 (plurality opinion). The Supreme Court found this departure unjustified because Section 2 does not require "crossover" districts, i.e., those "in which minority voters make up less than a majority of the voting-age population." *Id.* at 13. Consequently, a crossover district cannot "justify a violation of state law, namely the Whole County Provision." *Pierce*, 97 F.4th at 204.

"The General Assembly then adopted a policy of creating majority-minority districts." *Id.* at 205. That also failed. Based on an expert's finding of divergent racial voting patterns, the General Assembly included 28 majority-Black districts in the 2011 legislative plans. *Covington v. North Carolina*, 316 F.R.D. 117, 132-33, 169 (M.D.N.C. 2016) (three-judge court), *aff'd*, 581 U.S. 1015 (2017). The *Covington* court found racial predominance from the General Assembly's goal of drawing majority-minority districts "first, before any other 'non-VRA' districts," which overrode the WCP. *Id.* at 130-31, 138-39. The districts did not satisfy strict scrutiny because no evidence established legally significant racial bloc voting. *Id.* at 168. The Supreme Court summarily affirmed. *North Carolina v. Covington*, 581 U.S. 1015 (2017).

Chastened by the federal rulings against majority-Black districts, "the General Assembly implemented a policy forbidding consideration of race," yet "the 'dizzying succession of litigation' over North Carolina's electoral districts continued—now on a partisan gerrymandering theory." *Pierce*, 97 F.4th at 205. That new series of cases culminated in the North Carolina Supreme Court's holding that partisan gerrymandering claims are non-justiciable. *Harper v. Hall*,

886 S.E.2d 393 (N.C. 2023) (*Harper III*). The court afforded the General Assembly the opportunity to redistrict mid-decade, given that prior plans were configured under a "mistaken interpretation" of North Carolina law. *Id.* at 448.

3.      The Senate districts challenged here (SD1 and SD2) were the product of that redistricting. "In compliance with court rulings, in 2023, the General Assembly did not use race when drawing districts." JA1594. Though the Senate Redistricting committee invited anyone to submit evidence justifying majority-Black districts, "[n]obody presented evidence of legally significant racially polarized voting." JA1594. The only group that submitted evidence "did not request a majority-black district," let alone justify one under the governing standard. *Pierce*, 97 F.4th at 207; JA2602-2628; JA877; JA896.

By consequence, the 2023 Senate plan was governed by the WCP without VRA districts. JA1594. In northeast North Carolina, the WCP could be satisfied by two options for single district county groupings, neither of which "creates a majority-black district." JA875; JA1594-1595. The General Assembly elected a configuration used in the 2021 plan invalidated in an interim partisan gerrymandering ruling—rather than a version imposed under that mistaken reading of State law. JA1595-1596. The WCP "left no further discretion to alter the borders" of SD1 and SD2. JA1595. "Neither Senate district splits a county between other Senate districts." JA1598.

The General Assembly resisted calls to "use[] racial data to prepare amendments" with a crossover district that would depart from the WCP (in

6

plain violation of *Bartlett*). JA1596. The district court found that SD1 and SD2 "reflect[] legitimate and weighty districting considerations." JA1598.

4.    Plaintiffs are two Black voters who reside in SD2; no party resides in SD1. JA1599. They filed this case in November 2023 against North Carolina's election agency and officials, as well as legislative officers the State designates to defend its legislation (Legislative Defendants), *see* N.C. Gen. Stat. § 1-72.2; *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 185 (2022), who have defended this lawsuit, *see Pierce*, 97 F.4th at 208 & n.5. Plaintiffs sought a preliminary injunction, but the district court denied their motion. JA1584-1585; *Pierce v. N.C. State Bd. of Elections*, 713 F. Supp. 3d 195 (E.D.N.C. 2024). This Court affirmed on multiple, independent grounds, including that Plaintiffs were unlikely to show legally significant white bloc voting or vote dilution under the totality of circumstances. *Pierce*, 97 F.4th at 212-25. The Court faulted Plaintiffs for "largely argu[ing] as though we may decide the facts anew." *Id.* at 214.

On remand, the district court conducted a lengthy discovery period, a five-day bench trial where a large record was developed, and a post-trial amplification of the record based on 2024 election information (which was delayed and not available at the time of trial). JA207-208, JA1586-1587. On September 30, 2025, the district court issued a 125-page opinion and final order again rejecting Plaintiffs' Section 2 claim on numerous grounds. JA1580-1705.

A parallel Section 2 challenge to, *inter alia*, SD1 and SD2 progressed before a three-judge district court convened under 22 U.S.C. § 2284(a); *see Pierce*, 97 F.4th at 206 n.3. On November 20, 2025, that court (the *Williams* panel)

rejected the challenge against SD1 and SD2. *Williams v. Hall*, 810 F. Supp. 3d 637, 712-31 (M.D.N.C. 2025). Although the *Williams* panel found the first precondition satisfied—based on evidence materially different from what Plaintiffs here presented, *see infra* note 10—along with the third, it held that the claim was not proven under the totality of circumstances. *Id.* Accordingly, four federal judges have now rejected the same Section 2 claim after two fulsome trials.

The *Williams* panel certified its Section 2 holding as a partial final judgment to enable an appeal, 810 F. Supp. 3d at 731-32, which would have gone "directly to" the Supreme Court "as of right." *Shapiro v. McManus*, 577 U.S. 39, 41 (2015); *see* 28 U.S.C. § 1253. That enabled immediate Supreme Court review to test the hypothesis that "a bevy of recent decisions from the Supreme Court" require a judgment against SD1 and SD2. Br. 49. But the *Williams* plaintiffs took no appeal.

8

## SUMMARY OF THE ARGUMENT

The district court's judgment rests secure on multiple independent holdings. The Court should affirm.

I.      The most straightforward resolution of this appeal is under "the totality of circumstances" test, which four judges have applied to reject Section 2 claims against SD1 and SD2. Plaintiffs do not even challenge the district court's finding—which is sufficient to support its judgment—that the fact of substantial proportionality militates against their claim. On the remaining factors, Plaintiffs improperly ask the Court to act as trier of fact, reweigh each item of evidence, and make credibility determinations from the cold—and massive—record. These arguments fare no better now than in the prior *Pierce* appeal.

II.      The district court's judgment stands independently on the district court's findings under the first and third *Gingles* preconditions.

The first precondition requires proof that the Black population is sufficiently large and geographically compact to be drawn in a reasonable configured district, without eliminating neighboring opportunity districts. Plaintiffs' several attempts here showed the demographics too constraining to satisfy that standard. They must play games with district configurations, the population counts, or neighboring districts to present a new majority-Black district.

The third precondition requires proof of white bloc voting at a sufficient level to require a majority-Black district. Plaintiffs' challenge to that standard takes aim at every Supreme Court precedent that has meaningfully discussed the

9

third precondition, as well as this Court's precedent. And it is not seriously contested that a majority-Black district is unnecessary to secure equal Black opportunity in northeast North Carolina. Accordingly, the third precondition is unmet.

## STANDARDS OF REVIEW

"[T]he clearly-erroneous test of Rule 52(a) is the appropriate standard for appellate review of a finding of vote dilution." *Gingles*, 478 U.S. at 79. Appellate courts must defer "not only to the district court's ultimate conclusion of vote dilution, but also to its 'finding that different pieces of evidence carry different probative values in the overall section 2 investigation.'" *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1301 (11th Cir. 2020) (citation omitted). The appellate court's "function is not to reweigh the evidence presented to the district court." *United States v. Charleston County*, 365 F.3d 341, 349 (4th Cir. 2004) (citation omitted). Moreover, the Court's "role in reviewing the district court's" assessment of "expert testimony is limited." *Levy v. Lexington Cnty.*, 589 F.3d 708, 719 (4th Cir. 2009). The Court reviews an order excluding evidence "for abuse of discretion," giving "'particularly wide latitude to the district court's discretion.'" *S. States Rack And Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 595 (4th Cir. 2003).

## ARGUMENT

The district court correctly held that SD2 does not violate Section 2. Plaintiffs failed to prove that elections in this district are not "equally open." 52 U.S.C. § 10301(b).

10

Congress enacted the VRA pursuant to its "power to enforce [the Fifteenth Amendment] by appropriate legislation." U.S. Const. amend. XV, § 2. That Amendment bars only state actions taken "with a discriminatory purpose." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481 (1997). While Section 2 originally tracked the Fifteenth Amendment's prohibition against intentional discrimination, *City of Mobile v. Bolden*, 446 U.S. 55, 61-63 (1980) (plurality opinion), Congress amended it in 1982, and it now "turns on the presence of discriminatory effects, not discriminatory intent." *Allen v. Milligan*, 599 U.S. 1, 25 (2023). Nevertheless, Section 2 imposes "exacting requirements" that "limit judicial intervention" to "'instances of intensive racial politics'" where an "'excessive role [of race] in the electoral process'" denies minority voters "equal opportunity to participate." *Id.* at 30 (citation omitted). The Supreme Court has observed favorably that Section 2 cases have "rarely been successful." *Id.* at 29.

Precedent has "set out three threshold requirements for proving a § 2 vote-dilution claim" and "provided a non-exhaustive list of factors to be considered in determining whether § 2 ha[s] been violated." *Brnovich v. DNC*, 594 U.S. 647, 660 (2021). As a threshold, the challenger must show that the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district," which is reasonably configured; that it "is politically cohesive"; and "that the white majority votes sufficiently as a bloc to enable it…usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50-51. If proven, these "*Gingles* preconditions" show that a lack of equal opportunity "is *possible*." *Milligan*, 599 U.S. at 26. But the challenger "must then

11

go on to prove that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group." *Perez*, 585 U.S. at 614. At this stage, making inquires known as the "Senate factors" and other court-identified queries, the court determines whether the "possibility" of discriminatory effect "is reality." *Milligan*, 599 U.S. at 26.

This framework leaves no room for Plaintiffs' assertion that proof of the *Gingles* preconditions is dispositive in the "paradigmatic" case. Br. 46. The standard is "exacting," not lax. *Milligan*, 599 U.S. at 30. The Supreme Court has "clearly declined to hold" the preconditions "sufficient in combination." *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994). The Supreme Court has also rejected Plaintiffs' implicit assertion that, "whenever a legislature *can* draw a majority-minority district, it *must* do so." *Cooper*, 581 U.S. at 305; *Johnson*, 512 U.S. at 1017 ("Failure to maximize cannot be the measure of § 2."); *Shaw II*, 517 U.S. at 913 (rejecting "maximization policy"). Plaintiffs' maximization theory would contravene the statute's disclaimer of any "right to have members of a protected class elected in numbers equal to their proportion in the population." 52 U.S.C. § 10301(b).

And it would render Section 2 unconstitutional. Congress may not "enforce" the Reconstruction Amendments by "changing what the right [they protect] is." *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997). Section 2 can be an "appropriate method" of enforcing a ban on intentional discrimination only where it proscribes effects that reflect at least a "risk of purposeful

discrimination," *City of Rome v. United States*, 446 U.S. 156, 177 (1980), or "unconscious prejudices and disguised animus that escape easy classification," *cf. Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 521 (2015). Accordingly, current precedent directs "an intensely local appraisal" of objective factors that may suggest invidious intent, including the "design and impact" of the challenged system and the jurisdiction's "past and present reality." *Gingles*, 478 U.S. at 78. The analysis depends on "the benefit of the trial court's particular familiarity with the indigenous political reality." *Id.* at 79.

## I.    The District Court Correctly Rejected Plaintiffs' Claim Under the Totality of Circumstances

While the *Gingles* preconditions typically come first, this appeal may be resolved summarily under "the totality of circumstances." 52 U.S.C. § 10301(b). Under that inquiry, four federal judges have reviewed similar records and found that SD1 and SD2 do not violate Section 2. JA1660-1705; *Williams*, 810 F. Supp. 3d at 712-31. They cannot all have clearly erred.

### A.    The District Court Is Not Alleged to Have Erred in Finding Substantial Proportionality, a Dispositive Factor

The district court correctly found Section 2 liability foreclosed by the substantial proportionality of Black opportunity districts to the BVAP in North Carolina. Plaintiffs do not dispute its holding.[2]

---

[2] There is "no requirement that any particular number of factors be proved" or that they be addressed in a specific order. *Gingles*, 478 U.S. at 45. This brief presents factors leading with those on which the judgment can be affirmed with the least analytical difficulty.

Central to a Section 2 analysis is "the proportionality inquiry, comparing the percentage of total districts that are [minority] opportunity districts with the [minority] share of the" population. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 436 (2006) (*LULAC*). "One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast." *Johnson*, 512 U.S. at 1017. Accordingly, Section 2 liability will rarely arise where minority voters "would enjoy substantial proportionality." *Id.* at 1014. This factor merits "great weight." *Fairley v. Hattiesburg Mississippi*, 662 F. App'x 291, 300-01 (5th Cir. 2016); *see also Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist., No. 1*, 56 F.3d 904, 912 (8th Cir. 1995) (observing its "special importance"). In *Johnson*, a unanimous Supreme Court reversed a finding of Section 2 liability—even though the *Gingles* preconditions were met—*solely* because of the substantial proportionality of Hispanic opportunity districts to Hispanic voting-age population. *See* 512 U.S. at 1014-15.

The district court found that this factor "militates against Section 2 liability." JA1704. In identifying "opportunity districts," *LULAC*, 548 U.S. at 436, the court began by noting that the Senate plan includes "numerous" Democratic-leaning districts, which all provide Black opportunity as Plaintiffs define that concept, *see infra* § I.B.2. JA1704. Then, focusing more narrowly on districts with "high concentrations of minority voters," Br. 69, the court identified 12 districts that elect Democratic senators with BVAPs exceeding 25% and two more with BVAPs exceeding 20%. JA1704. Because the State's BVAP

14

is 21.37% and the Senate plan contains 50 districts, the plan *exceeds* proportionality. JA1705. At least 24% and arguably 28% or more of the Senate plan's districts are opportunity districts.

Notwithstanding its "special importance," *Little Rock*, 56 F.3d at 912, Plaintiffs have never addressed this inquiry. They presented no argument below about it, Dist.Ct.Dkt.126 at 214-56, and none on appeal, *see* Br. 47-81. Any forthcoming argument is doubly barred. "Generally, parties may not raise new arguments on appeal that were not first presented to the district court below," *Richardson v. Clarke*, 52 F.4th 614, 625 (4th Cir. 2022), and "a party forfeits an argument by failing to develop it in the opening brief." *G.M. by E.P. v. Barnes*, 114 F.4th 323, 337 n.7 (4th Cir. 2024). Any review of this issue in this Court would contravene the principle of party presentation. *See Clark v. Sweeney*, 607 U.S. 7, 9 (2025).

This alone compels affirmance. *Cf. Nagle v. Alspach*, 8 F.3d 141, 145 (3d Cir. 1993) (explaining that appeal failing to challenge each ground for the judgment "never had any possibility of resulting in reversal"). As noted, substantial proportionality is a sufficiently powerful factor to foreclose Section 2 liability on its own—even where a trial court has found it. *Johnson*, 512 U.S. at 1014-15. That is because there is no likely "risk of purposeful discrimination," *City of Rome*, 446 U.S. at 177, or "disguised animus," *Tex. Dep't of Hous.*, 576 U.S. at 521, behind a redistricting plan that is generous with minority opportunity. In all events, Plaintiffs have failed to show entitlement to "a political feast." *Johnson*, 512 U.S. at 1017.

15

**B.    The District Court Correctly Found Polarization Muted at Most and Reflective of Partisanship, Not Race**

Two additional factors the district court weighed concern both "the extent and cause of racially polarized voting." *Williams*, 810 F. Supp. 3d at 712. Both cut against Plaintiffs' claim. JA1655-1666; JA1691-1702.

1.    Because it "would be exceedingly difficult for plaintiffs to show that they were effectively excluded from fair access to the political process" where their candidate of choice "receive substantial support from white voters," S. Rep. No. 97-417, at 33 (1982), the second Senate factor directs courts to address "the extent to which voting…is racially polarized," *Gingles*, 478 U.S. at 37 (citation omitted). This factor favors the defense where "evidence demonstrates notable crossover voting statewide and locally." *Pierce*, 97 F.4th at 222.

The district court found evidence of "substantial crossover voting statewide" and "in northeast North Carolina," as well as in SD1 and SD2. JA1656. Plaintiffs merge their challenge to this finding with their contention that the district court erred in finding "legally significant" bloc voting under the third *Gingles* precondition. Br. 50. The district court did not err under the third precondition. *See infra* § II.B. But even if it did, that would not mean it erred under the second Senate factor, which assumes the third precondition is met and yet demands another review of the "extent" of polarization. *Gingles*, 478 U.S. at 37 (citation omitted). Here, the district court's analysis of that issue is well grounded in its extensive findings of substantial crossover voting and agreement

16

among experts and fact witnesses "that black voters do not need a majority-black district to elect their candidates of choice." JA1633; *see infra* § II.B. It is, in fact, "Plaintiffs' own evidence" that "demonstrates notable crossover voting." *Pierce*, 97 F.4th at 222.

2.      As at the preliminary-injunction stage, the district court "considered whether partisanship, rather than race, drove polarization in North Carolina." *Pierce*, 97 F.4th at 222. Contrary to Plaintiffs' position, Br. 76 & n.6, it was right to do so. "Certainly the reason for polarized voting is a critical factor in the totality analysis." *Charleston County*, 365 F.3d at 349. It is irrelevant to equal openness, the "touchstone" of Section 2, *Brnovich*, 594 U.S. at 668, that Black and white voters prefer different candidates if that reflects partisanship, not race. In such a case, challengers cannot establish *racially* discriminatory effects. *See Whitcomb v. Chavis*, 403 U.S. 124, 152-53 (1971). Nor is there a risk of purposeful discrimination in a State's choice not to create a majority-Black district where this most likely reflects permissible partisan goals. *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) ("a jurisdiction may engage in constitutional political gerrymandering"). To force the creation of a majority-Black district in such instances would transform Section 2 into "a weapon[] of political warfare." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 11 (2024) (citation omitted).

Plaintiffs claim Circuit precedent "saddles defendants with the burden" to disentangle race and politics. Br. 77. It does no such thing. *See Pierce*, 97 F.4th at 223; *Charleston County*, 365 F.3d at 349; *see also LULAC, Council No. 4434 v.*

17

*Clements*, 999 F.2d 831, 860 (5th Cir. 1993) (describing "the burden of the plaintiffs"); *Williams*, 810 F. Supp. 3d at 712-17. Nor could it. Supreme Court precedent requires "a plaintiff" to "prove" vote dilution "under the totality of the circumstances." *Perez*, 585 U.S. at 614; *Milligan*, 599 U.S. at 18 (same). That race and party are often "intertwined," Br. 76 (citation omitted), only confirms how important that showing is. The Supreme Court has in similar circumstances emphasized the need to "disentangle race from politics" and held that "a plaintiff" "must" do that work. *Alexander*, 602 U.S. at 9.

In any event, the district court examined *Legislative Defendants'* evidence in 12 thorough pages before concluding "that party preference rather than racial preference drives voting in North Carolina." JA1702. No "legal error" infects that analysis. Br. 77. This Court affirmed the same finding of the same court based on the same type of evidence. *See Pierce*, 97 F.4th at 223 ("Plaintiffs do not identify any legal error or clear factual error in the district court's consideration of this evidence"). This case is the polar opposite of *Charleston County*, where elections were "non-partisan" and the district court did not credit evidence offered to show a partisan cause of racial voting patterns. *See* 365 F.3d. at 352-53. In contrast to this case, only "anecdotal evidence"—and not the robust statistical showing made here—suggested partisan polarization. *Id.* at 352. Moreover, the defense expert conceded that Black-preferred Black candidates were defeated more often than Black-preferred white candidates, which cut against the defense argument. *Id.* at 353.

The record here is entirely different. Looking at a vast range of elections, the district court found that "Black voters overwhelmingly support Democratic candidates," "white voters predominantly support Republican candidates," and these trends hold regardless of the candidate's race, which shows that voters of both races do not make candidate selections "because of race." JA1692; *see also* JA1693-1702. This was a thorough analysis, contrary to Plaintiffs' claim. Br. 77. Crucially, when political identity is cancelled out—as in the 2016 North Carolina Supreme Court contest, where a white and Black candidate ran without partisan labels—voting was not polarized. JA1695. In 2024, Plaintiff Pierce defeated a white Democrat in the Democratic primary for HD27, which covers counties in Plaintiffs' Demonstration Area. JA380; JA391-392. This and other evidence, taken together, showed "that the race of the candidate has no impact beyond the impact of party, particularly for white voters." JA1695. The *Williams* panel made the same finding based on opinions of the same defense expert, Dr. Alford. 810 F. Supp. 3d at 714-15.

Plaintiffs show no error. They principally criticize Dr. Alford's consideration of "the race of the *candidates*." Br. 78. But "a model that accounts for the candidate's race can provide probative evidence about causation." *Pierce*, 97 F.4th at 223. That is because voters' choice to support a candidate of their partisan preference, but not of their race, indicates that "a *voter's* party affiliation better explain[s] racially polarized voting as compared to the *voter's* race," Br. 78, as where "[w]hite voters supported Republican candidates at essentially the same rate regardless of their race, and black voters supported Democratic

19

candidates at essentially the same rate, regardless of their race." *Pierce*, 97 F.4th at 223. After all, voters' race was a key variable in Dr. Alford's analysis. It must also include candidate race to provide "testable" means to disentangle voters' race from their political preference. JA984.

Plaintiffs also contend that the partisan explanation cannot hold because "Democratic candidates promote policies and values shared by Black voters." Br. 78 (quoting JA981). But any contention about a need "to further isolate and measure other potential race-based reasons by black voters prefer Democrats" goes "to the persuasiveness of the evidence and the weight it should receive." *Pierce*, 97 F.4th at 223.

Besides, the interplay between race and policy preference only confirms why they must "disentangle race from politics." *Alexander*, 602 U.S. at 9. Section 2 provides no relief "where racial animosity is absent although the interests of racial groups diverge." *Gingles*, 478 U.S. at 100 (opinion of O'Connor, joined by Rehnquist, C.J., and Powell, J.); *see id.* at 83 (opinion of White, J., agreeing). In enforcing the Fifteenth Amendment's guarantee of racial equality, Section 2 could not create favored and disfavored political parties or political platforms. Accordingly, a party does not gain a Section 2 right to districts its candidates can win by taking "positions on issues" that minority voters tend to favor. JA981.

*Gingles* did not hold otherwise. There, Black and white *Democrats* displayed starkly different voting patterns in primary elections. *Gingles*, 478 U.S. at 59 (majority opinion). Plaintiffs do not contend that Black voters cannot elect

20

their preferred candidate in primary elections and present no basis to second guess the district court's finding that voting patterns reflect interest-group politics rather than racial animus.[3]

## C.    The District Court Correctly Found Substantial Successes of Black Candidates

The district court also considered "the extent to which members of the minority group have been elected to public office," the seventh Senate factor. *Gingles*, 478 U.S. at 37 (citation omitted). This is "one of the most important Senate Report factors." *NAACP, Inc. v. City of Niagara Falls*, 65 F.3d 1002, 1022 (2d Cir. 1995). The district court weighed this factor in favor of the defense because "black candidates have found substantial electoral success" in North Carolina. JA1683; *see* JA1677-1682. The holding is amply supported.

The question is whether "no members," or just a "few," "of a minority group have been elected to office over an extended period of time." S. Rep. 97-417 at 29, n.115. Here, it is undisputed that in the 2024 election, 38 Black candidates were elected to the General Assembly—28 in the House (23.33%) and 10 in the Senate (20%). JA1114; JA3167; JA433-434; JA1713. That is far more than zero, or just a few, Black candidate successes. Plaintiffs' expert, Dr. Burch, confirmed these numbers represent "parity with the population as a

---

[3] Plaintiffs are unpersuasive in taking out of context Dr. Alford's testimony that he did not "assess whether" Black voters prefer Democrats "because Democratic candidates promote policies and values shared by Black voters." JA981; Br. 77. Even if that were the cause, it would confirm this is a case of interest-group politics, not racial animus.

whole." JA812; *see Gingles*, 478 U.S. at 40 (comparing "rate of black electoral success" against "the percentage of blacks in the total state population").

Black members have also found success within the General Assembly. The current House Democratic Leader and the current Senate Democratic Leader are Black. JA483; JA433. Black candidates have been successful in northeastern North Carolina. Black candidates, including Plaintiff Rodney Pierce, were elected in SD5, HD8, HD23, HD24, and HD27 in 2024. JA380; JA138, JA140-141. CD1 has been represented by Black congressmembers since 1990. JA148-150; JA357-358. At the local level, Black commissioners held 40 of 62 (65%) county commissioner seats in the Black Belt counties. JA3138. More generally, 581 Black elected officials served in offices across North Carolina as of August 2024. JA3138. Numerous Black officials have been elected to statewide, judicial, and local offices in North Carolina. JA3137-3138; JA3104-3106; JA1220-1221. The district court's finding could hardly be more supported in fact.

Plaintiffs dispute none of this but rather claim the district court should have discounted substantial Black successes. *See* Br. 68-71. There is no merit in this "attempt to relitigate the significance of each piece of evidence they put before the district court." *Pierce*, 97 F.4th at 221. And it is Plaintiffs who promote legal error in contending the district court should have considered only "endogenous" elections in SD1 and SD2. *Compare* Br. 69 *with Pierce*, 97 F.4th at 221 ("we reject Plaintiffs' argument that the district court legally erred by considering under the seventh factor the successful election of black candidates

22

statewide and not merely in the challenged districts"). The law-of-the-case doctrine bars any claim that the district court erred in looking at statewide elections and officeholders. *See Carlson v. Boston Sci. Corp.,* 856 F.3d 320, 325 (4th Cir. 2017).

Plaintiffs also deem Black electoral success irrelevant if it occurs in "majority-Black or majority-minority districts." Br. 69-71. But the district court found it improper for their expert, Dr. Burch, to "lump[] together" "majority-*minority* districts" and "majority-*black* districts." JA1681 (emphasis added). Districts composed of pluralities of different racial or ethnic minorities are not majority-minority districts under Section 2. *Petteway v. Galveston County*, 111 F.4th 596, 603 (5th Cir. 2024) (en banc); *Nixon v. Kent County*, 76 F.3d 1381, 1386 (6th Cir. 1996) (en banc). And Plaintiffs presented no evidence suggesting coalitional voting by different minority groups in any event. Plaintiffs ignore this finding.

Further, Plaintiffs are wrong in implying that Black candidates need "majority-*Black* districts" to prevail, as was the case in *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1020 (N.D. Ala. 2022) (emphasis added), *aff'd on other grounds sub nom. Milligan*, 599 U.S. 1;[4] *Miss. State Conf. of the NAACP v. State Bd. of Election Comm'rs*, 739 F. Supp. 3d 383, 461 (S.D. Miss. 2024) (addressing "majority-black districts"). Here, by contrast, it is undisputed that "black voters do not

---

[4] The *Singleton* trial court's findings under the totality of circumstances went "unchallenged" in the Supreme Court's *Milligan* case. 599 U.S. at 23. Plaintiffs are misguided in their frequently employed strategy of plucking discussion from *Singleton* and treating it as Supreme Court precedent.

need a majority-black district to elect their candidate of choice." JA1632. Black candidates were "winning" "without majority-minority districts," which is why they were deemed unconstitutional in North Carolina last decade. *Pierce*, 97 F.4th at 205; *see supra* pp. 5-6. Even assuming results in majority-Black districts do not count, just four of the 28 Black House members (in HD23, HD27,[5] HD58, and HD107) and one of the 10 Black Senate members (in SD28) were elected from majority-Black districts. JA856-861; JA2740-2741; JA1725. The other 33 Black members of the General Assembly won districts with BVAPs below 50%. *See* JA859-861.

Plaintiffs provide no conceptual reason to discount Black representation in districts with "high concentrations of minority voters." Br. 69. The large number of such districts in the State is itself evidence against Plaintiffs' claim of inequal opportunity. *See supra* § I.A. The *Williams* panel credited these in finding that "Black candidates are regularly elected in North Carolina, including in northeastern part of the State." 810 F. Supp. 3d at 718. The district court did not err in doing the same.

### D.  The District Court Correctly Found Elections Are Not Marred by Racial Appeals

Yet another inquiry undermining Plaintiffs' claim is the sixth Senate factor, which asks "whether political campaigns have been characterized by overt or subtle racial appeals." *Pierce*, 97 F.4th at 219. The district court

---

[5] These districts resulted from the WCP as single-district county groupings, leaving no discretion for their configuration. *See* JA380-381, JA1987-1988. The General Assembly did not purposefully make them majority-Black districts.

24

examined an extensive record and found that campaigns "have not been characterized by overt or subtle racial appeals." JA1677. The *Williams* panel issued a similar holding. 810 F. Supp. 3d at 718-22.

The relevant question is whether racial appeals are prevalent rather than "isolated." *Clements*, 999 F.2d at 879; *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1281 (N.D. Ga. 2023) (finding six alleged racial appeals insufficient). Here, the district court weighed competing opinions of Plaintiffs' expert Dr. Burch and Legislative Defendants' expert Dr. Critchlow and found that racial appeals are, at most, "isolated and aberrational incidents." JA1671.

Plaintiffs ask for re-trial. Br. 65-68. But a "district court is at the apex of its discretion" in deciding a "battle of expert opinions." *United States v. 269 Acres, More or Less, Located in Beaufort Cnty.*, 995 F.3d 152, 165 n.8 (4th Cir. 2021). The court's findings are eminently supportable. Dr. Burch failed to conduct any systematic study of racial appeals, JA842; JA1210-1211, and did not explain or document her methodology for identifying racial appeals, leaving no way for her analysis to be replicated or tested. *See* JA1210-1211; JA3093; JA835-836, JA838. This "ad hoc approach[] [does] not facilitate an assessment of whether racial appeals occur regularly or otherwise 'characterize North Carolina political campaigns.'" *Williams*, 810 F. Supp. 3d at 719 (citation omitted). Moreover, as Dr. Critchlow explained, Dr. Burch was overinclusive in treating "legitimate policy concerns, like illegal immigration or crime, as racial appeals." JA1671. It was at least "plausible," *Cooper*, 581 U.S. at 309 (citation omitted), for the district

25

court to conclude that conservative or Republican policy positions are not *per se* racist. *Pierce*, 97 F.4th at 222.

In fact, Dr. Burch's definition of racial appeals was so grossly expansive as to sweep in even *bipartisan* policy views—such as "criticism of TikTok." JA1671; Br. 66 (deeming this a "racially charged reference[] to China"); JA1217; JA3099-3100 (Dr. Critchlow explaining that advertisement related to the Chinese government's ownership of TikTok "wasn't an attack on the Chinese people" or "Asian Americans"); *TikTok Inc. v. Garland*, 604 U.S. 56 (2025) (unanimously upholding bipartisan legislation adverse to TikTok). Reciting Dr. Burch's *conclusions* and embellishing the record with racially tinged lawyers' arguments, *see* Br. 65-66, cannot salvage her failure to apply "reliable principles and methods." *See* Fed. R. Evid. 702(c).

Dr. Critchlow, in contrast, conducted a systematic analysis with an identified, replicable methodology that is "standard" in the field of political history. JA1200-1205; JA3086-3094. His analysis was designed to examine "what candidates wish to project to votes in a campaign," "afford a sense of public opinion," and "provide a sense of what was controversial or important to the public." JA1201. Dr. Critchlow looked at newspaper reports for accusations of racism in campaigns because that is an "objective measure." JA1204-1205. Dr. Critchlow found no "pervasive emphasis on racism" in North Carolina. JA1209-1210. Campaigns tend to focus on "bread-and butter-issues" like the economy, taxes, healthcare, and education—not on racial appeals. JA1206;

26

JA3091. The district court did not err in privileging grounded methodology over *ad hoc* confirmation bias.

Indeed, this is a case where the "absence of evidence is probative." *Williams*, 810 F. Supp. 3d at 722. Dr. Burch alleged 16 campaigns at the federal, statewide, and local levels involving a racial appeal, but admitted more than 1,000 contests may have been held during the years she studied. JA840-842. Dr. Burch could, at best, assert that racial appeals occur in just over 1% (16 out of 1,000) of contests. *See* JA1671. None of the examples cited by Dr. Burch were in state senate campaigns.

The racial appeals Plaintiffs discuss now are too little, too late. For example, Plaintiffs point to advertisements during the 2022 U.S. Senate race. Br. 66. But Dr. Critchlow showed these were not racial appeals: the ads challenged Cheri Beasley's record as a judge and sought to paint her as soft on crime. *See* JA3089-3090; JA1208-1209. While Beasley's campaign alleged these ads were factually inaccurate, neither her campaign nor the press claimed these ads were racial appeals or alleged racism. JA3090. Plaintiffs also emphasize racial appeals allegedly made in the 2024 Governor's race. Br. 66. The district court and Dr. Critchlow acknowledged these statements could involve a charge of racism, *see* JA1676, but as Dr. Critchlow explained, Robinson was "'an unusual candidate' who finished well behind President Trump in the 2024 election in North Carolina." JA1246-1247. As the *Williams* panel held, these statements "were not an example of a candidate using a racial appeal in an effort to win votes; quite the opposite, it is an instance of a candidate's former racial

27

comments coming back to hurt him with North Carolina voters." 810 F. Supp. 3d at 720.

### E. The District Court Correctly Found No Voting Practices That Exacerbate Discriminatory Effects

The district court found additional support for Legislative Defendants' position in the third Senate factor—whether the State uses "other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." *See Gingles*, 478 U.S. at 37 (citation omitted). The analysis addresses "current practices," as its concern is whether "other voting practices or procedures amplify the effect of the challenged voting procedure." *Pierce*, 97 F.4th at 221.

Here, the district court found no evidence of such effects, and with good reason. The court credited Legislative Defendants' expert, Dr. Taylor, and his findings that "North Carolina employs typical voting practices and procedures"; that it does not use "unusually large Senate districts," "cumulative voting," or "a single-shot provision"; and that its "voting procedures specifically cater to black voters in northeast North Carolina." JA1656-1657. That is not "one data point," Br. 51, but a fulsome review of a fulsome record.

By comparison, Plaintiffs made no serious counter-attempt. On appeal, they contend—with no evidence—that the State's prohibition on voting by convicted felons "disenfranchises Black North Carolinians at nearly three times the rate of white citizens." Br. 50. But the appellate ruling they cite for that proposition *reversed* the trial decision that made that finding, including because

28

the trial court "erred by not making any findings concerning the racial makeup of the overall felon population." *Cmty. Success Initiative v. Moore*, 384 N.C. 194, 218 (2023).

Nor did Plaintiffs present evidence to back their contention that "[t]he State's voter-identification requirements disproportionately burden Black voters." Br. 50. They again cite a court decision—not evidence—and omit critical context. The ruling found a material fact dispute concerning the impact of the State's voter-identification requirements that justified trial. *N.C. State Conf. of NAACP v. Hirsch*, 720 F. Supp. 3d 406, 426-27 (M.D.N.C. 2024). But Plaintiffs fail to cite the decision of this Court reversing a preliminary injunction in that case. *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 310-11 (4th Cir. 2020). And, after trial, the district court was unable "to conclude that the size of the burden imposed by" the voter-identification rule "is greater than the usual burdens of voting" and that there was "limited evidence…about the number in absolute terms of persons unable to vote because they lacked qualifying ID." *N.C. State Conf. of NAACP v. Hirsch*, No. 1:18-cv-01034, slip op. at 116 (M.D.N.C. Mar. 26, 2026). The court therefore rejected the challenge. Here, *no* evidence presented below addressed the impact of the voter identification requirement. In *Williams*, where the challengers did present some evidence on this issue, the panel found no impact from the voter identification requirement because "over 99.9995% of black voters and over 99.9998% of white voters had their ballots counted in the 2024 general election." 810 F. Supp. 3d at 724.

That leaves Plaintiffs' discussion of the State's at-large elections for appellate court positions. Br. 50-51. On this point, they cite their own proposed conclusions of law filed below. Br. 51. And they do not explain how that election method could "enhance the opportunity for discrimination" in *senate* elections. *Gingles*, 478 U.S. at 45. This comes nowhere close to showing clear error.

### F.    The District Court Correctly Found No Recent Evidence of Voting-Related Racial Discrimination

The district court considered the "extent…of official discrimination…that touched the right…to vote," *i.e.*, the first Senate factor. *Gingles*, 478 U.S. at 36-37 (citation omitted). The court found the record effectively as it stood as at the preliminary injunction stage, where this Court endorsed its finding that Plaintiffs' "evidence of historical discrimination" was "'outdated'" and merited "'little weight.'" *Pierce*, 97 F.4th at 221 (citation omitted). Once again, Plaintiffs pointed to "very old cases in North Carolina." JA1654-1655. The district court applied settled law holding that "recent history is more persuasive" for this analysis "than history far more removed." *Pierce*, 97 F.4th at 221; *see also Veasey v. Abbott*, 830 F.3d 216, 232 (5th Cir. 2016) ("[T]he most relevant 'historical' evidence is relatively recent history, not long-past history."). The district court also afforded "little weight" to lay witness testimony by individuals who were "not trained historians, were not qualified as experts, and could only testify to their personal knowledge." JA1654 (citing Fed. R. Evid. 602). Plaintiffs do not challenge that credibility determination.

30

Plaintiffs, however, ask the Court to reweigh the evidence. But it already rejected materially identical arguments. *Pierce*, 97 F.4th at 221-22. Plaintiffs fail yet again. The *Williams* panel joined the court below in holding that "recent history is more probative for understanding whether the 2023 Senate districts are discriminatory in effect." 810 F. Supp. 3d at 722. Because "history did not end in 1965," it was proper to look for "current data reflecting current needs." *See Shelby County. v. Holder*, 570 U.S. 529, 552-53 (2013). In contending that "Reconstruction-era and Jim Crow discrimination" should have received more weight, Br. 49, Plaintiffs miss the role of the first Senate factor in identifying at least a "risk of purposeful discrimination." *City of Rome*, 446 U.S. at 177. A legislature whose members have recently engaged in discrimination poses a greater risk of additional discrimination than one that has not. *Cf. Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) (identifying the "historical background" that may be relevant as "a series of official actions" by the officials whose motive is questioned); *see also Raymond*, 981 F.3d at 304-05. The older the evidence, the less its probative weight.[6]

Remarkably, Plaintiffs cite the General Assembly's mistaken choice to *provide* majority-Black districts last decade as evidence of discrimination. Br. 48-49. It is absurd in the extreme for Plaintiffs to claim the General Assembly's error in doing what they demand here—creating majority-Black districts—is

---

[6] Plaintiffs note a ruling this Court issued "[j]ust last year," Br. 48, but it found discrimination in "1877" and "1899." *N.C. A. Philip Randolph Inst. v. N.C. Bd. of Elections*, 155 F.4th 298, 310 (4th Cir. 2025).

evidence in *their* favor. This Court's *Pierce* decision correctly viewed this history to cut the other way. *See* 97 F.4th at 204-06; *see supra* pp. 4-6. Plaintiffs ignore that the courts made "no finding that the General Assembly acted in bad faith or with discriminatory intent in drawing the challenged districts." *Covington*, 316 F.R.D. at 124 n.1; *see also Cooper*, 581 U.S. at 306 (explaining the General Assembly made "a legal mistake" in providing majority-Black districts); *Pierce*, 97 F.4th at 204-05 (describing this history).

### G.    The District Court Correctly Held That the State's Policies Are Not Tenuous

On the ninth Senate factor, which examines "the policy underlying the state['s] use of" the challenged districts, *Gingles*, 478 U.S. at 37 (citation omitted), the district court found those invoked here are "not 'tenuous.'" JA1690. The court explained that SD1 and SD2 are dictated by "North Carolina's WCP," which represent "a sovereign policy from the beginning of North Carolina's history" that are implemented through "objective, neutral, and non-arbitrary means." JA1690. This ruling properly acknowledges "the importance of the county to [North Carolina's] system of government" and the State's "long-standing tradition of respecting county lines." *Stephenson I*, 562 S.E.2d at 385-86. It also properly admits the minimal risk of purposeful discrimination in the State's implementation of a pre-set methodology rooted in the State Constitution. *See also Williams*, 810 F. Supp. 3d at 730.

Plaintiffs respond "that § 2 compliance trumps the Whole County Provision." Br. 75. Because federal law always trumps state law, that argument

32

wishes the inquiry away. The question is not whether federal law is supreme, but whether North Carolina's interest "lies at the heart of representative government." *Fusilier v. Landry*, 963 F.3d 447, 460 (5th Cir. 2020). It does. Besides, Plaintiffs ignore that creating majority-Black districts that contravene the WCP is suspect under the *federal* Constitution. They do not challenge the district court's independent finding that the General Assembly had a strong interest "in complying with federal constitutional principles." JA1690. *See Pierce*, 97 F.4th at 221 n.10. Any challenge to that independent—and sufficient— holding is forfeited.

Plaintiffs are also off base in faulting the district court for crediting the testimony of Senator Hise concerning the State's policies. Br. 75. Their argument defies "the presumption of legislative good faith." *Alexander*, 602 U.S. at 20; *see also Abbott*, 585 U.S. at 603 (rejecting "original sin" theory presuming bad intent based on past bad action). Senator Hise credibly testified that, from two possible county groupings for SD1 and SD2, the Senate Committee chairs selected the one that better preserves communities of interest and aligns with media market coverage. JA875. Senator Hise also testified that the General Assembly chose against majority-Black districts because no evidence of legally significant racially polarized voting justified race-based departures from the WCP. JA873-874, JA876-877. This testimony was unrebutted.

33

**H.      The District Court Correctly Found the General Assembly Responsive to the Needs of Black Voters**

Applying the eighth Senate factor, the district court found no "significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37 (citation omitted). This question was not close. Legislative Defendants presented opinions of an expert, Dr. Taylor, examining the topic from multiple vantage points. JA1685; JA3141-3146. Plaintiffs' expert did not examine the topic, and the district court correctly declined to extend her opinions beyond the purposes for which they were prepared and offered. JA1686. Plaintiffs inexplicably cite "Dr. Burch's analysis" without preserving a challenge to that ruling. *See* Br. 73.

Plaintiffs ask the Court to weigh opinions of their "fact witnesses" over Dr. Taylor's opinion. Br. 72. But they only confirm why appellate process does not work that way. For example, they say their lay witnesses established "chronic underfunding of public schools." Br. 72. But Dr. Taylor examined school-funding statistics published by the State and determined that the eleven counties of North Carolina's Black Belt held an average rank of 30.5 out of 100 counties in terms of school funding in 2024. JA3143-3144 & n.50. All eleven Black Belt counties received low wealth supplemental funding from the State. JA1123-1125; JA2916. Likewise, in Fiscal Year 2022 to 2023, the General Assembly provided $10 million to Chowan County, Northampton, and Washington Counties, $7.8 million to Halifax County, and $6 million to Warren County for the Needs-Based Public School Capital Fund. JA3144. North

34

Carolina's public historically Black universities and colleges received over half a billion dollars in appropriations for the biennium. JA3144-3145. These specific findings, present in the text of Dr. Taylor's report, JA3144, and in his testimony, JA1122-1125, refute Plaintiffs' assertion that Dr. Taylor's report says nothing about "*Black Belt counties* specifically," Br. 73, and their bizarre claim that the district court had to discredit Dr. Taylor's opinions and credit their lay witnesses.

Even if Dr. Taylor's many analyses were set aside, that would not change the outcome because "a plaintiff" must "prove" vote dilution. *Abbott*, 585 U.S. at 614. A trial court need not find this factor met based solely on "anecdotal evidence." *Williams*, 810 F. Supp. 3d at 728. And Plaintiffs' contentions fail because the question is whether responsiveness exists in the form of "tangible efforts of elected officials," *Niagara Falls*, 65 F.3d at 1023 n.24, not whether a minority group gets its policy wish list. "Of course, everyone wants more funding," JA1686, and Plaintiffs may want a different State "healthcare policy," redistricting plans, equality outcomes, and so forth. Br. 72-73. But no rule of law binds North Carolina to the political goals of a few "fact witnesses." Br. 73.

## I. The District Court Correctly Held That Effects of Past Discrimination Are Not Shown to Hinder Political Participation

The fifth Senate factor addresses the extent to which minority group members "bear the effects of discrimination" that "hinder their ability to participate effectively in the political process.'" *Gingles*, 478 U.S. at 37 (citation omitted). The district court weighed this factor against Plaintiffs, crediting

35

Dr. Taylor, and discrediting Plaintiffs' expert, Dr. Burch. JA1658-1669. The ruling lies "at the apex of its discretion." *269 Acres*, 995 F.3d at 165 n.8.

To begin, the court faulted Dr. Burch for failing to show that socio-economic differences hinder "black North Carolinians' political participation." JA1670. Because effects of discrimination are relevant only if they "hinder" minority participation, *Gingles*, 478 U.S. at 37, a challenger must show "depressed political participation," *Williams*, 810 F. Supp. 3d at 727. Plaintiffs claim they showed this, but fail to show what Black participation is in relevant areas, let alone that it is depressed. Br. 61. They claim simply that "American survey research" shows that "racial disparities…hinder Black political participation." Br. 61. But an "article on national…patterns is no substitute for" local evidence. *Growe v. Emison*, 507 U.S. 25, 42 (1993). No item in Plaintiffs' long string cite shows evidence of participation disparities in North Carolina. *See* JA319; JA768; JA774-775; JA2028; JA2042-2046. Nor did they show the district court any such evidence in their lengthy discussion of this factor. *See* Dist.Ct.Dkt.126 ¶¶185-231.

The district court separately criticized Dr. Burch for "assum[ing] past racial discrimination caused" the results she identified without a "causal analysis." JA1658. Plaintiffs call this finding irrelevant, Br. 58, but this Court's precedent calls for evidence "connecting the [socioeconomic racial] disparities they reported between black and white North Carolinians to official race discrimination or unresponsive elected officials." *Pierce*, 97 F.4th at 222. Plaintiffs do not seriously dispute the district court's finding that Dr. Burch

36

"failed to conduct her own causal analysis, rely on a persuasive causal analysis, or explore alternative explanations." JA1658. Their contention that "today's racial disparities result from discrimination," Br. 59, assumes the point they had to prove but did not, *see* JA1660 ("an expert needs to control for other relevant variables to infer a causal relationship"). No amount of reciting outcomes, *see* Br. 59, can show causation or clear error on this point.[7] The rest of their discussion improperly urges the Court to reweigh each item of evidence examined across 12 thorough pages of fact-finding. JA1658-1670.

The district court found additional problems with Dr. Burch's credibility and her analysis. JA1653-1654; JA1663-1664; JA1667-1668. For example, Dr. Burch "cherry-picked" counties in her analysis by omitting two counties (Pasquotank and Tyrrell) in SD1 and SD2 and including one (Edgecombe) that is not. JA1653-1654. Plaintiffs do not dispute this, but instead claim that excluding Edgecombe would have bolstered Burch's conclusions and that there is "no evidence" that including the omitted counties would have changed the outcome. Br. 64. But that reverses the burden. Their failure to offer this evidence meant the court was "left without a Senator Factors analysis" as to two of the counties in the districts they challenge here. *See* JA1653. In other parts of her analysis, Dr. Burch relied on outdated and incomplete data in education, *see* JA1663-1664, and admitted she lacked recent or relevant evidence of discriminatory lending practices. JA1667-1668.

---

[7] Plaintiffs resort to tricks, first claiming that "Defendants did not even contest the point below," Br. 59, but that is false, Dist.Ct.Dkt.125-1 at 32, ¶68.

Plaintiffs additionally challenge as "irrelevant" the district court's finding that "racial disparities in northeast North Carolina do not exceed statewide or national disparities." Br. 62. But Plaintiffs' claim shows why a comparative analysis is important. Section 2 claims succeed "rarely." *Milligan*, 599 U.S. at 29. The Senate Report relied upon in *Gingles* made clear that in "most communities…it would be exceedingly difficult for plaintiffs to show that they were effectively excluded from fair access to the political process under the results test." S. Rep. 97-417, at 33. The report proceeded to credit a Department of Justice study finding no plausible claim in "200 cities"—as of 1978. *Id.* at 35. By necessary implication, a jurisdiction with conditions that rank around the national average *today* cannot be the site of a successful Section 2 case. The gist of Plaintiffs' claim, understood in context, is that every district court must be compelled to find Section 2 liability in every case. That view is wrong.

Supreme Court precedent compels a "meaningful comparison" between disparities in employment, wealth, and education. *Brnovich*, 594 U.S. at 671. Other courts have credited Dr. Taylor's comparative approach, but Dr. Burch relies on artificially magnifying otherwise small differences. *Democracy N.C. v. De Luca*, No. 1:23-cv-878, 2026 WL 836812, at *26 (M.D.N.C. Mar. 26, 2026) (crediting Dr. Taylor's testimony and "useful" comparative approach); *Williams*, 810 F. Supp. 3d at 725-28, 730 (discussing Dr. Taylor's comparative approach and finding that totality evidence "convincingly demonstrates that 'voting is "equally open" and affords an equal "opportunity"' to black and white North Carolinians alike" (citations omitted)).

## II.    Plaintiffs Failed to Establish The First and Third *Gingles* Preconditions

Though the Court need not reach the following issues, Plaintiffs' failure to establish two of the *Gingles* preconditions confirms that "there neither has been a wrong nor can be a remedy." *Growe*, 507 U.S. at 41.

### A.    The First Precondition Was Not Satisfied

The district court did not err in finding the first *Gingles* precondition unsatisfied. JA1611-1629. That precondition requires proof that the minority group is "sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Milligan*, 599 U.S. at 18 (alteration marks omitted). These are distinct requirements. First, under the numerosity component, the plaintiff most identify a compact minority population that is a "numerical, working majority of the voting-age population." *Bartlett*, 556 U.S. at 13 (plurality opinion); *LULAC*, 548 U.S. at 433. Second, a plaintiff must show that a "reasonably configured" district drawn according to "traditional districting criteria" can be configured around this compact minority population. *Milligan*, 599 U.S. at 20; *LULAC,* 548 U.S. at 433.

However, "it is not enough that [Plaintiffs] show the possibility of creating a majority-minority district." *LULAC*, 548 U.S. at 429. Because "the State cannot be faulted" where "the inclusion of the [P]laintiffs" in an opportunity district "would necessitate the exclusion of others," the first "condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Id.* at 430 (quoting *Johnson*, 512 U.S. at 1008).

39

This doctrine refutes Plaintiffs' myopic assertion that "features of other districts that would surround" a proposed majority-Black district "are legally irrelevant." Br. 25. The first condition demands "an *additional*" opportunity district, Br. 43, rather than one that "trade[s] off" the "rights of some minority voters … against the rights of other members of the same minority class." *Johnson*, 512 U.S. at 1019. This requires analysis of effects on surrounding districts. *See Milligan*, 599 U.S. at 19 (asking whether "a second" opportunity district could be "'reasonably configured'" (citation omitted)); *LULAC*, 548 U.S. at 435 (comparing plan with "five reasonably compact…opportunity districts" against alternative with "six such districts"). The first precondition is not satisfied by "only a single district" viewed apart from "the rest of the map." *Negron v. City of Miami Beach*, 113 F.3d 1563, 1571 (11th Cir. 1997).

Here, the challenged plan provides an opportunity district in northeast North Carolina, SD5, which resulted organically from the WCP without "racial predominance." *Milligan*, 599 U.S. at 31 (plurality opinion); JA1625. And, as "a performing crossover district," JA1625, SD5 affords minority opportunity in the manner favored in precedent. *Johnson*, 512 U.S. at 1020 ("majority-minority districts…rely on a quintessentially race-conscious calculus aptly described as the 'politics of second best'" (citation omitted)). "States can—and in proper cases should—defend against alleged § 2 violations by pointing … to effective crossover districts." *Bartlett*, 556 U.S. at 24 (plurality opinion). Accordingly, the question is not merely whether a majority-Black district is possible, *contra* Br. 12,

40

but whether one can be configured into a plan without compromising SD5 or "flouting traditional criteria." *Milligan*, 599 U.S. at 28. The answer is no.

### 1. Three Demonstration Districts Failed the Numerosity Element

Evidencing the demographic constraints, Plaintiffs presented three illustrative districts that fell shy of the majority-Black mark. JA1615-1619. As noted, the relevant group must constitute a "numerical, working majority of the voting-age population." *Bartlett*, 556 U.S. at 13 (plurality opinion). The BVAPs of two districts Plaintiffs presented at trial fell below that line, Demonstration B (48.41%) and Demonstration D (49.22%). JA1615. So did the BVAP of Demonstration E (49.64%), JA1621, which the district court properly excluded, *see infra* § II.A.3. Plaintiffs agree that these districts' BVAPs fall below 50% and have abandoned Demonstration B. *See* Br. 12-21. These proposed alternatives fail the first condition's "objective, administrable rule." *Bartlett*, 556 U.S. at 22 (plurality opinion).

In asking the Court to find that the Black group constitutes more than 50% of the *citizen* voting age population (CVAP), Br. 27-29, Plaintiffs fail to address the requirement to prove the Black group constituted a majority of the "*voting-age* population." *Id.* (emphasis added). Plaintiffs cite the North Carolina Supreme Court decision reviewed in *Bartlett*, which recommended an inquiry into "citizens of voting age." *Pender Cnty. v. Bartlett*, 649 S.E.2d 364, 374 (N.C. 2007); Br. 28. But that only proves the Supreme Court was presented with that view and rejected it.

41

Plaintiffs additionally ignore that the district court declined to "credit" the "analysis using [CVAP] data" by Plaintiffs' expert, Blake Esselstyn, because he "concedes he almost exclusively uses decennial census data, rather than ACS data, when drawing districts" and because "Plaintiffs…vacillate between BCVAP and BVAP as it suits their needs." JA1618. The choice of BCVAP was the result of litigation expediency—taking a favorable figure over an unfavorable one—not a well-founded expert opinion. Fed. R. Evid. 702(c). District courts have the best of reasons to discredit analyses where "an expert could selectively change his predicted outcomes to suit the exigencies of the moment." *Pierce*, 97 F.4th at 215. Plaintiffs have forfeited any challenge to that credibility determination by omission.

Regardless, Plaintiffs fail to show clear error in the district court's choice to credit their own BVAP figures, rather than BCVAP figures. BVAP figures come from the decennial census, which is "presumed accurate until proven otherwise." *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 932 (8th Cir. 2018) (quotations omitted); *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 946 (7th Cir. 1988); *Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1341 (11th Cir. 2000); *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 853-54 (5th Cir. 1999). By operation of law, Demonstrations D and E are presumptively not majority-Black districts.

Plaintiffs argue that a presumption of accuracy applies to their BCVAP estimates, which come not from the decennial census but from the American Community Survey (ACS). Br. 28. But Plaintiffs forfeited this argument too by

42

failing to assert it below. *See* Dist.Ct.Dkt. 126 ¶¶367-408. And it is wrong. The presumption of accuracy applies, not to just any data the Census Bureau promulgates, but to "the 'head count'"—i.e., the decennial census. *Dixon v. Hassler*, 412 F. Supp. 1036, 1040 (W.D. Tenn.), *aff'd sub nom. Republican Party of Shelby Cnty., v. Dixon*, 429 U.S. 934 (1976); *see also Kirkpatrick v. Preisler*, 394 U.S. 526, 534-35 (1969). Courts have declined to deem ACS figures presumptively accurate and found them too unreliable to overcome decennial census figures. *Mo. State Conf. of the NAACP*, 894 F.3d at 932 (finding no clear error in district court's refusal to credit ACS figures over the decennial census); *Benavidez v. Irving Indep. Sch. Dist., Tex.*, 690 F. Supp. 2d 451, 460 (N.D. Tex. 2010); *Rios-Andino v. Orange County*, 51 F. Supp. 3d 1215, 1225 (M.D. Fla. 2014); *Pope v. County of Albany*, No. 1:11-cv-0736, 2014 WL 316703, at *13 n.22 (N.D.N.Y. Jan. 28, 2014).

As Plaintiffs' expert admitted below, "the Decennial Census counts" are "an enumeration" reported "without any margins of error," and the results "are considered to be the best data available." JA559; *see Utah v. Evans*, 536 U.S. 452, 476 (2002). By contrast, "[t]he ACS is a sample survey" that is considerably less accurate. *Mo. State Conf. of the NAACP*, 894 F.3d at 932. The district court had every reason to conclude that "the [ACS] data is filled with uncertainty" and cannot override the presumption that the BVAP figures are accurate.[8] JA1616.

---

[8] Plaintiffs are wrong to call it "unrebutted" that ACS margins of error "were negligible." Br. 28-29. Dr. Collingwood testified that margins of error cannot be accurately calculated, JA743, and the estimates in Plaintiffs' presentations showed possible true values below 50% BCVAP, JA2522; JA291-292.

43

The evidence here shows that this data is unreliable. Plaintiffs' expert originally used 2016-2020 5-year ACS data to calculate his demonstration districts' BCVAP estimates, despite more recent data being available. JA630, JA667. When the 2018-2022 5-year estimates were used, the BCVAP estimates for Demonstrations B and D dropped significantly, with Demonstration B's dropping below 50%. JA668-669.

Plaintiffs confuse matters by citing precedent looking to CVAP where "noncitizens were…a significant part of the relevant population." *Barnett v. City of Chicago*, 141 F.3d 699, 705 (7th Cir. 1998). The purpose of CVAP in such cases is "refinement" of voting-age-population figures to account for "a significant difference in the citizenship rates of the majority and minority populations," as often occurs with Hispanic populations. *Negron*, 113 F.3d at 1568. A Hispanic voting-age population majority will be "hollow" if large segments are ineligible to vote. *LULAC*, 548 U.S. at 429. But in such cases, the Hispanic voting-age population will necessarily exceed 50% and satisfy the "objective" necessary condition. *Bartlett*, 556 U.S. at 18 (plurality opinion). CVAP is not used in such cases to show majority-Black status that the decennial census figures refute—let alone to enable plaintiffs to pick figures they prefer—but rather to test whether the voting-age majority signifies electoral opportunity. *See LULAC*, 548 U.S. at 429 (Hispanic group's majority-minority status under "voting-age population" overridden by low citizenship numbers); *see also, e.g.*, *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 690-91 (S.D. Tex. 2017) (Hispanic VAP consistently above Hispanic CVAP); *Negron*, 113 F.3d at 1568 (same).

44

The district court correctly found no concerns of that nature. JA1617-1618. Here, Plaintiffs wield the BCVAP figures as a replacement for BVAP figures that do not suit their litigation needs—that is, to attack the decennial census numbers. But Plaintiffs have not even attempted to satisfy the arduous standard for overcoming the presumption of accuracy in the decennial census.

**2.    The Demonstration Districts Are Not Reasonably Configured**

Plaintiffs failed in many different respects to prove that any Demonstration was reasonably configured.

a.    To begin, the district court rightly faulted Plaintiffs for failing to "address whether the black population in northeast North Carolina is sufficiently geographically compact." JA1619. That population, in fact, is "geographically dispersed." JA1598.

Plaintiffs could hardly be more wrong in claiming the court "invented a novel requirement." Br. 21. The Supreme Court long ago made clear that "[t]he first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district." *LULAC*, 548 U.S. at 433 (citation omitted). *LULAC* rejected the argument Plaintiffs make now, *see* Br. 21-22, that "the relative smoothness of the district lines made the district compact." 548 U.S. at 432. *Milligan* had no occasion to overrule *LULAC*, as Plaintiffs suggest, Br. 22, because no argument about the illustrative districts was offered under *LULAC* in that case, *see* 599 U.S. at 19-20. *Gingles* itself directed an inquiry into how "integrated" minority voters are in a district. 478 U.S. at 50.

45

b.    In all events, the district court found that Plaintiffs' illustrative plans are *not* reasonably configured. JA1620-1627. Districts are not reasonably configured if they contain "tentacles, appendages, bizarre shapes, or any other obvious irregularities." *Milligan*, 599 U.S. at 20 (citation omitted). The district court found that Demonstration D "carve[s] a jagged crescent (or claw-like shape) into northeast North Carolina and fails to respect political subdivisions." JA1621. Demonstration E likewise "splits counties, stretches to capture black population centers, and features an unusual claw-like shape." JA1621 n.11. Demonstration C "fails to respect the boundaries of political subdivisions by splitting Vance County and the city of Henderson," and contains a "tail-like 'appendage.'" JA1621-1622. Demonstration A forces county splits in neighboring districts, increasing the number of splits for the plan, and compels "a county grouping that is massive, gangly and outlandish," consisting of 23 of North Carolina's 100 counties. JA1624. It fails to respect "communities of interest." JA1624 (citation omitted).[9]

Plaintiffs improperly ask the Court to "duplicate the role of the lower court...to decide factual issues de novo." *Chavez-Deremer v. Med. Staffing of Am., LLC*, 147 F.4th 371, 398 (4th Cir. 2025) (citation omitted). Their arguments fail because "the district court's account of the evidence is plausible." *Id.* (citation omitted). For example, Plaintiffs do not dispute that Demonstration C

---

[9] Plaintiffs criticize the configuration of SD1 and SD2, but unlike the demonstration districts which split cities and precincts based on Esselstyn's discretion and admitted use of racial data, JA1627-1628, the visual concerns raised by Plaintiffs are the result of county lines.

46

contains a tail-like appendage. They call it too small to matter, Br. 23, but the district court had good reason to disagree: that "tail alone accounts for 63% of Vance County's BVAP." JA1622. Moreover, the district court weighed the district as a whole, noting its disregard for political subdivisions, and Plaintiffs do not address these findings. Br. 23-24.

Plaintiffs similarly do not deny that Demonstrations D and E contain crescent carve-outs and claw-like shapes. JA1621. Instead, they claim the districts are comparable in form with SD1 and SD2. Br. 23. But the analogy fails. SD1 and SD2 were not drawn because of race or imposed by a federal authority. They are the product of the WCP, which left none of their lines to "discretion." JA1595; *see also* JA875. Insofar as they are not ideal geometric shapes, that is due to the State's "long-standing tradition of respecting county lines" and its formulaic approach to reconciling that tradition with federal law. *Stephenson I*, 562 S.E.2d at 386. By contrast, Demonstrations D and E contravene the WCP and, by consequence, the method by which the State "respect[s] existing political subdivisions." *Milligan*, 599 U.S. at 20. Districts that honor the grouping formula cannot justify irregular forms that break the grouping formula.

Plaintiffs also claim circularly that the district court's criticisms of Demonstration A's "downstream effects" under State law contravene "the Supremacy Clause." Br. 26. This misses that Section 2—the relevant federal law—"never require[s] adoption of districts that violate traditional redistricting principles." *Milligan*, 599 U.S. at 30 (quotation and alteration marks omitted). Besides, Plaintiffs have no response to the district court's observation that the

47

23-district grouping they propose was deemed evidence of a *federal* constitutional violation in *Covington*. 316 F.R.D. at 132-33; JA1625. Plaintiffs also fail to explain how the reasonable-configuration requirement can be lifted where their proposal's "outlandish" impacts are in neighboring districts. JA1624. "A district court cannot implement an incomplete plan, containing only a single district." *Negron*, 113 F.3d at 1571.

        c.      Plaintiffs also failed to show that Demonstrations A or C can be implemented as part of a reasonably configured plan that improves Black opportunity.

Demonstration A "would not enhance the ability of minority voters to elect the candidates of their choice." *Abbott*, 585 U.S. at 617. Demonstration A—if configured in a legally compliant plan—would not enhance minority opportunity because it eliminates SD5. This occurs because Demonstration A departs from North Carolina's WCP and resets the county groupings, which causes a cascade effect that breaks up SD5. JA1625. This does not show that a "second" opportunity district is feasible. *Milligan*, 599 U.S. at 19; *see also Abbott*, 585 U.S. at 617 (finding clear error in trial court's reliance on alternative that broke Texas's county-line rule).

Plaintiffs respond, first, that "federal law" could require that SD5 be "frozen" in contravention of the WCP. Br. 27. It cannot. SD5 is a "crossover" district, JA1625, and "§ 2 does not require crossover districts." *Bartlett*, 556 U.S. at 23 (plurality opinion). By consequence, a crossover district cannot "justify a

48

violation of state law, namely the Whole County Provision." *Pierce*, 97 F.4th at 204. This is "legally forbidden." *Id.* at 228.

Plaintiffs, second, fault the district court for supposedly suggesting "that SD5 must be preserved under federal law." Br. 27. That's wrong again. The district court correctly held that "Section 2 does not require a district if it would destroy another preforming district." JA1626. That does not mean Section 2 protects SD5, but rather that trading it away for a new opportunity district shows "only that lines could have been drawn elsewhere, nothing more." *Johnson*, 512 U.S. at 1015. Precedent rejects Plaintiffs' one-step-forward-one-step-back theory of vote dilution. *LULAC*, 548 U.S. at 429-30; *Abbott*, 585 U.S. at 617; *Johnson*, 512 U.S. at 1008, 1019; *Milligan*, 599 U.S. at 19; *Bartlett*, 556 U.S. at 24 (plurality opinion). The *Williams* panel put to rest any latent doubt on this by rejecting an alternative that would trade SD5 for a new majority-Black district. 810 F. Supp. 3d at 709 ("Plaintiffs have not shown that" such a rendition "would create an additional minority opportunity district in northeastern North Carolina, as opposed to moving the location of that district.").[10]

All that aside, the district court declined to credit the method Plaintiffs' expert, Dr. Mattingly, used to freeze SD5 in place because that "manipulation"

---

[10] The *Williams* panel found the first precondition satisfied by a configuration that added a new majority-Black district and also raised SD5's BVAP above 50%. *Id.* at 710. Plaintiffs presented no such alternative here. Moreover, the *Williams* panel recognized that the General Assembly would be constitutionally barred from raising SD5's BVAP above 50%. *Id.* Respectfully, an illustrative plan of admitted "unsuitability for use as an actual legislative redistricting plan," *id.*, does not establish the first condition.

of his algorithm was not peer reviewed. JA1626. In a curt footnote, Plaintiffs say this finding "makes little sense," Br. 27 n.3, but they "do not identify a tangible error in the district court's analysis," *Belville v. Ford Motor Co.*, 919 F.3d 224, 233 (4th Cir. 2019). Because "the examination of a scientific study by a cadre of lawyers is not the same as its examination by others trained in the field of science," the district court was amply justified in discounting a method for its "lack of peer review." *Perry v. United States*, 755 F.2d 888, 892 (11th Cir. 1985); *see also Brock v. Merrell Dow Pharm., Inc.*, 874 F.2d 307, 313 (5th Cir. 1989) ("courts must nonetheless be especially skeptical of medical and other scientific evidence that has not been subjected to thorough peer review").

Demonstration C also fails this test because it was not proven to be configured in a manner that preserves SD5, contrary to Plaintiffs' assertions. *See* Br. 27. Demonstration C was not implemented as part of a plan that complies with the WCP. As explained, the North Carolina Supreme Court has directed that "legislative districts required by the VRA shall be formed prior to creation of non-VRA districts." *Stephenson I*, 562 S.E.2d at 396-97. Subsequently, county groupings must be built around VRA districts using "non-VRA districts" built from "non-VRA population pool[s]." *Id.* at 397; *see supra* pp.4-5. As Plaintiffs' counsel and their witnesses understood at trial, this precedent directs map-makers "to freeze a VRA district and then cluster the rest of the state" into groupings around it. JA498; *see also* JA502-505; JA406.

But Dr. Mattingly did not freeze Demonstration C—the alleged VRA district—and then build his county groupings around it with "a non-VRA

50

population pool." *Stephenson I*, 562 S.E.2d at 397. Instead, he grouped Demonstration C together with non-VRA districts (labelled C-11 and C-4) into an illegal grouping that wraps around SD5. *See* JA2141; JA2001-2002. That approach is not "to freeze a VRA district and then cluster the rest of the state." JA498. Demonstration C should have been frozen as a district and groupings built around it. SD5 cannot be shown to have "organically" survived the imposition of Demonstration C, Br. 27, by a configuration that violates the Whole County Provision, *see Abbott*, 585 U.S. at 617 (applying this rule).

When asked about this error at trial, Dr. Mattingly claimed his method did "remove a frozen district," i.e., Demonstration C, "along with any split from the clustering exercise [and] treat it as its own district and…apply [the] algorithm to the remaining part of the map." JA532. But Dr. Mattingly's code revealed this to be false: Demonstration C is plainly grouped with other districts, not set apart as a frozen district outside the groupings. JA537-538; JA3173. Confronted with this fact, Dr. Mattingly backtracked, stating that he "misspoke at little bit" and that his approach "gets a little tricky." JA538. Unsurprisingly, the district court found that this testimony "conflicted with [Dr. Mattingly's] report" and was "confused and not credible." JA1628. That finding presents no contest under the "special deference" it warrants, *see Pierce*, 97 F.4th at 215, and Plaintiffs do not even challenge it. That leaves them no basis to claim that Demonstration C would, if properly implemented in accord with North Carolina's WCP, leave SD5 intact.

Moreover, the districts labeled C-11 and C-4 fail to comply with North Carolina's county-grouping doctrine. Demonstration District C splits Vance County, and Districts C-4 and C-11 are split in Wilson County. JA2141; JA658-660. But those are not the most populous counties in the vicinity available to split for equal-population purposes. Franklin and Nash Counties are more populated, and they were available for splits to achieve equal population. JA658-660. The North Carolina Supreme Court has indicated that traversals should split the most populous available counties in an area where a split is necessary to achieve equal population. In *Pender County*, the court concluded that a crossover district created in Pender County could not justify departures from the WCP and then addressed permissible remedies. 649 S.E.2d at 375-76. The court considered possible splits in Pender and New Hanover Counties and, noting that New Hanover County was the larger, stated that Pender County should be maintained as a whole county and New Hanover County should be split. *Id.* Demonstration C and its neighboring districts violate that principle.

d.      The district court was correct to find all demonstration districts unreasonably configured for the additional, independent reason that racial goals predominated over traditional districting principles. JA1627-1629. As explained, Section 2 "never requires adoption of districts that violate traditional redistricting principles." *Milligan*, 599 U.S. at 30 (quotation and alteration marks omitted). Accordingly, the Supreme Court has "long drawn" a line "between consciousness" of race "and predominance." *Id.* at 33 (plurality opinion). A district is reasonably configured only if "race did not predominate." *Id.* at 32

52

(plurality opinion). Thus, a Section 2 plaintiff must "adduce[] at least one illustrative map" in which race did not predominate. *Id.* at 33 (plurality opinion); *see also id.* at 62 (Thomas, J., dissenting) (noting that eight Justices "appear[] to agree that the plaintiffs could not prove the first precondition…by drawing an illustrative map in which race was predominant").

The district court had sound reasons to determine that "race was the predominant factor motivating" the "decision to place a significant number of voters within or without a particular district." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017) (citation omitted). Plaintiffs attack a straw man in suggesting it held that any creation of a majority-Black district amounts to predominance. Br. 29. The district court, in fact, began with "the use of an express racial target" but proceeded to examine "all of the lines" of the districts Plaintiffs' expert configured in reaching its determination, just as the Supreme Court has directed. *Bethune-Hill*, 580 U.S. at 192; *see* JA1627-1629. Under the clear-error standard applicable to predominance findings, *Cooper*, 581 U.S. at 309, Plaintiffs' reliance on *Milligan*—which affirmed a trial court's finding concerning predominance, 599 U.S. at 33-34—only underscores that the predominance finding here needs no revisiting.

### 3.   Demonstration E Was Properly Excluded

Plaintiffs have no basis to rely on Demonstration E because the district court properly excluded it due to Plaintiffs' discovery violations. JA114-122. Plaintiffs' expert, Mr. Esselstyn, presented Demonstrations A through D in his initial report, but waited until his rebuttal report to spring Demonstration E—at

53

which point Legislative Defendants' experts had no opportunity to respond. JA120.

Plaintiffs fail to show that this order was outside the district court's "wide latitude." *S. States*, 318 F.3d at 595 (affirming exclusion of untimely disclosed expert opinions). Demonstration E did not, as they claim, respond to opinions of Legislative Defendants' experts. Br. 20. Legislative Defendants' expert, Dr. Trende, criticized Demonstrations A through D, JA117-118, and nothing about a *new* demonstration district could respond to his criticisms of *those* districts. The district court correctly concluded that Demonstration E "functions as a new argument that seeks to prove plaintiffs' Section 2 claims." JA117. It could (if properly configured) satisfy the first precondition standing alone. But "expert evidence necessary to support their case-in-chief" must be presented "in the initial round of expert disclosures." *United States ex rel. Brown v. Celgene Corp.*, No. 10-cv-3165, 2016 WL 6542730, at *3 (C.D. Cal. June 29, 2016). "A party may not offer testimony under the guise of 'rebuttal' only to provide additional support for his case in chief." *McKiver v. Murphy-Brown LLC,* No. 7:14-cv-180, 2018 WL 1832964, at *1 (E.D.N.C. Apr. 17, 2018) (citation omitted). There is no redistricting exception to that principle, as Plaintiffs nonsensically suggest. Br. 20-21.

## B.     The Third Precondition Was Not Satisfied

Plaintiffs failed to establish the third *Gingles* precondition, which requires proof of a "racial bloc voting that is 'legally significant.'" *Pierce*, 97 F.4th at 212 (citation omitted). The district court correctly found this element unmet because

54

"black voters do not need a majority-black district to elect their candidate of choice." JA1632.

1.    *Gingles* recognized that "in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." 478 U.S. at 49 n.15; *see also Voinovich v. Quilter*, 507 U.S. 146, 158 (1993) (same). The Supreme Court has also acknowledged the converse: "[i]n areas with substantial crossover voting"—i.e., white voting for minority-preferred candidates—"it is unlikely that the plaintiffs would be able to establish the third *Gingles* precondition." *Bartlett*, 556 U.S. at 24 (plurality opinion). For example, the Court found the third precondition unmet in *Abrams v. Johnson*, 521 U.S. 74 (1997), because white crossover voting "ranged from 22% to 38%." *Id.* at 92.

Precedent has evolved to clarify that "[t]he key inquiry under *Gingles*' third factor...is whether racial bloc voting is operating at such a level that it would actually minimize or cancel minority voters' ability to elect representatives of their choice, if no remedial district were drawn." *Pierce*, 97 F.4th at 212 (quotation and alteration marks omitted). Because a VRA remedy here is a majority-Black district, polarization lacks legal significance where a majority-Black district is unnecessary. *Bartlett*, 556 U.S. at 18-19; *Pierce*, 97 F.4th at 213.

Plaintiffs call this "a new legal test," Br. 35, but ignore every Supreme Court decision that has meaningfully addressed the third precondition. *Bartlett* explained that Section 2 cannot require "crossover" districts because the third precondition will not "be met in a district where, by definition, white voters join

55

in sufficient numbers with minority voters to elect the minority's preferred candidate." 556 U.S. at 16 (plurality opinion). In *Cooper*, the Court quoted and applied this principle in rejecting North Carolina's CD1 because "of a longtime pattern of white crossover voting in the area that would form the core of the redrawn" district. *Cooper*, 581 U.S. at 304. That pattern indicated "that a § 2 plaintiff could [not] demonstrate the third *Gingles* prerequisite."[11] *Id.* at 302.

The Supreme Court also summarily affirmed *Covington*'s rejection of 28 North Carolina majority-Black legislative districts drawn based on the advice of experts who found "statistically significant racially polarized voting in 50 of the 51 counties studied." 316 F.R.D. at 169 (quotation marks omitted). The studies merely found "'racially polarized voting,'" which "simply refers to when different racial groups 'vote in blocs for different candidates.'" *Id.* at 170. But they missed the "crucial difference between *legally significant* and *statistically significant* racially polarized voting." *Id.* (emphasis in original). Whereas polarized voting can occur "when 51% of a minority group's voters prefer a candidate and 49% of the majority group's voters prefer that same candidate," "the third *Gingles* inquiry is concerned only with 'legally significant racially polarized voting,'" *id.* (quoting *Gingles*, 478 U.S. at 51, 55-56). Polarization becomes legally significant only when "operating at such a level that it would actually minimize or cancel minority voters' ability to elect representatives of

---

[11] *Cooper* did not hold that "that crossover districts…may serve as lawful § 2 remedies." Br. 36. It held that, where a crossover district would perform, there was neither "a wrong nor can be a remedy." 581 U.S. at 306 (citation omitted).

56

their choice, if no remedial district were drawn." *Id.* at 168 (quotation and alteration marks omitted).

In summary, "courts have repeatedly rejected arguments that Section 2 required" majority-Black districts "when the State lacked evidence that such districts were necessary for black-preferred candidates to win." *Pierce*, 97 F.4th at 217. Plaintiffs cannot expect to prove a Section 2 case when they too lack such evidence.

2.      Plaintiffs contend that the third precondition is met if minority-preferred candidates usually lose "in the *actual* enacted districts." Br. 35. But the third precondition cannot become altered "simply because the litigation roles are reversed—i.e., here it is Plaintiffs, not the State, who advocate for a majority-minority district drawn on the basis of race." *Pierce*, 97 F.4th at 217-18. As explained, the Supreme Court in racial gerrymandering cases has *forbidden* majority-Black districts that are unnecessary to guarantee minority equal opportunity. That is the standard the district court applied.[12]

Plaintiffs' approach could not be applied in racial gerrymandering cases, where "the *actual* enacted districts," Br. 35, have typically been configured as performing opportunity districts. *See Alexander*, 602 U.S. at 8 ("States often admit to considering race for the purpose of satisfying our precedent interpreting

---

[12] The district court did not hold that "even *one* white crossover voter precludes" the third precondition. Br. 36. It asked the question posed in *Cooper*, *Covington*, *Bartlett*, and *Abrams*. To be sure, the *Williams* panel found the third precondition met based on review of electoral opportunity in SD1 and SD2, but it did not address the conflict between its approach and the precedents discussed here. *See Williams*, 810 F. Supp. 3d at 710-12.

57

the Voting Rights Act"). A legislature cannot prove that minority-preferred candidates will ordinarily lose districts designed for them to win. *See Cooper*, 581 U.S. at 304 (measuring "a longtime pattern of crossover voting," not opportunity in enacted district); *Abrams*, 521 U.S. at 94 (same); *Covington*, 316 F.R.D. at 169-70 (same). Indeed, the third precondition in such cases is measured as of "the time of imposition" of new districts, *Pierce*, 97 F.4th at 203, when the question remains "*hypothetical*," Br. 41, because no districts are yet enacted. If the question is whether *some* tipping point in an area differentiates opportunity from its absence, the answer will most always be yes. There could be, in Plaintiffs' view, no difference between legally significant and statistically significant polarization. *But see Cooper*, 581 U.S. at 304 n.5; *Covington*, 316 F.R.D. at 169; *Pierce*, 97 F.4th at 216.

Plaintiffs' view also conflicts with Section 2's "majority-minority requirement." *Bartlett*, 556 U.S. at 17. Section 2 "does not require crossover districts." *Id.* at 23. But Plaintiffs say it does. Br. 36. Their contention that the third precondition is satisfied in districts of about 25% and 30% BVAP that do not need to exceed 50% BVAP would impose a sliding-scale rule demanding that legislatures identify the minority-opportunity tipping point and deem it both ceiling and floor. *See Cooper*, 581 U.S. at 301-03 (prohibiting BVAP level that was unnecessary). This would require not only that the General Assembly create crossover districts but that it break county groupings in the process. *Bartlett* could not be clearer in rejecting both parts of that theory.

58

Plaintiffs' proposed doctrine is especially pernicious where they have rested solely on general election data equating Black and Democratic opportunity. So applied, Plaintiffs' sliding-scale doctrine would require every legislature to configure every district as a performing Democratic district. The Republican Congress that amended Section 2 did not think it was outlawing Republican electoral success, and it could not have enforced the Fifteenth Amendment that way even if it so desired.

3.    Plaintiffs make no contention that a VRA remedy is needed in northeast North Carolina. They do not contest the district court's finding "that 50% [BVAP] districts are not necessary." JA1644; *see also* JA1636. They cannot deny that—as in *Cooper*, *Covington*, *Bartlett*, and *Abrams*—a 50% BVAP district would be excessive and not narrowly tailored to Section 2's dictates. Nor could they dispute that their own expert's estimate rate of white crossover voting in SD1 and SD2 (22.36% and 19.9%), JA2748, is on par with the crossover rates deemed high in *Abrams*. 521 U.S. at 92 ("22% to 38%"); *see also* JA1633-1634 (discussion of Plaintiffs' expert's analysis showing crossover voting).[13]

Plaintiffs' inability to prove a need for a majority-Black district is telling where their expert, Dr. Collingwood, was found to have engaged in "cherry-picking" by rigging a "result-driven analysis" based on "arbitrarily chosen" parameters "without a reliable methodology" that "failed to show his work."

---

[13] Plaintiffs also cannot dispute that their own expert's reconstituted election analysis showed wide margins of victory, on average between 10 and 20 points, in the demonstration districts. JA756; JA2078-2082; JA212; JA2760.

JA1639; JA1641; JA1644. Yet he could not justify a majority-Black district in northeast North Carolina. His inflated BVAP-needed-to-win estimate was 47%. JA1632. The district court rejected that estimate, and Plaintiffs improperly "attempt to relitigate the significance of each piece of evidence." *Pierce*, 97 F.4th at 221. This only illustrates why appellate courts must "not take it upon [themselves] to weigh the trial evidence as if [they] were the first to hear it." *Cooper*, 581 U.S. at 316.

The district court had numerous, sound reasons to discredit Dr. Collingwood. Dr. Collingwood had never conducted his "simulation" analysis before this case, and Dr. Alford found it "unusual" and "not the way…I've seen other experts do it." JA1636; JA994. Dr. Collingwood testified that "[y]ou can't do" this type of analysis at the district or county levels, JA255, but experts have done just that in published work, *see* Grofman, Handley et al., *Drawing Effective Minority Districts: A Conceptual Framework and Some Empirical Evidence*, 79 N.C. L. Rev. 1383, 1423 (2001), and expert materials Plaintiffs' own counsel has sponsored, JA1637-1638. Ignoring the published work, Plaintiffs contend the district court should not have considered the expert report, Br. 40-41, but Dr. Alford properly relied on that report, JA3194-3195, and Plaintiffs did not present the nature of their present objection to the district court, *compare* Br. 40-41 (contending expert reports are improper impeachment) *with* JA249 (making no such contention). Regardless, the district court did not treat the report as "substantive evidence" or consider it for the truth of its BVAP calculations. The district court instead permitted Dr. Collingwood to be cross-

examined regarding the inconsistencies between his methodology and that used by known experts in the field, and his lack of knowledge about this critical topic. *See* JA1638-1640. This was proper impeachment. *Lowe v. Walbro, LLC*, 147 F.4th 601, 610 (6th Cir. 2025) ("Impeachment evidence is evidence used to discredit a witness and not used to prove the truth of the matter."); *Standley v. Edmonds-Leach*, 783 F.3d 1276 (D.C. Cir. 2015) (similar).

Even if Plaintiffs' arguments for a different approach were persuasive, *see* Br. 42, that would not overcome the district court's finding that Dr. Collingwood chose to examine a "Demonstration Area" selected "without a reliable methodology," JA1639, with obvious defects, like "a hole" resulting from the arbitrary exclusion of a county, JA1640. Dr. Collingwood admitted he "used an area wider than any of the demonstration districts," JA2083, and never justified his choice of counties. JA991; JA2512-2513. Dr. Collingwood excluded counties contained in SD1 and SD2 as well as counties within the Black Belt as Plaintiffs define it. *See* JA1639-1640. Because expert opinion must rest on a reliable method, Fed. R. Evid. 702(c), this amply justifies the district court's finding of a "result-driven analysis." JA1641.

The district court additionally found that Dr. Collingwood "was not a credible witness at trial." JA1646. The district court, for example, was also troubled by Dr. Collingwood's opinion that minority-preferred candidates were "Blocked" from office in elections they won. JA1647-1648. Moreover, the night before his direct examination, Plaintiffs' counsel served an updated version of his resume that "he personally edited." JA1646. When asked if he removed

information, Dr. Collingwood testified that "[y]ou would never do that in academia." JA1647; JA293. In fact, Dr. Collingwood removed a prominent reference to Dr. Barreto as chair of his doctoral thesis committee. JA1646; JA293-294. Dr. Barreto was discredited at the preliminary-injunction stage of this case. *See Pierce*, 97 F.4th at 212-18. When asked about this, Dr. Collingwood was "visibly nervous" and "gave a rambling answer" that the trial court found "unconvincing" and "poorly" reflective "on his credibility." JA1647. In asking the Court to make its own credibility findings, Br. 44-45, Plaintiffs disregards "the superiority of the trial judge's position to make determinations of credibility." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). Besides, Plaintiffs did not attempt to rehabilitate Dr. Collingwood's testimony regarding his resume on redirect, JA294-312, or in their post-trial filing, *see* Dist.Ct.Dkt.126. The point is forfeited.

In sharp contrast, Dr. Alford followed accepted methods to estimate the BVAP needed to win based on 2024 election results and identified 42% as the best available average, which the district court credited. JA1646. In one cryptic sentence, Plaintiffs challenge the court's admission of this analysis, Br. 43, but this "passing shot" is insufficient to preserve the point, *G.M.*, 114 F.4th at 337 n.7 (citation omitted). So too are their vague references to "flaws" with unexplained docket citations. Br. 43. The district court was "at the apex of its discretion" in relying on Dr. Alford's report and not Dr. Collingwood's. *269 Acres*, 995 F.3d at 165 n.8.

62

## CONCLUSION

The district court's judgment should be affirmed.

Even if the Court found error in the district court's ruling that is not harmless, the Court would be obligated to "remand for further proceedings to permit the trial court to make [any] missing findings." *Pullman-Standard v. Swint*, 456 U.S. 273, 291 (1982). There is no merit in Plaintiffs' request that this Court "weigh the facts itself and reach a new conclusion." *Underwood v. Bank of Am. Corp.*, 996 F.3d 1038, 1056 (10th Cir. 2021); *see* Br. 81-82.

April 20, 2026

Respectfully submitted,

/s/ *Richard B. Raile*

Phillip J. Strach
Alyssa M. Riggins
Cassie A. Holt
Jordan A. Koonts
NELSON MULLINS RILEY &
   SCARBOROUGH LLP
301 Hillsborough Street
Raleigh, North Carolina 27603
(919) 329-3800
phil.strach@nelsonmullins.com

Richard B. Raile
Katherine L. McKnight
Trevor M. Stanley
Allen J. Dickerson
BAKER & HOSTETLER LLP
1050 Connecticut Ave. N.W.,
Washington, DC 20036
(202) 861-1711
rraile@bakerlaw.com

Patrick T. Lewis
BAKER & HOSTETLER LLP
Key Tower
127 Public Square
Cleveland, Ohio 44114
(216) 861-7096
plewis@bakerlaw.com

Erika Dackin Prouty
BAKER & HOSTETLER LLP
200 Civic Center Drive, Ste. 1200
Columbus, OH 43215
(614) 462-4710
eprouty@bakerlaw.com

*Counsel for Legislative Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitations set by this Court's order extending the word count for this brief to 16,000 words because it contains 15,969 words, excluding the parts of the brief exempted by FRAP 32(f).

2.    This brief complies with the typeface and type-style requirements of FRAP 32(a)(5) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Calisto MT font.

April 20, 2026

/s/ Richard B. Raile
Richard B. Raile
BAKER & HOSTETLER LLP
1050 Connecticut Ave. N.W.
Washington, DC 20036
(202) 861-1711
rraile@bakerlaw.com

*Counsel for Legislative Defendants-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2026, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

April 20, 2026

/s/ Richard B. Raile
Richard B. Raile
BAKER & HOSTETLER LLP
1050 Connecticut Ave. N.W.
Washington, DC 20036
(202) 861-1711
rraile@bakerlaw.com

*Counsel for Legislative Defendants-Appellees*